**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

LUDLOW EXCHANGE, LLC d/b/a NOVIG,

    Plaintiff,

  - against -

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York;
ROBERT WILLIAMS, in his official capacity as
Executive Director of the New York State
Gaming Commission; BRIAN O'DWYER, in his
official capacity as Chair and Commissioner
of the New York State Gaming Commission;
PETER J. MOSCHETTI, JR., JOHN A. CROTTY,
SYLVIA B. HAMER, MARTIN J. MACK,
MARISSA SHORENSTEIN, and JERRY
SKURNIK, in their official capacities as
Commissioners of the New York State Gaming
Commission,

    Defendants.

-----------------------------------------------------------------x

Civil Action No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

ECF CASE

Plaintiff Ludlow Exchange, LLC d/b/a Novig ("Novig"), by and through its undersigned

counsel, brings this complaint for declaratory and injunctive relief against Defendants Letitia James,

Robert Williams, Brian O'Dwyer, Peter J. Moschetti, Jr., John A. Crotty, Sylvia B. Hamer, Martin J.

Mack, Marissa Shorenstein, and Jerry Skurnik, each sued in his or her official capacity (collectively,

"Defendants"), alleging as follows:

**INTRODUCTION**

1.  Novig brings this action to enjoin Defendants from enforcing New York's

preempted gambling and sports wagering laws to federally regulated transactions that Congress

placed within the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").

2.    New York has moved aggressively against federally regulated event-contract trading within its borders, suing both KalshiEX LLC and Coinbase Financial Markets, Inc. under Executive Law § 63(12) for offering the type of contracts at issue here.  Novig, having just secured its status as a Designated Contract Market ("DCM") registered by the CFTC, brings this action to prevent Defendants from doing the same to Novig.

3.    The event contracts Novig lists are a type of derivative instrument that is extensively regulated under federal law and that can be listed, traded, and settled only on federally registered exchanges.  Congress granted the CFTC "exclusive jurisdiction" over precisely such transactions, 7 U.S.C. § 2(a)(1)(A), and New York law is thus squarely preempted as applied to the event contracts Novig has launched today on its platform.

4.    Novig, Inc. was founded in 2021 with the goal of providing sports-based event contracts to customers across the United States.  Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event will occur.  To pursue that goal under federal regulation, Novig, Inc. formed Plaintiff Ludlow Exchange LLC d/b/a Novig as its wholly owned subsidiary on October 14, 2025, for the purpose of operating as a CFTC-regulated DCM.  Novig began offering these event contracts to customers located in New York today.

5.    Event contracts are quintessential "swaps" as defined by the Commodity Exchange Act ("the CEA" or "the Act") and therefore can only be traded on federally regulated exchanges that are subject to the exclusive jurisdiction of the CFTC.  Under the CFTC's supervision, event-contract markets have flourished.  These still-growing markets have become a multi-billion dollar industry as investors, market participants, and the public at large have found event contracts to be an enormously valuable tool for generating information about the likelihood of a future event taking place and hedging risks.  Billions of dollars in transaction volume have already been traded on event-contract exchanges in the United States in 2026 alone.

6.      Novig pursued and obtained the relevant federal designation in 2026.  On June 16, 2026, the CFTC designated Novig as a DCM after conducting the thorough review prescribed by the CEA.  As a DCM, Novig is subject to the CFTC's 23 "Core Principles," along with the broader CFTC regulatory framework.  7 U.S.C. § 7(d).

7.      In line with these federal obligations, Novig has built its platform to protect the participants who trade on it.  Only participants at least 21 years of age may trade, a threshold Novig applies even though federal law does not require it.  Participants may set binding daily, weekly, or monthly limits on their own trading and deposits, and may freeze trading on their accounts for periods ranging from one day to six months.  Novig enforces those elections through third-party identity screening, so that a participant cannot open a second account to evade a limit set by the participant, and Novig participates in an industry-wide program allowing participants to engage in an exclusion across multiple prediction-market platforms.  Novig also screens for prohibited traders, identifying participants who attempt to transact in markets where they hold undue influence over the outcome or have access to material non-public information.  Novig further invests significant resources in training its employees on the importance of maintaining best trading practices.

8.      New York's regulators have made their position on federally regulated event contracts quite clear.  On October 24, 2025, the New York State Gaming Commission demanded that KalshiEX LLC, a CFTC-designated contract market, cease and desist from "illegally operating, advertising, promoting, administering, managing, or otherwise making available an unlicensed mobile sports wagering platform in New York State," and reserved the right to levy civil penalties and fines.  On April 21, 2026, the Attorney General commenced an enforcement proceeding under New York Executive Law § 63(12) against Coinbase Financial Markets, Inc., a futures commission merchant registered with the CFTC, seeking restitution, disgorgement, damages, a penalty of three times the respondent's gain, and a further penalty of $100,000 for each offer of sports wagering

without a New York license.  And on July 31, 2026, the Attorney General commenced a separate

Executive Law § 63(12) proceeding against KalshiEX LLC, alleging violations of the New York

Constitution, Penal Law, Racing Law, and Wire Act, and seeking the same relief against a

respondent that has reported $178 billion in annualized transaction volume.

9.      Under Defendants' view, an event contract that references a sporting event

constitutes a wager under New York Penal Law § 225.00(2) and sports wagering under Racing Law

§ 1367(1)(x), and any entity that is offering these contracts without obtaining a state license therefore

violates applicable state law as an unlicensed sports wagering platform under Racing Law §§ 1367-

a(2)(a) and 1367-a(4)(b).

10.     The CEA forecloses this theory.  The statute's text, history, and context all show that

Congress intended to vest the CFTC with centralized authority over regulated derivatives markets

and to ensure nationwide uniformity in those markets.  Congress gave the CFTC exclusive

jurisdiction over "transactions involving swaps or contracts of sale of a commodity for future

delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7

U.S.C. § 2(a)(1)(A).  The Second Circuit has recognized that the statutory definition of a "swap" is

"broad[]," *United States* v. *Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), and event contracts comfortably

fall within this definition because they are "contract[s]" that "provide[] for any purchase, sale,

payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the

occurrence of an event or contingency associated with a potential financial, economic, or

commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

11.     Congress's preemptive intent is expressed in the statutory text.  When it created the

CFTC in 1974, Congress deleted the provision of the Act that had, until then, preserved "any State

law applicable" to futures trading, doing so, as its floor sponsor explained, "[i]n order to assure that

Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis).  The

conference report stated that the amendments would "preempt the field insofar as futures regulation is concerned" and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.). Indeed, when the House proposed a provision that would allow state law to apply to CEA-regulated transactions, the Senate agreed to its inclusion only after amending the provision to clarify that it applied "[e]xcept as *hereinabove* provided" in the grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (emphasis added); S. Rep. No. 93-1131, at 31 (1974).

12.     Despite the CFTC's exclusive jurisdiction over event contracts, Novig expects that New York will imminently bring an enforcement action against it along the same lines as the other lawsuits that Defendants have already brought against similarly situated parties. New York's threatened enforcement of its laws is preempted several times over. The only court of appeals to reach the issue has held as much. *See KalshiEX, LLC* v. *Flaherty*, 172 F.4th 220, 228–31 (3d Cir. 2026). And numerous district courts have agreed. *See United States* v. *Minnesota*, 2026 WL 2150211, at *10–12 (D. Minn. July 27, 2026) (express preemption); *KalshiEX LLC* v. *Johnson*, 2026 WL 1223373, at *6–8 (D. Ariz. May 5, 2026) (field, conflict, and impossibility preemption); *KalshiEX LLC* v. *Orgel*, 2026 WL 474869, at *7, 9–10 (M.D. Tenn. Feb. 19, 2026) (conflict preemption); *KalshiEX LLC* v. *Flaherty*, 2025 WL 1218313, at *4–6 (D.N.J. Apr. 28, 2025) (field preemption), aff'd, 172 F.4th 220 (3d Cir. 2026); *see also Blue Lake Rancheria* v. *Kalshi Inc.*, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (question of contract legality "belongs to the [CFTC]").

13.     Pursuant to the CEA's mandate, the CFTC has constructed a comprehensive regulatory regime to oversee both event-contract trading and the entities that facilitate those transactions. In March 2026, the CFTC sought public comment through an advance notice of proposed rulemaking. *See* Prediction Markets, 91 Fed. Reg. 12,516 (Mar. 16, 2026). And on June 12, 2026, the CFTC published a proposed rule that would amend 17 C.F.R. § 40.11 to define

the enumerated categories of event contracts, including "gaming," and to set out the procedures and factors governing whether a particular contract is "contrary to the public interest." *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,859–61 (June 12, 2026).  The CFTC preliminarily concluded that contracts settling on the aggregate outcomes of professional and collegiate sporting events are "unlikely to be found to be contrary to the public interest" where the exchange relies on objective settlement data and maintains appropriate surveillance and coordination with sports governing bodies.  *Id.* at 35,835–36.

14.    Novig thus seeks declaratory and injunctive relief under the Declaratory Judgment Act and the Constitution.  *See* 28 U.S.C. §§ 1651, 2201, 2202.  Federal law expressly preempts New York law, and this Court has the equitable power to enjoin Defendants from enforcing preempted state gambling laws.  *See Ex Parte Young,* 209 U.S. 123, 156–60 (1908).  But given New York's mistaken view and track record, Novig must either risk exposing the company to significant civil (and potentially even criminal) liability or refrain from offering event contracts to New Yorkers altogether.  "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'"  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007) (citation omitted).

15.    Absent this Court's relief, Novig will also incur irreparable harm in multiple ways. For starters, if Novig offers event contracts to its users in New York, Defendants could bring an enforcement action premised on the false notion that Novig is violating state gambling laws, exposing Novig to criminal liability under Penal Law §§ 225.05 and 225.10 and to the ruinous monetary relief the Attorney General now seeks from Kalshi: disgorgement, treble the respondent's gain under Penal Law § 80.10, and $100,000 for every offer of "sports wagering."  Exposure of that magnitude is existential, and New York's sovereign immunity would place it beyond recovery even

after litigation exposes the fatal flaws in Defendants' legal position.  Yet Novig is no better off if it stays out of this intensely competitive market while litigation unfolds, because it would forfeit market share and revenue it could never recoup.

16.    These irreparable harms warrant equitable relief.  Novig also easily clears the other bars for seeking a preliminary injunction.  Both the balance of the equities and the public-interest considerations augur in favor of this Court's prompt intervention in Novig's favor.

17.    Because the specter of New York enforcement is imminent and existential to Novig's business operations, Novig respectfully seeks expedited consideration of its request for a preliminary injunction.

## PARTIES

18.    Plaintiff Novig is a limited liability company organized under the laws of the State of Delaware.  Novig was formed on October 14, 2025, and is in good standing under Delaware law.  Novig is headquartered in New York, New York, and its principal place of business is 169 Madison Avenue, Suite 2199, New York, NY 10016.  Novig was organized for the purpose of operating as a DCM regulated by the CFTC, and it conducts no other business.

19.    Novig filed its application for designation as a contract market with the CFTC on December 16, 2025.  The CFTC has designated Novig as a DCM under Section 7 of the Commodity Exchange Act, 7 U.S.C. § 7.  The CFTC granted that designation on or about June 16, 2026, finding that Novig's application and demonstrations established its ability to comply with the Act and the CFTC's regulations applicable to DCMs.  The CFTC approved the application subject to the conditions that Novig comply with all representations and submissions made in support of it, that Novig comply with all provisions of the Act and the CFTC's regulations applicable to designated contract markets, and that Novig permit no futures commission merchant to intermediate transactions or carry customer accounts unless the Order of Designation is amended.

*See* In the Matter of the Application of Ludlow Exchange, LLC for Designation as a Contract Market, Order of Designation (CFTC).

20. The event contracts at issue in this action are listed, traded, and settled on Novig's federally regulated DCM. Novig's trading model is non-intermediated: contracts trade on an anonymous electronic central limit order book, are cleared on a fully collateralized basis by a derivatives clearing organization, and no futures commission merchant may intermediate any transaction or carry any customer account.

21. Defendant Letitia James is the Attorney General of the State of New York and is sued in her official capacity. The Attorney General is authorized by New York Executive Law § 63(12) to apply for an order enjoining the continuation of repeated fraudulent or illegal acts in the carrying on, conducting, or transacting of business affecting the interests of the public within New York, and to seek restitution, disgorgement, damages, injunctive relief, and costs where a person or business entity has engaged in repeated fraudulent or illegal acts or has otherwise demonstrated persistent fraud or illegality.

22. Defendant Robert Williams is the Executive Director of the New York State Gaming Commission (the "Gaming Commission") and is sued in his official capacity. Defendant Brian O'Dwyer is the Chair and a Commissioner of the Gaming Commission and is sued in his official capacity. Defendant Peter J. Moschetti, Jr. is the Vice Chair and a Commissioner of the Gaming Commission and is sued in his official capacity. Defendants John A. Crotty, Sylvia B. Hamer, Martin J. Mack, Marissa Shorenstein, and Jerry Skurnik are Commissioners of the Gaming Commission and are sued in their official capacities. Defendants Williams, O'Dwyer, Moschetti, Crotty, Hamer, Mack, Shorenstein, and Skurnik are referred to collectively as the "Gaming Commission Defendants."

23.     The Gaming Commission is the state agency that regulates legal gambling in the State of New York, and the Gaming Commission Defendants constitute, direct, and act through it. The Gaming Commission asserts general jurisdiction over all gaming activities within New York State and over the corporations, associations, and persons engaged therein, including specifically the regulation of sports wagering, pursuant to New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") §§ 104(1) and (24).  It asserts the power to levy and collect civil penalties and fines for any violation of the Racing Law pursuant to Racing Law § 104(9).  The Gaming Commission Defendants exercise those asserted powers, and it is their exercise of those powers that Novig seeks to restrain.

24.     Together, Defendants are responsible for enforcing any demand that Novig comply with the New York laws that are preempted as applied to event contracts traded on a federally designated contract market.

25.     Defendants have each exercised that enforcement authority against entities similarly situated to Novig.  *See supra* ¶8.

## JURISDICTION AND VENUE

26.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.  This action presents a federal question under the laws and Constitution of the United States because it concerns whether the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, preempts New York's gambling and sports wagering laws insofar as they purport to regulate transactions on a CFTC-designated contract market.

27.     The Court may award injunctive relief under 28 U.S.C. § 1651, and may award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

28.     The Eleventh Amendment does not bar this action.  Novig sues only state officials, in their official capacities, and names no state agency as a defendant.  "[A] state official . . . is not the

State for sovereign-immunity purposes." *Va. Off. for Prot. & Advocacy* v. *Stewart*, 563 U.S. 247, 255 (2011).  Under *Ex Parte Young*, a plaintiff may sue state officials in their official capacities for prospective declaratory and injunctive relief to stop the threatened enforcement of state law that violates federal law.  *Ex Parte Young*, 209 U.S. at 156; *Verizon Md., Inc.* v. *Pub. Serv. Comm'n*, 535 U.S. 635, 645–46 (2002); *accord KalshiEX LLC* v. *Williams*, 2026 WL 1961872, at *4 (S.D.N.Y. July 7, 2026) (permitting Kalshi's claims to proceed against the individual Gaming Commission members in their official capacities); *Orgel*, 2026 WL 474869, at *5–6 (M.D. Tenn. Feb. 19, 2026) (same as to Tennessee gaming officials).  Novig seeks precisely that relief here.

29.     This Court has personal jurisdiction over Defendants.  Defendants are domiciled in New York and perform their official duties in New York.

30.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events giving rise to Novig's claim occurred in this District and Defendants reside in the State of New York.  Novig maintains its principal place of business in this District, and the enforcement actions and demands described herein were directed at conduct occurring in this District.

## FACTUAL ALLEGATIONS

**A.     Event Contracts Are Derivative Instruments That Allow Market Participants To Hedge Risk And Generate Real-Time Information About Consequential Events.**

31.     This action concerns derivatives.  A derivative takes its value from something else— an asset, a rate, or a variable known as the underlier.  The CEA defines the "commodities" that may serve as underliers in sweeping terms so that it covers not only physical goods such as wheat, oil, and gold, but also intangibles such as financial indices, interest rates, and the occurrence or nonoccurrence of an event carrying financial, commercial, or economic significance.  *See* 7 U.S.C. § 1a(9), (19).

32.     Among the most familiar derivatives is the swap—an arrangement under which two parties exchange payments measured by the value or performance of some underlying reference, whether an interest rate, a commodity price, or a real-world contingency. *See Sec. Indus. & Fin. Mkts. Ass'n* v. *CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014).  Event contracts represent a paradigmatic subspecies of swaps because they allow market participants to take positions on whether a future occurrence will materialize.  Most are binary: every "yes" position is matched by a corresponding "no" position, and at expiration the party who read the outcome correctly is paid.

33.     Take a contract on whether the New York Knicks will win the NBA championship. Once that question resolves (whether the Knicks win the NBA Finals), the contract expires and settles accordingly.  The side representing the occurrence (*i.e.*, "Knicks win") receives the contract payout, while the side representing the nonoccurrence (*i.e.*, "Knicks do not win") receives nothing. The event contract settles with one side receiving $1 and the other side $0; the specified contingency either occurs or does not occur.

34.     These contracts can also, importantly, be traded in the market at any point before the event contract expires.  Thus, the contract's price will fluctuate as market participants trade in and out of positions, reflecting the market's real-time views regarding the probability of the underlying future event based on, among other things, new data.

35.     Take the Knicks example again.  In Game 4 of the 2026 NBA Finals, the Knicks entered as favorites on prediction markets.  As the Spurs built a commanding lead in the game, the markets flipped, and by the start of the fourth quarter, with the Spurs up 95 to 75, the Spurs were priced at around a 99 percent probability of winning the game.  Then the Knicks rallied.  OG Anunoby tipped in a missed Jalen Brunson three-pointer with 1.2 seconds remaining to complete a record 29-point comeback and a 107 to 106 win, and all the while the markets repriced accordingly.

That real-time repricing is the mechanism by which event-contract trading aggregates dispersed information about the probability of the underlying outcome.[1]

36.    Much like a company's stock price fluctuates based on the market's continual reassessment of the company's value—reflecting the public's perception of information related to the company's future earnings—event contracts likewise reflect the market's up-to-date prediction of the probability that a particular event will transpire.

37.    Event contracts, like many financial instruments, serve multiple important financial functions.  Event contracts can be a form of investment, and they can also serve as a device for mitigating risk for market participants who are already exposed in other ways to the consequences of the underlying event.  Sporting outcomes in particular carry economic weight for a wide range of participants.  That is unsurprising given that sports are a multi-billion dollar industry that ripples across the broader economy.  Advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and state-licensed sportsbooks all have financial exposure that turns on how games end.  Sports-related event contracts let those parties manage that exposure.

38.    Several examples neatly illustrate this principle.  A regional sponsor whose marketing spend is tied to a team's postseason run can offset the risk of an early exit by purchasing event contracts against the team's championship odds.  A hotel whose occupancy depends on whether the local team hosts a home playoff game can protect against that exposure by taking a position against the team's seeding.  A broadcaster whose ad revenue turns on ratings for a marquee matchup can hedge the risk that a star player is unavailable by purchasing contracts against that player's participation.  A state-licensed sportsbook, whose book concentrates exposure to a particular outcome by design, can offset that exposure on an exchange rather than absorbing it alone.  Sports

---

[1] *Knicks Championship Odds Swing from 62 to 38 to 82 Percent in Game 4 Thriller*, RealGM (June 11, 2026), https://basketball.realgm.com/wiretap/286022/Knicks-Championship-Odds-Swing-From-62-To-38-To-82-Percent-In-Game-4-Thriller.

event contracts, in other words, allow market participants to isolate and efficiently price the risk of a single economically consequential occurrence.

39.     Beyond hedging, these markets generate valuable information, often in real time. Market participants often research the underlying event's probability before taking a position, thus their trades may provide valuable information to the public. The depth and breadth of participation also improves the quality of information. Liquidity is therefore critical to price discovery because it allows market participants to move in and out of their positions efficiently. The public benefits from the wisdom of the crowd if the event contract's market is liquid and includes the most well-informed traders.

40.     Congress also recognized the twin roles that derivatives play in the national economy by declaring that derivative transactions "are affected with a national public interest by providing" both a means of hedging risk and a mechanism for "disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

41.     Prediction markets have become an increasingly important part of the financial landscape. Prices from CFTC-registered exchanges now appear on major financial data platforms alongside conventional asset prices, and news organizations cite them as measures of public expectation. Reporters watch them as a live gauge of investor expectations ahead of every Federal Open Market Committee meeting, comparing their probabilities to Fed funds futures. In the 2025 New York City mayoral race, event contracts repriced repeatedly as new information came out, with Zohran Mamdani's win probability rising from roughly 18 percent to 53 percent after new polling, swinging between 41 and 58 percent on election day, briefly yielding the lead to Andrew Cuomo, and then jumping to 99 percent later that night after projections.[2] In the 2026 California

---

[2] Chris Gerlacher, *NYC Mayoral Race Tests Prediction Market Reliability*, Prediction News (June 24, 2025), https://predictionnews.com/news/nyc-mayoral-race-tests-prediction-market-reliability.

gubernatorial race, Eric Swalwell's withdrawal immediately elevated Tom Steyer to roughly a 55 percent favorite.[3]  And in the entertainment context, more than $200 million traded on prediction-market Oscars contracts that repriced after each awards-season milestone.[4]

### B.    Congress Granted The CFTC Exclusive Jurisdiction Over Derivatives Traded On Federally Designated Exchanges, Including Swaps.

42.    Federal supervision of derivatives spans more than a century.  Before 1922, these instruments commanded little judicial respect.  One court dismissed futures trading as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and the Supreme Court described futures contracts as "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508–09 (1884).  Numerous States passed laws to suppress or restrict futures trading of commodities.

43.    That view did not hold.  Over time, as markets matured and the economic value of derivatives became more apparent, courts and commentators came to recognize these instruments as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of City of Chi.* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905).  Congress followed suit by first centralizing futures trading on federally approved contract markets in the Grain Futures Act of 1922, ch. 369, 42 Stat. 998, 1000–02 (1922) ("Grain Futures Act"), and then broadening federal supervision of derivatives exchanges in the CEA fourteen years later, Pub. L. No. 74-675, 49 Stat. 1491 (1936).

44.    As first enacted, the CEA left "any State law applicable" to covered transactions undisturbed. *Id.*  That changed in 1974.  Congress created the CFTC to administer the statute and

---

[3] *See* Bryan Metzger, *This Billionaire Is the Odds-on Favorite to Become California's Governor After Swalwell Dropped Out*, Bus. Insider (Apr. 13, 2026), https://www.businessinsider.com/kalshi-polymarket-billionaire-tom-steyer-california-governor-eric-swalwell-2026-4.

[4] Mike Breen, *Kalshi and Polymarket Generate Over $200M on Oscars, Calling 19 of 24 Winners*, DeFi Rate (Mar. 16, 2026), https://defirate.com/news/over-200m-traded-on-oscars-kalshi-polymarket.

vested it with "exclusive jurisdiction" over transactions in derivatives listed and traded on federally registered exchanges.  7 U.S.C. § 2(a)(1)(A).

45.    Congress left no doubt about what it was doing.  Alongside the grant of exclusive jurisdiction, it struck the clause that had preserved "any State law applicable" to futures trading.  *See* H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.); 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis) (proposing the deletion "[i]n order to assure that Federal preemption is complete").  When the House floated language that would have let state law reach CEA-regulated transactions, the Senate accepted only after amending the provision to clarify that it applied "[e]xcept as hereinabove provided"—that is, subject to the exclusive-jurisdiction grant.  *See* 7 U.S.C. § 2(a)(1)(A); S. Rep. No. 93-1131, at 31 (1974).  Preemption was a central goal of this legislation.  As one commentator put it, preemption "was a central issue in the proceedings which culminated in the 1974 amendments to the CEA."  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692 (1982) (emphasis omitted).

46.    The concern driving that choice was practical.  Congress recognized the obvious point that a national market cannot function under fifty regulators.  As one Senator put it, regulation under "different State laws would just lead to total chaos."  Commodity Futures Trading Comm'n Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113, 93d Cong. 685 (1974) (statement of Sen. Clark).  The House Committee on Agriculture sought to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 79 (1974).  The conference report was explicit that the amendments would "*preempt the field* insofar as futures regulation is concerned," and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States."  H.R. Rep. No. 93-1383, at 35–36 (1974) (emphasis added).

47.    Congress simultaneously widened the statutory definition of "commodity" to encompass "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The purpose was to capture "futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 79 (1974); *see Effex Cap., LLC* v. *Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019).

48.    In 2010, Congress further broadened the CFTC's exclusive jurisdiction to cover swaps. The CFTC's exclusive jurisdiction now reaches "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). The amendment placed swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures," and supplied an "explicit congressional mandate to carry out regulation of the swap markets under federal law free from potential state interference." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3, 13 (2019).

49.    This statutory history extends in one direction. Congress has legislated three times in this area, and each time, it has decided to enlarge the federal role such that it has become "abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 44–45 (1974).

50.    The accompanying definition of "swap" is correspondingly broad, covering any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Courts have taken that language at face value. The Second Circuit has observed that the CEA "define[s] 'swap' broadly," *Phillips*, 155 F.4th at 113, and Congress wrote the definition to

capture instruments that "in the future become[] commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv).

51.    Two narrow carveouts accompany the grant of exclusive jurisdiction, and neither is implicated here.  One preserves the authority of the Securities and Exchange Commission and other federal agencies over instruments within their statutory mandate.  *See* 7 U.S.C. § 2(a)(1).  The other leaves the States room to apply generally applicable laws to off-exchange transactions—those not conducted on a DCM—and to unregistered entities.  7 U.S.C. § 16(e)(1); *see* H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (States may regulate "transactions outside those preserved exclusively for the jurisdiction of the CFTC").

52.    Novig is registered as a DCM, and its contracts trade on an exchange.  It is a contract market designated by the CFTC, and the transactions at issue occur on that market.  The off-exchange carveout therefore has no application, and no other federal agency claims these instruments.

**C.    The CFTC Comprehensively Regulates Designated Contract Markets And The Event Contracts They List.**

53.    Derivatives may be offered to the public only on a CFTC-approved DCM.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

54.    Such approval does not come easy.  An applicant must document its compliance with the 23 Core Principles set forth in the CEA.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a)(2).  An applicant must also show that it will observe the Commission's rules; that it will adopt, monitor, and enforce its own rules; that the contracts it lists are not readily susceptible to manipulation; that it has both the capability and the obligation to detect and prevent manipulation, price distortion, and disruption through surveillance, compliance, and enforcement; and that it will impose position limits to constrain manipulation risk.  17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

55.     The obligations do not end at designation.  A DCM must assume "a duty of self-regulation, subject to the Commission's oversight," and also is required to "enact and enforce rules to ensure fair and orderly trading."  *Am. Agric. Movement, Inc.* v. *Bd. of Trade*, 977 F.2d 1147, 1150–51 (7th Cir. 1992).  A slew of other CFTC regulations govern in painstaking detail various other parts of the entity's operations, from recordkeeping and daily market-data reporting to the public disclosure of certain contract terms and rules and other requirements relating to liquidity, dispute resolution, governance, and auditing.  To give one illustrative example, a DCM must extend "impartial access to its markets and services" to every person holding trading privileges.  17 C.F.R. § 38.151(b).  An entity may lose its designation if it is found in noncompliance with these regulations.

56.     A DCM has two routes to listing a new contract.  It may certify in writing, no later than the business day preceding listing, that the contract conforms to the CEA and the CFTC's rules, 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a); or it may seek the CFTC's approval beforehand, 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c).  Under the latter route, the CFTC must "approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or its regulations.  7 U.S.C. § 7a-2(c)(5)(B).

57.     An entity cannot avoid oversight through certification.  The Commission has a 10-day window to "stay[] the certification" for additional review.  7 U.S.C. § 7a-2(c)(3).  If the Commission does not act within this period, the new contract is deemed approved.  *Id.* § 7a-2(c)(2).

58.     Congress also legislated specifically with respect to event contracts.  Under the special rule adopted in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), the CFTC may find an event contract "contrary to the public interest" where it "involves" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule.  7 U.S.C. § 7a-2(c)(5)(C)(i) ("the Special Rule").  The CFTC has long taken the position that the Special Rule

operates as a "discretionary review framework rather than a self-executing per se prohibition" and that the Special Rule "does not authorize the CFTC to impose a per se prohibition" on the listing of such event contracts independent of a public interest determination. 91 Fed. Reg. at 35,815, 35,811, 35,813; *see* 17 C.F.R. § 40.11(a)(1)–(2).

59. Two consequences follow from Congress's decision to give the Commission such authority. The first is that event contracts touching on gaming—which include sports-based event contracts—are within the Commission's exclusive jurisdiction. A grant of power to review them after all presupposes as much. The second is that Congress opted for a regime of individualized, contract-by-contract analysis rather than the use of categorical, blanket prohibitions.

60. The CFTC is also equipped with the full panoply of tools necessary to conduct this analysis and ensure regulatory compliance across the industry. The CFTC has the authority to bring actions in federal court or before administrative tribunals, and it is empowered to seek a range of remedies including civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and suspension, denial, revocation, or restriction of registration and trading privileges. The CFTC may also refer matters to the Department of Justice or state authorities if it finds evidence of criminal conduct. CFTC, Div. of Enf't, Enforcement Manual § 3.3 (2020).

61. In sum, federal law thus reaches every stage of an event-contract transaction. The CFTC prescribes the procedures by which a contract may be listed and retains authority to review, stay, and prohibit it; designates and supervises the exchange that lists it; and polices the trading that follows.

62. The CFTC has said as much itself. In an official statement less than two months ago, the Commission explained that it has "clear and longstanding exclusive jurisdiction to regulate event contracts and the prediction markets on which they trade under the Commodity Exchange Act, which preempts state laws purporting to regulate designated contract markets." Press Release,

Commodity Futures Trading Comm'n, Release No. 9251-26, *CFTC Sues New Mexico as the State*

*Becomes the Latest Attempting to Infringe on Federal Jurisdiction* (June 12, 2026).

> **D.     Novig Sought To Operate Under State Licensing Regimes, Found Them Structurally Incompatible With An Exchange, And Obtained Federal Designation.**

63.     Novig, Inc. was founded in 2021 by Jacob Fortinsky and Kelechi Ukah and was incorporated in Delaware on March 3, 2021.

64.     Novig, Inc.'s founders conceived the company after observing that established sportsbooks routinely limited or banned customers who won too often, treating a successful bettor, in the words of its chief executive, "the same way a casino treats a card counter." The company sought to eliminate that practice. Its exchange structure removes what the company describes as "unfair odds and punitive limits on winning traders," and produces prices driven by real-time supply and demand rather than by bookmaker discretion.

65.     Indeed, the Novig name is a homage to the key distinctions between event-contract platforms and sportsbooks. Traditional sportsbooks make money by adjusting the odds so that they include a commission for the sportsbook to cover the costs of facilitating the wager. This commission is called "vigorish" or "vig" in the language of sportsbooks. The Novig name reflects a business model in which the company does not charge a "vig."

66.     Novig, Inc. did not begin by seeking federal designation. It first attempted to operate within precisely the state licensing framework that Defendants now seek to enforce against Novig. On September 21, 2023, the State of Colorado Department of Revenue, Division of Gaming approved an Internet Sports Betting Operator license for Novig Laboratories, LLC d/b/a Novig, and the company launched its product in that State in October 2023.

67.     Colorado's regulations recognized exchange wagering as a form of sports wagering, defining "exchange wagers" as "a form of wagering in which two or more persons place identically

opposing wagers in a given market, allowing patrons to wager on both winning and non-winning outcomes in the same event." Sports Betting Regulation 1.4(8), 1 C.C.R. 207-2. Yet in 2023 the Commission declined to adopt proposed rules for exchange wagering. Novig, Inc. sought their adoption through the process the State provided. It participated in at least two stakeholder meetings, and on December 13, 2023 formally requested that the Commission "prioritize the passage of exchange wagering regulations," stating that it was "fully prepared to comply with any additional regulations or guidelines" the State might set. The company thereafter proposed a modified feature and met with the Division of Gaming to explain this feature. On February 9, 2024, the Division determined that the proposed feature would constitute exchange wagering and advised the company to "wait until appropriate proposed rules are not only voted on by the Commission but, if applicable, go into effect."

68.    That effort demonstrated why a state-by-state licensing model is structurally incompatible with an event-contract exchange. The traditional framework was designed for sportsbooks—operators that act as counterparties to every wager, set their own prices, and earn revenue from the spread between those prices and true probability. An exchange earns no vig and takes no position. It depends instead on liquidity: a trade can occur only if a buyer and a seller can be matched at the same price. Confining an exchange's participants within a single State's borders deprives it of the counterparties that make the market function at all. Novig, Inc. encountered further difficulty with other state regulators. Regulators are often incentivized to protect incumbent operators over a lower-margin product like Novig's that would reduce state tax revenue. A licensing regime calibrated to the economics of the house does not readily accommodate a market with no house.

69.    In April 2024, Novig, Inc. withdrew from the Colorado market. It thereafter remitted unpaid patron funds to the Colorado Treasury and, in March 2025, submitted its request to

surrender the license and withdraw its associated persons, which the Division of Gaming confirmed it would process.  In September 2024, the company launched a freemium and sweepstakes offering under which participants transact in one of two virtual currencies ("Novig Coins" or "Novig Cash") rather than wagering cash directly, with no purchase ever required.  Novig Coins are a freemium currency used only for free play, with no real-world value and no redemption; every participant can receive 500 free Coins whenever the participant's balance falls below 100.  Novig Cash is a sweepstakes-entry currency that a participant can accumulate through gameplay, referrals, daily login rewards, no-cost giveaways, a free mail-in Alternative Method of Entry, or as a bonus attached to marked Coin purchases; Novig Cash cannot be purchased directly.

70.    Trading proceeds identically in either currency.  A participant selects Coins or Cash on the Order Slip and places an order to buy contracts that settle to one cent apiece if the corresponding outcome occurs, with orders matched against the platform's internal market maker or against other participants' orders.  Only Novig Cash won through gameplay may be redeemed for real money, and only after the participant clears a playthrough requirement, completes Know-Your-Customer verification, and satisfies the eligibility rules set out in the Sweepstakes Rules, which do not currently permit full sweepstakes redemption for participants located in New York.  Novig, Inc. has continued to operate this offering under state oversight while pursuing and obtaining the federal designation appropriate to the exchange product it has built.

71.    Novig, Inc.'s founders were familiar with prediction markets from the company's earliest days and came to view that model as the better fit for Novig's product. Novig did not initially pursue federal designation because, in the regulatory environment then prevailing, it anticipated that federal approval could take years and offered no assurance that sports-related event contracts would be permitted. Novig therefore first pursued state-by-state licensing, securing a

Colorado license in October 2023, before returning that license in April 2024 and later pursuing a federally regulated prediction-market model.

72.     Novig, Inc. formed Plaintiff Ludlow Exchange LLC d/b/a Novig or "Novig" on October 14, 2025 to pursue that path.  Novig applied to the CFTC for designation as a contract market pursuant to Section 5(a) of the CEA, 7 U.S.C. § 7(a), and Commission regulation 38.3(a), 17 C.F.R. § 38.3(a).  Novig's application comprised submissions dated January 1, 2026 through June 10, 2026, and included Novig's Certificate of Formation, its Amended and Restated Operating Agreement, its Certificate of Good Standing, its Rulebook, and a narrative demonstrating Novig's compliance with each of the core principles applicable to designated contract markets.

73.     On June 16, 2026, the CFTC granted that designation, placing Novig within the same regulatory architecture that governs futures and derivatives exchanges generally.  Commission staff reviewed Novig's application, including its rules and the representations Novig made, and conducted a technical evaluation of Novig's operational capabilities to evaluate its compliance with the core principles and corresponding Commission regulations applicable to DCMs under Section 5(d) of the Act, 7 U.S.C. § 7(d), and Commission regulations 38.100–38.1201.  The Commission found that Novig's application and demonstrations established its ability to comply with the Act and the Commission's regulations applicable to DCMs, and provided sufficient assurance that Novig would continue to comply.  It is the same designation the CFTC conferred on KalshiEX LLC in 2020.

74.     Novig is therefore not an intermediary that routes customer orders to an exchange operated by another entity.  Novig is itself the federally regulated exchange.  Every contract at issue in this action is listed, traded, and settled on a contract market designated by the CFTC under Section 7 of the CEA.  Novig is responsible for ensuring compliant surveillance, using systems and tools that monitor Exchange activity in real time and on a trade-date-plus-one basis, and for

enforcing its trading rules. Novig is likewise responsible for compliant regulatory reporting and recordkeeping, investigations, disciplinary actions, and establishing rules to resolve disputes involving its market participants.

75. Novig's designation reflects a federal judgment about how these instruments are to be regulated. The CFTC does not regulate casinos or sportsbooks. It regulates markets. In designating Novig, the CFTC found that Novig complied with the statutory and regulatory requirements governing federally designated derivatives markets—the same determination that subjects Novig to comprehensive federal oversight, and the same determination that Defendants' threatened enforcement would nullify.

76. Novig's regulatory history is thus the opposite of evasion. Novig, Inc. sought a state license, obtained one, and complied with it. It relinquished that license only after concluding that the state framework could not accommodate an exchange model, and it thereafter obtained federal designation through the process Congress established for exactly this category of instrument. Defendants now seek to apply to Novig the very state licensing regime that the company tested, found structurally unworkable for an exchange, and lawfully exited.

**E.    New York Has Applied Its Gambling And Sports Wagering Laws To Federally Designated Contract Markets And Has Commenced Enforcement Against A Federally Registered Intermediary.**

77. The New York Constitution provides that "no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling" shall "be authorized or allowed within this state," subject to enumerated exceptions for lotteries operated by the State, pari-mutuel betting on horse races, and casino gambling at no more than seven facilities. N.Y. CONST. art, I, § 9. The same provision directs the legislature to "pass appropriate laws to prevent offenses against any of the provisions of this section."

78.     New York's Penal Law defines gambling as occurring when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." Penal Law § 225.00(2). The Penal Law criminalizes promoting gambling, *id.* §§ 225.05, 225.10, and possessing gambling records, *id.* §§ 225.15, 225.20.

79.     In 2021, following the decision in *Murphy* v. *NCAA*, 584 U.S. 453 (2018), New York enacted a licensing regime for mobile sports wagering. *See* Racing Law §§ 1367, 1367-a. Sports wagering may be conducted, advertised, or promoted in New York only by entities licensed by the Gaming Commission, and the Commission has licensed nine mobile sports wagering operators. Racing Law § 1367-a(4)(b) provides that "[n]o entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." Racing Law § 1367-a(2)(a) provides that "[n]o entity shall administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission pursuant to this section." The Racing Law defines a "mobile sports wagering platform" as the combination of hardware, software, and data networks used to manage, administer, or control sports wagering accessible by electronic means. Racing Law § 1367(1)(k).

80.     On October 24, 2025, the Gaming Commission, through Defendant Williams, issued a cease-and-desist demand to KalshiEX LLC, a contract market designated by the CFTC since 2020. The letter demanded that Kalshi "cease and desist from illegally operating, advertising, promoting, administering, managing, or otherwise making available an unlicensed mobile sports wagering platform in New York State in connection with any sports event." The letter enumerated twenty categories of Kalshi's contracts by reference to Kalshi's filings with the CFTC, including "Will <team> win <event>?" contracts and contracts on individual player statistics.

81.     The Gaming Commission asserted that the activity described on Kalshi's website and in its filings with the CFTC "is offering sports wagering gambling opportunities to Kalshi customers within the meaning of Penal Law § 225.00(2)," and that Kalshi's federally self-certified contracts "are sports wagering within the meaning of New York law when they concern sports events within the meaning of Racing Law section 1367(1)(t)." The Gaming Commission reserved "all rights to investigate further and to levy and collect civil penalties and fines in connection with Kalshi's prior, current, and any future activity related to sports wagering and/or mobile sports wagering in New York."

82.     On October 27, 2025, Kalshi commenced an action in this District against the Gaming Commission and its Executive Director and Commissioners, including the Gaming Commission Defendants named here, seeking declaratory and injunctive relief on the ground that the CEA preempts New York's gambling and sports wagering laws as applied to event contracts traded on a designated contract market. *See* Complaint, *KalshiEX LLC* v. *Williams*, No. 1:25-cv-08846 (S.D.N.Y. July 13, 2026), Dkt. No. 1. Kalshi filed an amended complaint on October 28, 2025.

83.     On April 21, 2026, the Attorney General, through Defendant James, commenced an enforcement proceeding under Executive Law § 63(12) against Coinbase Financial Markets, Inc., a futures commission merchant registered with the CFTC, in the Supreme Court of the State of New York, County of New York. *See People* v. *Coinbase Fin. Mkts., Inc.*, Index No. 451604/2026 (N.Y. Sup. Ct. Apr. 21, 2026). The Attorney General alleged eight causes of action, predicated on Article I, Section 9 of the New York Constitution; Penal Law §§ 225.05, 225.10, and 225.20; Racing Law §§ 1367(16)(a), 1367-a(2)(a), and 1367-a(4)(b); and the federal Interstate Wire Act, 18 U.S.C. § 1084(a).

84.     The relief the Attorney General seeks in that proceeding is severe. It includes a permanent injunction against operating without a Gaming Commission license, an accounting

identifying each customer and *itemizing* bets placed, full restitution to customers, damages, disgorgement, a penalty of three times the respondent's gain under Penal Law § 80.10, a penalty of $100,000 for each offer or attempted offer of sports wagering or mobile sports wagering in New York without authorization under Racing Law § 1367(16)(a), prejudgment interest, costs under CPLR § 8303(a)(6), and leave to docket the resulting award as a money judgment under CPLR § 2222.

85.    Defendants' legal theory turns on no fact peculiar to Kalshi or to Coinbase. The theory is that an event contract referencing a sporting event constitutes gambling under Penal Law § 225.00(2) and sports wagering under Racing Law § 1367(1)(x), and that the entity making it available operates an *unlicensed* sports wagering platform under Racing Law §§ 1367-a(2)(a) and 1367-a(4)(b), irrespective of the CFTC's designation of the exchange or the CFTC's treatment of the contract. The Attorney General has pressed that theory further still, treating the offering of contracts on events involving New York college teams, and the acceptance of participants between the ages of eighteen and twenty-one, as independent components of the violation under Racing Law §§ 1367(1)(j), 1367(1)(s), 1367-a(4)(a)(iii), 1367-a(4)(a)(xi), 1367-a(4)(c), and 1367-a(4)(d). That theory applies to Novig with the same force with which Defendants have applied it to a designated contract market and to a federally registered intermediary.

86.    Compliance with Defendants' demands is not a practical alternative for Novig. If Novig obtained a New York *mobile* sports wagering license—assuming one were available to it— Novig would be required to confine its service to persons physically located within New York and to route wagers through equipment at a licensed New York casino. *See* Racing Law §§ 1367(2)(d), 1367-a(2)(d), 1367-a(4)(a)(ii). If Novig were required to obtain comparable licenses in other States, each would impose comparable geographic limitations. Such geographic partitioning would deprive Novig's markets of the liquidity on which they depend, because an event contract can be executed

only if a buyer and a seller can be matched at the same price. It would also frustrate the public interest Congress sought to advance in creating a federally regulated national market. Prediction markets aggregate dispersed information most accurately when they are broad, liquid, and open to participants across the country; the wider the pool of informed participants, the more reliably prices track the probability of the underlying event. Carving the market into fifty walled-off state exchanges would thin liquidity, degrade price discovery, and undermine the very informational value Congress recognized in declaring derivatives transactions "affected with a national public interest by providing" a means "for . . . disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Limiting the geographic scope of customers limits the efficacy of the market in ways Congress did not intend.

87.     Novig therefore confronts the choice that Defendants' position forces upon every federally designated exchange: *abandon* a federally authorized market in New York, or proceed and face civil penalties, criminal exposure, and an enforcement proceeding of the kind the Attorney General has already commenced against a federally registered intermediary. Novig has no option but to seek judicial relief. Absent it, Novig faces the prospect of civil penalties and criminal enforcement in New York from the date it begins offering the contracts its federal designation authorizes.

## CLAIM FOR RELIEF

### COUNT I
### United States Constitution
### (Supremacy Clause—Preemption by the Commodity Exchange Act)
### U.S. Const. art. VI, cl. 2

88.     Novig repeats and incorporates by reference each of the allegations set forth above.

89.     The Supremacy Clause provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art.

VI, cl. 2. Federal law accordingly "is supreme in case of a conflict with state law." *Murphy*, 584 U.S. at 477.

90. "[S]tate laws that 'interfere with, or are contrary to the laws of congress . . .' are invalid." *Wis. Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). A preempted state law is "without effect." *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981); *see Perez* v. *Campbell*, 402 U.S. 637, 652 (1971).

91. Federal law may preempt state law expressly or by implication. *See Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000). In this Circuit, courts recognize

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where 'Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*N.Y. SMSA Ltd. P'ship* v. *Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (quoting *Wachovia Bank, N.A.* v. *Burke*, 414 F.3d 305, 313 (2d Cir. 2005)). The categories "are not 'rigidly distinct.'" *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (quoting *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990)).

92. The "ultimate touchstone" of the inquiry is congressional intent. *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978)).

93. Under any and all of these frameworks, the New York laws Defendants have invoked are preempted to the extent Defendants seek to enforce them against Novig for listing, trading, and settling event contracts on a federally designated contract market. Those laws are Article I, Section 9 of the New York Constitution; New York Penal Law §§ 225.00, 225.05, 225.10, 225.15, and 225.20, together with the penalty provision of Penal Law § 80.10; Racing Law §§ 104(1), 104(9), and 104(24); Racing Law §§ 1367 and 1367-a, including §§ 1367(1)(j), 1367(1)(k), 1367(1)(s), 1367(1)(t), 1367(1)(x), 1367(2)(a), 1367(2)(d), 1367(16)(a), 1367-a(2)(a), 1367-a(2)(d), 1367-a(4)(a),

1367-a(4)(b), 1367-a(4)(c), 1367-a(4)(d), and 1367-a(4)(e); the regulations adopted thereunder at 9 N.Y. Comp. Codes R. & Regs. tit. 9 §§ 5300.1 through 5330.45; and Executive Law § 63(12). Executive Law § 63(12) is preempted as applied to those transactions no matter which predicate of illegality Defendants invoke through it, because the CFTC's jurisdiction over transactions on a designated contract market is exclusive and a State may not acquire authority over those transactions by borrowing a predicate from another source.

94.     The Act grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A).

95.     A "swap" includes any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

96.     The event contracts Novig has listed and proposes to list satisfy each element of that definition.  Each is an agreement providing for payment.  Each payment depends on the occurrence, nonoccurrence, or extent of the occurrence of a defined event—the final score, margin, win-loss result, tournament advancement, or statistical performance in a professional or collegiate sporting event.  And each such event is associated with potential financial, economic, or commercial consequences.  Novig does not contend that every conceivable event contract satisfies the definition, and the analysis that follows is directed to the contracts at issue here.

97.     The statutory definition of "swap" is deliberately broad, and the Second Circuit has so stated. *See Phillips*, 155 F.4th at 113.  Congress extended the definition to reach instruments that "in the future become[] commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), and

delegated to the CFTC and the Securities and Exchange Commission the authority to "further define" the term, 15 U.S.C. § 8302(d)(1).  Congress did not delegate that task to fifty state gaming regulators.

98.    The events underlying Novig's contracts sit at the core of the definition. Professional and collegiate sporting outcomes bear on advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and the institutional investors who hold equity in franchises and media rights.  They bear as well on state-licensed sportsbooks, whose exposure to those outcomes is concentrated by design and who could use exchange-traded contracts to hedge it. The CFTC has reached the same conclusion, explaining that event contracts settling on the aggregate outcomes of professional or collegiate sporting events, supported by objective settlement data and an established sport-level integrity framework, are "unlikely to be found to be contrary to the public interest." 91 Fed. Reg. at 35,835–36, 35,870.

99.    Swap status does not turn on the subject matter of the underlying event.  Congress carved out precisely two underliers from the CEA's reach—onions and motion picture box office receipts.  7 U.S.C. § 1a(9).  Sporting events are not among them, and the enumeration of two forecloses invention of a third.  *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (the express inclusion of one item implies the exclusion of another left unmentioned).

100.    Because the event contracts at issue are swaps traded on a contract market designated under Section 7, they fall within the CFTC's exclusive jurisdiction.  7 U.S.C. § 2(a)(1)(A).

101.    Congress supplied the preemptive language itself.  A grant of "exclusive" jurisdiction excludes others by its terms.  Applying ordinary usage, the District of Minnesota concluded that "exclusive" describes something "independent from or not shared by others," and that the words together "reflect congressional intent to give the CFTC the power over transactions in swaps that is independent from or not shared by other authorities." *Minnesota*, 2026 WL 2150211, at *10.  Usage

at the time of enactment was no different: "exclusive" meant "[s]hutting out; debarring from interference or participation; vested in one [entity] alone," and "exclusive jurisdiction" meant "power . . . over a[n entity] to the exclusion of all other[s]." Exclusive; Exclusive Jurisdiction, Black's Law Dictionary (5th ed. 1979).

102. The Supreme Court has confirmed that the "plain meaning" of a grant of "exclusive" jurisdiction "necessarily denies jurisdiction" to any other body. *Mississippi* v. *Louisiana*, 506 U.S. 73, 77–78 (1992).

103. Where "Congress has made its [preemptive] intent known through explicit statutory language," *English*, 496 U.S. at 79, courts give effect to the statute's "plain wording," *In re WTC Disaster Site*, 414 F.3d 352, 372 (2d Cir. 2005).

104. Federal courts have read comparable grants of exclusive jurisdiction to displace state authority over the same subject. *See Transcon. Gas Pipe Line Co.* v. *Pa. Env't Hearing Bd.*, 108 F.4th 144, 151–52 (3d Cir. 2024) (the "explicit statutory conferral of exclusive jurisdiction" is "a form of express preemption"); *Slaney* v. *Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 594–95 (7th Cir. 2001). The Seventh Circuit has described the CFTC as "the sole lawful regulator" where "its jurisdiction is exclusive." *Chicago Mercantile Exch.* v. *SEC*, 883 F.2d 537, 548 (7th Cir. 1989). The Sixth Circuit has explained that "the thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation." *Curran* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982).

105. Neither savings clause in § 2(a)(1)(A) disturbs the exclusive-jurisdiction grant. The first is subordinated in its own text: "[e]xcept as hereinabove provided," nothing in the section supersedes or limits the jurisdiction of other federal or state regulatory authorities. 7 U.S.C. § 2(a)(1)(A). What "hereinabove" precedes it is the grant of exclusive jurisdiction, and that grant

controls.  The second savings clause preserves the jurisdiction of courts, not of state gaming regulators.  The Third Circuit has read the two clauses the same way, holding that the "prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction," and that the "second carveout preserves jurisdiction for state courts in common-law actions but does not contravene the grant of CFTC's exclusive jurisdiction."  *Flaherty*, 172 F.4th at 230–31; *accord Minnesota*, 2026 WL 2150211, at *11.  And the preservation of state common-law actions carries no implication that Congress left room for state regulatory authority over on-exchange trading; the courts of appeals have long held the opposite.  *See Kerr* v. *First Commodity Corp. of Bos.*, 735 F.2d 281, 288 (8th Cir. 1984); *Kotz* v. *Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir. 1982) ("Congress clearly intended to create a single agency to regulate the field [of futures trading].").  The carveouts and the exclusive grant operate together, and both point to preemption.

106.    The Act's other provisions confirm rather than defeat preemption.  Section 16(e)(1) preserves state authority over transactions "not conducted on or subject to the rules of a registered entity."  7 U.S.C. § 16(e)(1)(B)(i).  DCMs are registered entities.  7 U.S.C. § 1a(40)(A).  As the Third Circuit put it, "here, registered entities include DCMs, so that limiting principle does not apply." *Flaherty*, 172 F.4th at 229.  Congress addressed state enforcement directly as well.  Section 13a-2(1) authorizes state officials to sue over conduct violating the Act or the CFTC's rules, but withholds that authority as to federally registered entities.  7 U.S.C. § 13a-2(1).  Congress thus calibrated the role of state officials with respect to this industry rather than leaving it at large, and the role it assigned them does not extend to the exchanges the CFTC designates.

107.    Novig is not an unregistered entity operating off-exchange. It is designated by the CFTC, supervised by the CFTC, and subject to suspension or revocation of its designation by the CFTC.  *See* 7 U.S.C. § 8(b).

108.    Field preemption applies where Congress enacts a "scheme of federal regulation . . . so pervasive . . . that [it] left no room for the States to supplement it," or where a "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

109.    The analysis begins by identifying the field. *See Kansas* v. *Garcia*, 589 U.S. 191, 208 (2020).  Courts must take care not to define it "too broadly." *Sikkelee* v. *Precision Airmotive Corp.*, 822 F.3d 680, 689 (3d Cir. 2016).

110.    The field here is not gambling.  It is the regulation of trading on federally designated contract markets—the discrete activity over which Congress conferred exclusive jurisdiction.  The Court of Appeals for the Third Circuit so held: "the District Court properly defined the scope of field preemption as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)." *Flaherty*, 172 F.4th at 229.  The preempted field is accordingly "the regulation of trading in swaps on CFTC-registered DCMs, the area over which Congress granted the CFTC exclusive jurisdiction," and field preemption extends to the "specific area" the federal scheme occupies. *Johnson*, 2026 WL 1223373, at *7 (quoting *Martin ex rel. Heckman* v. *Midwest Express Holdings, Inc.*, 555 F.3d 806, 809 (9th Cir. 2009)).

111.    Congress has occupied that field completely.  The Act and the CFTC's regulations govern who may operate a designated contract market, the standards for obtaining and retaining designation, the contracts that may be listed and the procedures for listing them, the conduct of trading, the exchange's surveillance and enforcement duties, its recordkeeping and reporting obligations, its governance, its treatment of participants, and the consequences of noncompliance. *See* 7 U.S.C. §§ 2(e), 6(a)(1), 7, 7a-2, 8(b); 17 C.F.R. pt. 38; 17 C.F.R. pt. 40.

112.    Courts construing § 2(a)(1)(A) have long held that the Act preempts state law regulating futures trading on a federally regulated exchange. *See Leist* v. *Simplot*, 638 F.2d 283, 322

(2d Cir. 1980) (Friendly, J.) ("§ 2(a)(1) of the CEA preempts the application of state law."); *Am. Agric. Movement, Inc.*, 977 F.2d at 1156–57; *F.T.C.* v. *Ken Roberts Co.*, 276 F.3d 583, 591–92 (D.C. Cir. 2001); *Kelly* v. *Carr*, 691 F.2d 800, 803 (6th Cir. 1980). The principle has been applied to state gambling law specifically. In *Paine, Webber, Jackson & Curtis, Inc.* v. *Conaway*, the court held the CEA preempted a state gambling statute that would have voided futures contracts, observing that "there unquestionably is a federal interest in whether a state brands commodity transactions as 'gambling' and effectively bars those transactions on federally regulated exchanges." 515 F. Supp. 202, 204–07 (N.D. Ala. 1981).

113.    That principle has now been applied to these precise instruments. *See Flaherty*, 172 F.4th at 229; *Johnson*, 2026 WL 1223373, at *6 ("The CEA occupies the field of swaps and futures traded on DCMs.").

114.    Congress's own history confirms the point. The Act was amended in 1974 "out of express concern that state-by-state regulation would fracture a national market," and "[e]very time Congress has revisited the federal-state allocation of authority in this area, it has chosen to expand federal control." *Johnson*, 2026 WL 1223373, at *6–7.

115.    The presumption against preemption does not apply here. The federal government has regulated derivatives markets continuously since 1922, *see generally Bd. of Trade of Chi.* v. *Olsen*, 262 U.S. 1 (1923) (assessing the constitutionality of the Grain Futures Act), and the presumption is not triggered in an area of longstanding federal presence, *see United States* v. *Locke*, 529 U.S. 89, 108 (2000). In any event, express preemptive language overcomes the presumption, and Congress supplied such language when it conferred "exclusive jurisdiction" on the CFTC. 7 U.S.C. § 2(a)(1)(A); *see Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).

116.    Novig does not contend that the Act preempts New York's regulation of gambling generally. New York remains free to license and police sportsbooks, casinos, and every other form

of gambling conducted outside a federally designated contract market.  Preemption reaches only trading on a market Congress placed within the CFTC's exclusive jurisdiction.  *Cf. Effex*, 933 F.3d at 894 (state-law claims survive where they have "little or no bearing upon the actual operation of the commodity futures markets" (quoting *Am. Agric. Movement, Inc.*, 977 F.2d at 1156)).

117.    Conflict preemption applies where compliance with both state and federal law is impossible, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941).

118.    New York's regime is geographically bounded by design.  A licensed mobile sports wagering operator may accept wagers only from persons physically located in New York, and those wagers must be transmitted to and accepted by equipment located at a licensed commercial casino in New York. Racing Law §§ 1367(2)(d), 1367-a(2)(d).

119.    Federal law imposes the opposite obligation.  A designated contract market must "provide its members . . . with impartial access to its markets and services," including "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1).

120.    A materially identical state regime has been held to make compliance impossible. Because the State's law would require "a DCM operator [to] exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1)," "[c]ompliance with federal and state regimes is therefore impossible, so impossibility preemption applies." *Johnson*, 2026 WL 1223373, at *8.  Another court reached the same conclusion in *Orgel*, 2026 WL 474869, at *10, after considering and rejecting the answer that an exchange need only obtain a state license: "this court does not see how Kalshi could allow impartial access nationwide when those within Tennessee can only trade with others in the state, who are over 21 years old, and those outside the state cannot

-36-

trade with those within the state.  It is hard to see how a federally regulated nationwide derivatives exchange could function in this way."  Novig faces the same structural impossibility.

121.    Beyond the regulatory conflict lies a structural one.  An event contract executes only when a buyer and a seller are matched at the same price.  An exchange confined to the residents of a single State, and required to replicate that confinement in every other State, does not operate a thinner market; in many contracts it operates no market at all.  The obstacle is not the expense of compliance.  It is the destruction of the mechanism by which the exchange functions.

122.    State enforcement of the kind Defendants threaten would frustrate Congress's objectives.  Congress created the CFTC and conferred exclusive jurisdiction on it to eliminate the patchwork of state regulation and bring futures trading under a uniform national framework.  State enforcement of gambling laws against a federally designated contract market "is exactly the patchwork that Congress replaced wholecloth by creating the CFTC."  *Flaherty*, 172 F.4th at 230.  Permitting each State to decide for itself which contracts a federally designated exchange may list would make the most restrictive State's standard the effective national rule, an outcome the CEA was enacted to prevent.

123.    The governing formulation is the Seventh Circuit's: state law is preempted "[w]hen application of state law would directly affect trading on or the operation of a futures market."  *Am. Agric. Movement, Inc.*, 977 F.2d at 1156.  Applied to a designated contract market, that standard is satisfied: "State law would directly affect trading on Kalshi by limiting who can trade with whom."  *Orgel*, 2026 WL 474869, at *10.  New York's laws, as Defendants would apply them, would dictate which contracts Novig may list and with whom its participants may trade.

124.    Defendants' position rests on the premise that these contracts involve gaming and therefore belong to the States.  The structure of the Act forecloses that premise.

125.    In Dodd-Frank, Congress enacted a Special Rule for event contracts.  The CFTC "may determine" that an event contract is "contrary to the public interest" where it "involve[s]" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule.  7 U.S.C. § 7a-2(c)(5)(C)(i).  Where the CFTC so determines, the contract may not be listed.  Otherwise, it may.

126.    That provision presupposes that event contracts involving gaming are within the CFTC's jurisdiction.  If such contracts escaped federal authority the moment they touched gaming, the Special Rule would have nothing to operate on, and courts do not read statutory provisions into irrelevance.  *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024).  Congress assigned the gaming question to the CFTC, not to the States.

127.    The two instruments may reference the same game, but they are different in kind, and economic resemblance does not determine regulatory classification.  The CFTC agrees.  When implementing the Dodd-Frank amendments, the CFTC declined to bring traditional insurance products within the swap definition even though those products replicate the economics of instruments that are regulated as swaps, explaining that they had not been "historically treated" or "regulated" as swaps and were "subject to different regulatory regimes" under state law.  77 Fed. Reg. 48208, 48211–12 (Aug. 13, 2012).  The CFTC's exclusive authority over exchange-traded event contracts leaves untouched the States' longstanding role in regulating wagers accepted by a house. The CFTC has drawn the same distinction between the two market structures, observing that the structure of a prediction market "is inapposite to that of legalized sports gambling, where the gaming company typically controls and adjusts the gambling odds." 91 Fed. Reg. at 35,807 n.6.

128.    Novig's exchange functions as a venue.  Its revenue does not generally depend on whether any participant's position resolves favorably.  Price formation occurs among participants transacting across a national market—the same process that sets a listed security's price on a public

exchange. Like other designated contract markets, Novig administers a market-maker function that supplies baseline depth and liquidity so that participants can enter and exit positions efficiently. That function is a standard feature of exchange design rather than a departure from it.

129. The sportsbook model inverts these features. The operator dictates the terms on which it will accept a wager and takes the other side of every one. *See United States* v. *McCoy*, 539 F.2d 1050, 1059 (5th Cir. 1976). Its posted odds express its own exposure and revenue objectives inside a licensed territory rather than the result of competitive bidding. Its economic interest is therefore opposed to its customers because it earns the "vig" priced into those odds. *See United States* v. *Greco*, 619 F.2d 635, 637 (7th Cir. 1980) ("This amount of profit to the bookmaker is commonly referred to as 'vigorish,' 'vig' or 'juice.'").

130. Prices on Novig's exchange are generally set by participants, whose orders match by price and time priority through a non-discriminatory algorithm. Novig's revenue does not depend on whether any participant's position resolves favorably. The practice that gave rise to the distinction between an exchange and a sportsbook—restricting or excluding customers because they win too often—is the practice Novig was founded to eliminate. Novig applies position and payout limits, as every exchange does, to manage settlement risk and preserve orderly markets; it does not apply them to penalize participants for trading successfully. Novig also makes each participant's historical trading performance available directly in its platform, rather than requiring the request-and-review process a customer must navigate to obtain that information from a sportsbook. A venue that takes no position against its participants has no reason to obscure how they are performing.

131. Congress recognized that hedging on an exchange depends on the presence of willing counterparties, not on a house. *See Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456

U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

132.    A party seeking a preliminary injunction must show a likelihood of success on the merits, a likelihood of irreparable harm absent relief, that the balance of equities favors relief, and that an injunction serves the public interest. *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Citigroup Glob. Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010). Because the relief sought would restrain government action taken pursuant to a statutory scheme, Novig accepts that it must establish a "clear or substantial likelihood of success on the merits." *N.Y. State Firearms Ass'n* v. *James*, 157 F.4th 232, 242 (2d Cir. 2025) (citation omitted). Novig satisfies that standard.

133.    Novig is likely to succeed for the reasons stated above, and for the reasons given in *Flaherty*, *Johnson*, *Orgel*, and *Minnesota*.

134.    Novig will suffer irreparable harm absent relief, and that harm "is neither remote nor speculative but actual and imminent." *See Faiveley Transp. Malmo AB* v. *Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). A regulated party is irreparably injured when it must choose between abandoning lawful activity and incurring ruinous civil and criminal liability under a preempted state law. *See Ex Parte Young*, 209 U.S. at 148. The Court of Appeals for the Sixth Circuit so held on closely analogous facts in *Churchill Downs Tech. Initiatives Co.* v. *Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025), finding irreparable injury where a State sought to enforce its wagering law against an out-of-state wagering platform in conflict with a federal statute. Novig stands in the same position.

135.    That is the choice Novig faces. If it offers event contracts to New York customers, it risks criminal exposure under the Penal Law, a civil penalty of $100,000 for each offer under Racing Law § 1367(16)(a), disgorgement, and a penalty of three times its gain under Penal Law §

80.10(1)(e)—precisely the relief the Attorney General has sought against a federally registered intermediary. If it withholds the product from New York, it forfeits one of the largest markets in the country, sacrifices the liquidity a national exchange requires, and loses customers and goodwill.

136.    Courts confronting the same dilemma have found it irreparable. A designated contract market in this position "faces a 'Hobson's choice': if it does not comply with the defendants' demand to cease it faces civil and criminal liability, but if it does comply it will incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if [it] disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange." *KalshiEX, LLC* v. *Hendrick*, 2025 WL 1073495, at *7 (D. Nev. Apr. 9, 2025).

137.    Loss of reputation and goodwill is irreparable in this Circuit. *See Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (characterizing "loss of reputation, good will, and business opportunities" as irreparable harms). Other courts have found the same harms sufficient in these very cases. *See Orgel*, 2026 WL 474869, at *10 (losing access to thousands of users and reputational harm suffice); *Minnesota*, 2026 WL 2150211, at *16–17.

138.    Sovereign immunity forecloses any later remedy. Because Novig could not recover damages from Defendants even if it ultimately prevailed, the losses it would sustain in the interim are by definition irreparable. *See Minnesota*, 2026 WL 2150211, at *16.

139.    Novig need not incur liability before seeking relief. *See Free Enterprise Fund* v. *PCAOB*, 561 U.S. 477, 490–91 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law."); *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."); *Steffel* v. *Thompson*, 415 U.S. 452, 459 (1974).

140. The balance of equities favors relief. A State has no cognizable interest in enforcing a preempted law. *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988); *Otto* v. *City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]."). It is true that preventing a State from effectuating statutes enacted by its representatives can itself constitute an injury, but that principle presupposes a valid statute. Where the state law is preempted as applied, the State is deprived of nothing to which it is entitled, and the interest it asserts carries correspondingly little weight.

141. Where a state law is likely preempted, the harm to the State from an injunction is correspondingly reduced. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen a state law is likely preempted, the harm to the state by temporarily enjoining enforcement of that law is diminished"); *Orgel*, 2026 WL 474869, at *11 (State "is likely to face no harm" from being enjoined from enforcing likely preempted law). Defendants retain every enforcement tool should they ultimately prevail. Weighing on the other side are the reliance interests that have formed around a market the CFTC has permitted to operate. Exchanges have devoted substantial resources to building infrastructure that complies with the Act in reliance on the federal designation the CFTC grants, and participants have entered positions on the strength of it. Defendants' theory would unsettle those interests retroactively.

142. The public interest favors relief. "If the Act preempts [state] law, then the public interest is best served by *enforcing* the Act." *Flaherty*, 172 F.4th at 232 (emphasis added). The public also has an interest in the integrity of the uniform national framework Congress designed for derivatives markets, in the informational value of prediction-market prices, which are theoretically more efficient the broader and more liquid the market, and in the supremacy of federal law. *See United States* v. *Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury

when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

143.    A preliminary injunction would hold the parties' legal positions in place pending resolution of a question on which courts have divided, rather than permit criminal liability to attach to a federally designated exchange while that question remains open.  A ruling at this stage "does not prejudge a finding for defendants through dispositive motion practice or trial."  *Flaherty*, 2025 WL 1218313, at *7.

144.    Novig accordingly seeks a declaration that the New York laws identified above are preempted as applied to event contracts traded on its federally designated contract market, and an injunction restraining their enforcement against Novig.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Novig respectfully requests that this Court enter judgment in Novig's favor and against Defendants as follows:

(i)    Issue a preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Novig, or any of its affiliates, officers, agents, servants, or employees, Article I, Section 9 of the New York Constitution; New York Penal Law §§ 225.00, 225.05, 225.10, 225.15, and 225.20; New York Penal Law § 80.10; Racing Law § 104; Racing Law §§ 1367 and 1367-a; New York Executive Law § 63(12), whatever predicate of illegality is invoked through it; 9 NYCRR §§ 5300 through 5330.45; any other rules adopted thereunder; and any other New York law that purports to regulate Novig's listing, trading, or settlement of event contracts on a designated contract market;

(ii)     Award a declaratory judgment that the foregoing provisions of New York law, and any rules adopted thereunder, are preempted by federal law and therefore violate the Supremacy Clause of the United States Constitution, insofar as Defendants seek to apply them to prohibit Novig, or any of its affiliates, officers, agents, servants, or employees, from offering customers event contracts traded on a designated contract market; and

(iii)    Grant such further relief as the Court deems just and proper.

Dated:  August 4, 2026
   New York, New York

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

*/s/ Benjamin R. Walker*
Benjamin R. Walker (4447363)
Ann-Elizabeth Ostrager (4903233)
John J. Liolos (5331053)
Jason P. Barnes (5874662)
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
walkerb@sullcrom.com
ostragerae@sullcrom.com
liolosj@sullcrom.com
barnesjas@sullcrom.com

Rishabh Bhandari (*pro hac vice forthcoming*)
1700 New York Avenue, N.W.
Washington, D.C., 20006
Tel: (202) 956-7500
Fax: (202) 293-6330
bhandarir@sullcrom.com

*Counsel for Plaintiff Ludlow Exchange, LLC
d/b/a Novig*