UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUDLOW EXCHANGE, LLC d/b/a NOVIG,<br>*Plaintiff*,<br><br>v.<br><br>LETITIA JAMES, *in her official capacity as Attorney General of New York*; ROBERT WILLIAMS, *in his official capacity as Executive Director of the New York State Gaming Commission*; BRIAN O'DWYER, *in his official capacity as Chair and Commissioner of the New York State Gaming Commission*; PETER J. MOSCHETTI, JR., JOHN A. CROTTY, SYLVIA B. HAMER, MARTIN J. MACK, MARISSA SHORENSTEIN, and JERRY SKURNIK, in their official capacities as Commissioners of the New York State Gaming Commission<br><br>*Defendants*. | 1:26-cv-06676-CM |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

Katherine Rhodes Janofsky
Robert Arnay
Zachary Manley
Assistant Attorneys General
*Of Counsel*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

STATUTORY AND REGULATORY BACKGROUND .......... 4

I. NEW YORK'S HISTORY OF POLICING GAMBLING .......... 4

II. FEDERAL REGULATION OF COMMODITY FUTURES TRADING .......... 4

RELEVANT FACTS AND PROCEDURAL HISTORY .......... 7

LEGAL STANDARD .......... 10

ARGUMENT .......... 10

I. PLAINTIFF HAS NOT SHOWN A "CLEAR OR SUBSTANTIAL" LIKELIHOOD OF SUCCESS ON THE MERITS .......... 10

A. Plaintiff's Preemption Claim Will Fail Because Plaintiff Has Not Shown Its Event-Contracts Are "Swaps" Under The CEA .......... 10

i. Plaintiff's Sports Event Contracts Do Not Meet §1a(47)(A)(ii)'s Definition Of A "Swap" Under The Statute's Plain Meaning, Context, Purpose and History .......... 11

a. Plain Language .......... 11

b. Context And Purpose .......... 13

c. Major Questions Doctrine .......... 16

d. Legislative History .......... 16

ii. Plaintiff's Arguments That Its Sports Offerings Are "Swaps" Are Meritless .......... 17

B. Even If The Event Contracts Are "Swaps," Plaintiff Is Unlikely To Succeed On Its Claim Because The CEA Does Not Preempt The At-Issue New York Laws .......... 20

i. No Express Preemption .......... 20

ii. No Field Preemption .......... 23

iii. No Conflict Preemption .......... 27

a. The Motion Failed To Establish Conflict Preemption .......... 28

b. Plaintiff's Notice of Supplemental Authority Is Irrelevant .......... 30

II. PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM .......... 31

III. THE EQUITIES AND PUBLIC INTEREST DO NOT FAVOR A PRELIMINARY INJUNCTION .......... 33

CONCLUSION .......... 35

WORD COUNT CERTIFICATION .......... 37

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Perez*,
585 U.S. 579 (2018) .....33

*Ah Sin v. Wittman*,
198 U.S. 500 (1905) .....23

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021) .....15

*Altria Grp. v. Good*,
555 U.S. 70 (2008) .....20

*Art and Antique Dealers League of Am., Inc. v. Seggos*,
121 F.4th 423 (2d Cir. 2024) .....27, 29

*Ass'n of Int'l Auto. Mfrs. v. Abrams*,
84 F.3d 602 (2d Cir. 1996) .....20

*Bond v. U.S.*,
572 U.S. 844 (2014) .....13

*Coal. for Competitive Elec. v. Zibelman*,
272 F. Supp. 3d 554 (S.D.N.Y. 2017) .....25

*Co. Inst. v. CFTC*,
720 F.3d 370 (D.C. Cir. 2013) .....4

*Coinbase Fin. Mkts. Inc. v. Nessel*,
_ F. Supp. 3d _, 2026 WL 2295184 (Aug. 7, 2026) ..... passim

*Convergen Energy WI v. L'Anse Warden Electric*,
2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020) .....32

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) .....20, 22, 33

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) .....10

*De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*,
520 U.S. 806 (1997) .....19

*Dubin v. U.S.*,
599 U.S. 110 (2023) .....13

*Figueroa v. Foster*,
864 F.3d 222 (2d Cir. 2017)....................26-27

*Freedom Holdings v. Spitzer*,
408 F.3d 112 (2d Cir. 2005)....................33

*Greater New Orleans Broad. Ass'n v. United States*,
527 U.S. 173 (1999)....................12

*KalshiEX LLC v. Assad*,
_ F.4th _, 2026 WL 2543846 (9th Cir. Aug. 28, 2026)....................passim

*KalshiEX LLC v. Bird*,
26-cv-00109, ECF 57 (S.D. Iowa Sept. 8, 2026)....................2

*KalshiEX LLC v. Cafferelli*,
_ F. Supp. 3d _, 2026 WL 2294589 (D. Conn. Aug. 10, 2026)....................passim

*KalshiEX LLC v. Cafferelli*,
2026 WL 2368931 (D. Conn. Aug. 15, 2026)....................30

*KalshiEX LLC v. Cox*,
2026 WL 2241564 (D. Utah Aug. 4, 2026)....................passim

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026)....................2, 17, 23

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. 2026)....................2

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025)....................passim

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)....................2, 12

*KalshiEX LLC v. Schuler*,
2026 WL 1295806 (6th Cir. Apr. 24, 2026)....................passim

*KalshiEX LLC v. Williams*,
2026 WL 1961872....................passim

*KalshiEX v. Flaherty*,
2025 WL 1218313 (D.N.J. Apr. 28, 2025)....................35

*KalshiEX, LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025)....................passim

*KalshiEX, LLC v. Schuler*,
2026 WL 657004 (S.D. Ohio Mar. 9, 2026) .......... passim

*Kansas v. Garcia*,
589 U.S. 191 (2020) .......... 29

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 10

*Medtronic v. Lohr*,
518 U.S. 470 (1996) .......... 20, 23

*Merrill Lynch, Pierce, Fenner, & Smith v. Curran*,
456 U.S. 353 (1982) .......... 4

*Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .......... 27

*Metro. Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025) .......... 6

*Mississippi v. Louisiana*,
506 U.S. 73 (1992) .......... 21

*Monsanto Co. v. Durnell*,
146 S. Ct. 2001 (2026) .......... 22

*Mullins v. City of N.Y.*,
626 F.3d 47 (2d Cir. 2010) .......... 6

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 3, 12-13, 23

*N. Am. Derivatives Exchange v. Nevada*,
815 F. Supp. 3d 1169 (D. Nev. 2025) .......... 1, 12

*N.Y. SMSA v. Town of Clarkstown*,
612 F.3d 97 (2d Cir. 2010) .......... 19, 23

*N.Y. State Firearms Ass'n v. James*,
157 F.4th 232 (2d Cir. 2025) .......... 9

*N.Y. State Telecomms. Ass'n. v. James*,
101 F.4th 135 (2d Cir. 2024) .......... 23

*Nat'l Ass'n for Gun Rts. v. Lamont*,
153 F.4th 213 (2d Cir. 2025) .......... 33

*New Jersey v. Bessent*,
149 F.4th 127 (2d Cir. 2025) ....................10

*Our Wicked Lady v. Cuomo*,
2021 WL 915033 (S.D.N.Y. Mar. 9, 2021) ....................33

*QCX LLC v. Nessel*,
2026 WL 1895958 (W.D. Mich. June 17, 2026) .................... passim

*Rice* v. *Santa Fe Elevator Corp.*,
331 U.S. 218 (1947)....................21

*Saratoga Cnty. Chamber of Commerce v. Pataki*,
798 N.E.2d 1047 (N.Y. 2003) (Smith, J., concurring in part) ....................3

*St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*,
131 F.4th 102 (2d Cir. 2025) ....................31

*Tom Doherty Assocs. v. Saban Ent*.,
60 F.3d 27 (2d Cir. 1995)....................32

*U.S. v. Harris*,
838 F.3d 98 (2d Cir. 2016)....................15

*U.S. v. Miller*,
604 U.S. 518 (2025)....................13

*United States v. Minnesota*,
2026 WL 2150211 (July 27, 2026) ....................2

*United States v. Wisconsin*,
2026 WL 2474512 (E.D. Wis. July 29, 2026) .................... passim

*Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*,
959 F.3d 1201 (9th Cir. 2020) ....................29

*We The Patriots USA v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ....................9, 31

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................15

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)....................13

*Yousefzadeh v. Johnson & Johnson Consumer Inc.*,
_ F.4th _, 2026 WL 2192415 (2d Cir. 2026) ....................22

**State Constitution**

N.Y. Const., art. I, §9 .....4

**Federal Constitution**

Art. VI, cl. 2 .....29

**State Statutes**

Penal Law
§225.00(4) .....4
§225.00(5) .....4
§225.05 .....4
§225.10 .....4
§225.15 .....4
§225.20 .....4
§225.30 .....4

Racing, Pari-Mutuel Wagering and Breeding Law
Art. 13, titles 3–8 .....4
§116 .....32
§912 .....8
§1367 .....4
§1367-a .....4
§1367-a(4)(a)(xi) .....34
§1367-a(4)(a)(iii) .....34
§1367-a(4)(e) .....34
§1367(1)(s) .....34
§1367(2)(d) .....34

**Federal Statutes**

7 U.S.C.
§1a(19) .....5
§1a(47) .....5
§1a(47)(A) .....15
§1a(47)(A)(i)-(vi) .....14
§1a(47)(A)(ii) .....10, 11, 15
§2 .....4
§2(a)(1)(A) ..... passim
§5 .....4
§7(d)(1)(A)(ii) .....31
§7a-2(c)(1) .....5
§7a-2(c)(5)(C)(i) .....5
§7a-2(c)(5)(C)(ii) .....5, 18

§13a-2(1) ....................25
§16(e)(2) ....................6, 21, 24
§16(h)(2) ....................6, 21, 24

15 U.S.C.
§3001(a)(1) ....................13
§1178 ....................13

18 U.S.C.
§1084 ....................13
§1952 ....................13
§1953 ....................13
§1955 ....................13

31 U.S.C.
§5362 ....................13
§5363 ....................13

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. 111-203, July 21, 2010,
124 Stat 1376 .................... passim

**State Regulations**

9 NYCRR
Part 5329 ....................4
Parts 5330 ....................4
§5330.13 ....................34
§5330.34 ....................34
§5330.45 ....................34
§5330.8(c)(4) ....................34
§5330.10(d)(5) ....................34
§5330.19 ....................34

**Federal Regulations**

17 C.F.R.
§40.11 ....................5
§40.11(a) ....................5, 6, 19, 31
§40.11(c) ....................19

**Rules**

Fed. R. Civ. P. 65(c) ....................35

**OTHER AUTHORITIES**

56 Cong. Rec. S5902-01 ........................................................................................................17

New Oxford American Dictionary, 2d Edition (2005) ...............................................................11

Defendants New York State Attorney General Letitia James ("AG") and the defendants affiliated with the New York State Gaming Commission ("Gaming Commission") (collectively, "Defendants") respectfully submit this memorandum of law and accompanying declaration of Robert Arnay and exhibits thereto ("Ex.") in opposition to the preliminary injunction motion ("Motion") filed by Plaintiff Ludlow Exchange, LLC d/b/a Novig ("Plaintiff" or "Novig").

## PRELIMINARY STATEMENT

Seeking to end-run the legitimate, lawful exercise of state authority over illegal sports gambling—exercises Congress *never* concluded ought to be preempted by the purported authority of a federal commodities agency—Plaintiff commenced this pre-enforcement action claiming its sports offerings are actually "swaps" under the Commodity Exchange Act ("CEA") and are thereby allegedly exclusively regulated by the Commodity Futures Trading Commission ("CFTC"). However, a growing majority of courts have rejected similarly baseless claims. Plaintiff's claim is even easier to dispatch, thanks to Plaintiff's long history of acknowledging that its offerings are merely sports gambling with a different marketing gimmick (more bettor-friendly than a "traditional sportsbook") and that its users are recreational sports gamblers (rather than businesses looking to hedge economic risks).

Founded in 2021, Plaintiff initially operated as a state-licensed sports gambling business in Colorado offering peer-to-peer sports wagers through in-state casinos, with plans to expand nationwide through state-by-state licensing. But this was short-lived. After disagreements with the Colorado regulator, Plaintiff switched to operating as an *unlicensed* sports gambling business through a so-called "sweepstakes" casino model, where users can make traditional sports wagers in exchange for in-app "coins" (with no monetary value) or in-app "cash" (which can be redeemed for actual money). However, this dual-currency "sweepstakes" casino model is just another form of unlicensed gambling, as demonstrated by state regulators, including New York, enforcing state

laws against operators of these "sweepstakes" casinos. In December 2025, New York also enacted legislation clarifying that "sweepstakes" casinos are and always have been illegal under state law. After this law was passed, Plaintiff announced it stopped offering its "sweepstakes" casino here.

Tired of dealing with what Plaintiff's CEO called "bullshit state regulators," Plaintiff rebranded itself as a "prediction market" seeking to offer its same sports gambling products repackaged as "sports event contracts" under the blessing of a newly-friendly CFTC. Indeed, Plaintiff's CEO recently said the quiet part out loud, claiming the CFTC has recently "legalized sports betting in all 50 states under a financial regulatory exchange framework."

Despite this sophistry, unlicensed gambling by another name is still unlicensed gambling, and States retain the authority to enforce their gaming regulations against prediction markets. Although prediction markets have clogged the federal courts with preemptive lawsuits seeking retroactive blessing for their unlicensed gambling, the vast majority of courts to address the issue—including in this District, the District of Connecticut, and the Ninth Circuit—have rejected prediction markets' arguments. The only contrary circuit court ruling was a flawed opinion from the Third Circuit that a majority of subsequent courts (including the Ninth Circuit) have declined to follow.[1] The Court should do the same here.

---

[1] *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025); *N. Am. Derivatives Exchange v. Nevada*, 815 F. Supp. 3d 1169 (D. Nev. 2025) ("*Nadex*"); *KalshiEX, LLC v. Schuler*, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ("*Schuler I*"); *KalshiEX LLC v. Schuler*, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) ("*Schuler II*") (denying injunction pending appeal); *QCX LLC v. Nessel*, 2026 WL 1895958 (W.D. Mich. June 17, 2026) ("*Nessel I*"); *KalshiEX LLC v. Williams*, 2026 WL 1961872, *as amended by* 2026 WL 2017466 (S.D.N.Y. July 13, 2026); *United States v. Wisconsin*, 2026 WL 2474512 (E.D. Wis. July 29, 2026); *KalshiEX LLC v. Cox*, 2026 WL 2241564 (D. Utah Aug. 4, 2026); *Coinbase Fin. Mkts. Inc. v. Nessel*, _ F. Supp. 3d _, 2026 WL 2295184 (Aug. 7, 2026) ("*Nessel II*"); *KalshiEX LLC v. Cafferelli*, _ F. Supp. 3d _, 2026 WL 2294589 (D. Conn. Aug. 10, 2026); *KalshiEX LLC v. Assad*, _ F.4th _, 2026 WL 2543846 (9th Cir. Aug. 28, 2026); *KalshiEX LLC v. Bird*, 26-cv-00109, ECF 57 (S.D. Iowa Sept. 8, 2026); *but see KalshiEX LLC v. Flaherty*, 172

First, Plaintiff fails to demonstrate a clear or substantial likelihood of success. Its "sports event contracts" do not fall within the CEA's definition of "swap." Nowhere in its text or history is there any indication that Congress intended to use the CEA to authorize Plaintiff's unlicensed gambling operations—a major matter historically within the police power of the States. The CFTC plainly does not have exclusive jurisdiction over such offerings.

Even if Plaintiff's offerings were "swaps," the CEA does not preempt the laws Plaintiff challenges. Plaintiff's express-preemption argument fails because neither the plain meaning of the CEA's "exclusive jurisdiction" provision nor an analysis of the surrounding context, purpose, and history establishes that Congress expressly preempted state regulation of sports gambling. Plaintiff's field-preemption argument has no support in the CEA's text, structure, context, or legislative history, nor the centuries-old history of New York gambling prohibitions. Plaintiff's argument that its own self-certification of any product it labels a "swap" sanitizes its violations of state law is baseless. Plaintiff's conflict-preemption argument fails because Plaintiff has not shown that compliance with both state and federal law is impossible or otherwise irreconcilable.

Plaintiff also fails to meet its burden on irreparable harm and the equities. Plaintiff's claims of economic harm are speculative, unfounded, or otherwise self-inflicted by its business decision to launch a near-nationwide unlicensed sports gambling business under the guise of a "prediction market" when courts across the country have rejected claims that States are preempted from enforcing their gaming laws against this conduct—including a court in this District that found that New York's laws in particular are not preempted just a few weeks before Plaintiff's launch.

Nor do the equities favor Plaintiff establishing an illegal foothold in New York. In

F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Orgel*, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026); *KalshiEX LLC v. Johnson*, 2026 WL 1223373 (D. Ariz. 2026); *see also United States v. Minnesota*, 2026 WL 2150211 (July 27, 2026) (preliminarily enjoining statute prohibiting prediction markets).

Plaintiff's favor is nothing but its interest in profiting from unlicensed gambling in New York. On the other side of the ledger is New York's enormous public interest in ensuring that gambling is conducted only through the channels created by the State Legislature, subject to the state consumer protections that are utterly absent from the CEA and the CFTC's implementing regulations (for the unsurprising reason that the CEA was never meant to regulate gambling).

## STATUTORY AND REGULATORY BACKGROUND

### I. NEW YORK'S HISTORY OF POLICING GAMBLING

New York has policed gambling since 1771. *Saratoga Cnty. Chamber of Commerce v. Pataki*, 798 N.E.2d 1047, 1063–65 (N.Y. 2003) (Smith, J., concurring in part). Gambling is prohibited under the New York Constitution, with enumerated exceptions. N.Y. Const., art. I, §9.

New York strictly regulates sports wagering. After the Supreme Court struck down a 1992 statute that had effectively banned commercial sports betting in most states (*see Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018)), New York allowed authorized in-person sports wagering at licensed commercial casinos (Racing Law §1367) and authorized mobile sports wagering (*id.* §1367-a), subject to a comprehensive statutory and regulatory regime designed to protect consumers, promote fairness and accountability, and protect the integrity of the underlying sports. *See* Racing Law Art. 13, titles 3–8; 9 NYCRR Parts 5329–5330. There is also criminal liability for "promoting" or "advancing" "gambling activity" (Penal Law §§225.00(4), 225.00(5), 225.05, 225.10) or possessing gambling records or devices (*id*. §§225.15, 225.20, 225.30).

### II. FEDERAL REGULATION OF COMMODITY FUTURES TRADING

Responding to concerns about price manipulation of commodities and other issues after World War I, Congress authorized federal regulation of commodity futures exchanges through the CEA. *Merrill Lynch, Pierce, Fenner, & Smith v. Curran,* 456 U.S. 353, 360–61 (1982); *see also* 7 U.S.C. §5 (CEA findings and purpose). In 1974, Congress amended the CEA (Pub. L. No. 93–

463, § 201(b), 88 Stat. 1389 (1974), codified at 7 U.S.C. § 2) to create the CFTC and, subject to certain limitations, give it "exclusive jurisdiction" over a particular class of derivatives—futures—traded on an exchange.[2] *See* 7 U.S.C. §2(a)(1)(A). In 2000, the CEA was amended to allow Designated Contract Markets ("DCM") to list contracts without prior CFTC approval by "self-certifying" their contracts comply with applicable laws. *Id*. §7a-2(c)(1).

Following the 2008 financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, to prevent another financial crisis. Pub. L. No. 111-203, 124 Stat 1376 (2010) ("Dodd-Frank"). Dodd-Frank amended the CEA in several ways relevant here. First, it enacted definitions for "swap" (7 U.S.C. §1a(47)) and added "swaps" traded or executed on a DCM to the CFTC's "exclusive jurisdiction" (§2(a)(1)(A)). Second, it made it unlawful for anyone other than an "eligible contract participant" to enter into a swap unless the swap was entered on or subject to the rules of a DCM. Third, in what is called the "Special Rule," Congress gave the CFTC the power to "determine" that certain swaps in "excluded commodities" are "contrary to the public interest" and therefore cannot be listed on a DCM, if the swap involves "activity that is unlawful under any Federal or State law, terrorism, assassination, war, gaming, or other similar activity" (§7a-2(c)(5)(C)(i)–(ii); *see also* (§1a(19)); *Nessel I*, 2026 WL 1895958, at *3–4 (legislative history overview). Moreover, CFTC regulations *outright prohibit* DCMs from listing event contracts related to any of these enumerated factors. 17 C.F.R. §40.11(a). The CFTC included this prohibition to "prevent gambling through the futures markets." Provisions Common to Registered Entities, 76 Fed. Reg. 44776, 44786 (July 27, 2011).[3]

---

[2] Derivatives are "contracts deriving their value from underlying assets." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013).

[3] On June 12, 2026, the CFTC issued a purported notice of proposed rulemaking to *inter alia* amend §40.11. 91 Fed. Reg. 35,806 (June 12, 2026). Plaintiff has been, and continues to be, subject to this regulation in its current form.

Today, subject to important limitations, the CEA grants the CFTC "exclusive jurisdiction…with respect to accounts, agreements…, and transactions involving swaps" that are "traded or executed" on DCMs. 7 U.S.C. §2(a)(1)(A). It also includes two savings clauses. The regulatory savings clause provides: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on … other regulatory authorities under the laws of… any State, or (II) restrict … such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Id.* The jurisdictional savings clause provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

In addition, as to preemption of state laws, the CEA supersedes "[s]tate or local law that prohibits or regulates gaming" *only for* certain limited derivatives not at issue here (*e.g.*, transactions in "security warrants," certain repurchase transactions, and certain banking products). *Id.* §16(e)(2). It also provides that a swap "may not be regulated as an insurance contract under the law of any State." *Id.* § 16(h)(2).

Finally, after the CFTC began operating through a single newly-appointed Commissioner in December 2025, it abandoned more than a decade of policy on the legality of sports "event contracts." In February 2026, it withdrew its 2024 notice of proposed rulemaking that would have clarified that event contracts involving sports betting may not be listed on exchanges. Ex. 16; *see also Assad*, 2026 WL 2543846, at *12-14 (noting this was already clear from 17 C.F.R. §40.11(a)). It also withdrew a September 2025 staff advisory warning DCMs to account for the risk of State regulatory actions and advise customers of the risk that their sports wagers could be cancelled due to State regulatory action. Exs. 12, 16. The CFTC has also issued notices of proposed rulemaking that would purport to arrogate to itself authority to regulate sports betting offered under the guise

of "event contracts" by prediction markets. *See* 91 Fed. Reg. 12516 (Mar. 16, 2026); 91 Fed. Reg. 35,806 (June 12, 2026). An overwhelming majority of States objected to these purported notices, emphasizing the CFTC's lack of jurisdiction over sports-related "contracts." Exs. 19, 21. During this time, a multi-billion-dollar shadow industry of sports gambling businesses masquerading as "prediction markets" (such as Plaintiff) has exploded.

## RELEVANT FACTS[4] AND PROCEDURAL HISTORY

### A. Novig Is Formed As A Sports Gambling Company

Plaintiff's founders decided to start a sports gambling business in 2021 while college students. Ex. 17 at 1. They formed "Novig Betting, Inc." (Ex. 37), which owns Plaintiff Ludlow Exchange, LLC (Ex. 15). It was unambiguously a sports gambling company. Exs. 3, 5 (Novig is a "sports betting exchange"); Ex. 4 ("Novig is in the sports betting industry"); https://www.youtube.com/watch?v=rcBZeSwm3Vk (Novig founder stating that end of "federal ban on sports betting" made it "perfect time" to launch its "sports betting exchange"). Its marketing pitch was that it was more friendly to retail bettors than "traditional sportsbooks." Exs. 4, 5.

Novig originally charted a course toward operating as a state-licensed gambling company by operating in partnership with state-licensed casinos, starting first in Colorado "before expanding nationally." Exs. 5, 6. In January 2024, it launched a state-licensed "sports betting app" in Colorado. Exs. 7, 8. The Colorado license is the only state license Plaintiff has ever held, and it was short-lived. Within a few months, Novig shut down its app after Colorado regulators did not approve its proposed "betting exchange system." Ex. 38 at 2.

By September 2024, Novig "opt[ed] to forgo the regulated market" in favor of operating

[4] Defendants cite evidence the Court may consider on a preliminary injunction motion. *Mullins v. City of N.Y.*, 626 F.3d 47, 52 (2d Cir. 2010); *Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 649 nn.38–42 (S.D.N.Y. 2025).

an unlicensed gambling business in the form of an online "sweepstakes" casino. Ex. 11; Compl. ¶ 69. However, because a dual-currency "sweepstakes" (where bettors can win virtual coins that are exchangeable for cash) is just betting by another name, "sweepstakes" casino operators came under state regulatory scrutiny. Exs. 13, 23, 28. Notably, in June 2025, the AG announced it had stopped the operators of 26 sweepstakes casinos from offering their unlicensed gambling here. Ex. 10; *see also* Ex. 25 (announcing $8 million payment from one operator to resolve claims). Several states have recently enacted legislation targeting "sweepstakes" (Exs. 13, 23, 38), with New York enacting legislation (codified in Racing Law §912) in December 2025 clarifying that such sweepstakes are and always have been illegal under state law. After this law was passed, Plaintiff announced its sweepstakes product was no longer available in New York. Ex. 14.

### B. Following The Trend Of Kalshi And Others, Plaintiff Re-Brands As a "Prediction Market" and Seeks DCM Designation From The CFTC

Tired of "having to deal with…bullshit state regulators" (*see* https://www.youtube.com/watch?v=DaRcHMJXtwM at 23:37-24:20), Plaintiff became a "prediction market." It applied for DCM status in December 2025, which was granted on June 16, 2026. *Id.* ¶¶71-72. Although it has, apparently for legal purposes, adopted the moniker of a "prediction market" offering "event contracts," Plaintiff is unmistakably clear that its product is sports betting under a different name and its target market remains recreational sports bettors. Ex. 23 (noting Novig's "lack of pretense" compared to other prediction markets, in that its "marketing material" shows "Novig is unambiguously a sportsbook"); https://www.youtube.com/watch?v=XLP0dAhZHhE (Sydney Sweeney "Just Sports" ad).

In early 2026 (while its DCM application was pending), Plaintiff's CEO declared that "[o]ur north star is to be the largest sports betting platform in the world" and "[o]ur mission is to democratize and financialize sports betting." Ex. 17 at 3; Ex. 18 at 4. In describing its target

customers, Plaintiff's CEO stated: "People want to bet on sports because it's fun[.]…[T]he majority of sports fans in the U.S. already bet on sports. They want a better version of what already exists today." *Id.* at 2. Plaintiff's website touts its product as a platform for recreational sports "trading," not for businesses looking to hedge risks. Ex. 35 at 2 ("fans use Novig to trade").

Indeed, Plaintiff's CEO stated "the federal government"—*i.e.*, the CFTC—has "legalized sports betting in all 50 states under a financial regulatory exchange framework." Ex. 18 at 3.

### C. Plaintiff Announces Its Intent To Enter The New York Market And Files This Preemptive Lawsuit

On August 5, 2026, Plaintiff announced the launch of its prediction market, including offering "sports event contracts" in New York. Compl. ¶4. This came in the face of numerous adverse court decisions finding that sports event contracts are subject to state gaming laws, including a decision in this District just weeks earlier. The same day, Plaintiff filed this lawsuit asserting a single preemption claim. *Id.* ¶¶28, 43-44. The next day, it filed the Motion.

Despite seeking to preempt the application of New York gaming laws to its "sports event contracts," Plaintiff has not supplied its contracts to the Court. However, Plaintiff's "self-certifications" to the CFTC demonstrate that its "contracts" are just gambling. Using a Mets-Braves game as its example, users can bet on whether: (1) the Braves will win (Ex. 27); (2) the Mets will cover the spread (Ex. 28); (3) the teams will collectively score more than 8 runs (Ex. 29); and (4) Mets outfielder Juan Soto will hit at least one home run (Ex. 30). Users can also bet on season-long achievements, such as whether (1) the Braves will win the World Series (Ex. 31), (2) Braves' first basemen Matt Olson will hit more than 29 home runs (Ex. 32), and (3) Braves pitcher Chris Sale will win the Cy Young award (Ex. 33).

While these are Plaintiff's self-certifications for MLB "contracts," Plaintiff has similar self-certifications covering football, basketball, soccer, tennis, golf, auto racing, and fighting. Ex.

34. Plaintiff also offers "event contracts" on college football, including bets on individual games (such as the game winner, point spread, and total points scored) and season outcomes (such as playoff champion and player-of-the-year winner). *Id*. Plaintiff also offers "parlays" (a bet that links multiple wagers together for a higher payout if all bets hit, but no payout if one bet misses), which reportedly comprise approximately one-third of its "trading" volume. Ex. 24.

## LEGAL STANDARD

Plaintiff must establish (1) a "clear or substantial likelihood" of success on the merits, (2) that it will likely suffer irreparable harm without an injunction, and (3) that the balance of equities and public interest favor an injunction. *See N.Y. State Firearms Ass'n v. James*, 157 F.4th 232, 242 (2d Cir. 2025) (noting that the "more rigorous likelihood-of-success standard" applies "when, as here, the preliminary injunction will affect governing action taken in the public interest pursuant to a statutory or regulatory scheme"); *We The Patriots USA v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (noting that the final two requirements merge when the government is a defendant).[5]

## ARGUMENT

### I. PLAINTIFF HAS NOT SHOWN A "CLEAR OR SUBSTANTIAL" LIKELIHOOD OF SUCCESS ON THE MERITS

#### A. Plaintiff's Preemption Claim Will Fail Because Plaintiff Has Not Shown Its Event-Contracts Are "Swaps" Under The CEA

The CEA's definition of "swap" includes an "agreement, contract, or transaction…that provides for any purchase, sale, payment, or delivery…that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). Because the text, history, and purpose of the CEA demonstrate that sports event contracts are not "swaps," as

[5] All case quotations are "cleaned up" unless otherwise noted.

defined therein, Plaintiff has not shown the requisite likelihood of success on its preemption claim.

#### i. Plaintiff's Sports Event Contracts Do Not Meet §1a(47)(A)(ii)'s Definition Of A "Swap" Under The Statute's Plain Meaning, Context, Purpose and History

Statutory interpretation "begin[s] with the plain language of the statute, giving the statutory terms their ordinary or natural meaning." *New Jersey v. Bessent*, 149 F.4th 127, 145 (2d Cir. 2025). "[A] statute's meaning does not always turn solely on the broadest imaginable definition of its component words." *Epic Sys. Corp. v.* Lewis, 584 U.S. 497, 523 (2018). The statute's words must "be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Where meaning is ambiguous, courts may use "a variety of interpretive tools, including canons, statutory structure, and legislative history." *Bessent*, 149 F.4th 127 at 145; *see also Assad*, 2026 WL 2543846, at *7–17 (considering language, structure, subject matter, and context). To the extent Plaintiff's arguments rely on the CFTC's (or any other agency's) interpretation of the CEA, that interpretation is entitled to no deference. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

##### a. Plain Language

Treating Plaintiff's event contracts as swaps is inconsistent with the plain language of §1a(47)(A)(ii) in two ways. First, the contingencies underlying Plaintiff's contracts are not "associated with a potential financial, economic, or commercial consequence." To "associate" means to "connect (someone or something) with something else in one's mind" or to "connect (something) with something else because they occur together or one produces another." "Associate," New Oxford American Dictionary (2d ed. 2005). Such a connection in the mind cannot reasonably exist unless the potential effects on these types of conditions are sufficiently material and direct. Thus, §1a(47)(A)(ii) requires the alleged "event" that is the subject of the contract to, by its nature, have some inherent or intrinsic economic value, as opposed to merely

having downstream financial consequences.

Numerous courts, including the Ninth Circuit, have agreed that this is the best interpretation of the statutory language. For example, the District of Nevada concluded the "event or contingency" must be "itself inherently joined or connected with a potential financial, economic, or commercial consequence" such that it "has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it." *Hendrick*, 817 F. Supp. 3d at 1027; *see also id.* at 1027–32 (analysis of phrase leading to plain-meaning conclusion). In affirming, the Ninth Circuit concluded that "[t]his interpretation is supported by the plain meaning of 'associate.'" *Assad*, 2026 WL 2543846, at *12. Other district courts have reached similar conclusions. *See Nessel I*, 2026 WL 1895958, at *6 (the potential economic consequences must be "inherently joined or connected with" the events underlying the contract; the underlying events cannot be "connected to financial consequences only through downstream, and theoretically infinite, chains of potential consequences"); *Cafferelli*, 2026 WL 2294589, at *8 ("If the existence of some downstream economic consequence is sufficient to transform an event into a swap, the statute would encompass virtually any uncertain event with economic ramifications—a construction that is difficult to reconcile with the text Congress enacted."); *Bird*, 26-cv-00109, ECF 57 at 15.

Second, sports "events contracts" like Plaintiff's are not "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." At most, the contracts turn on the *outcome* of an "event," not its occurrence or non-occurrence. *See Nadex*, 815 F. Supp. at 1181–87 (reaching that conclusion after analyzing various dictionary definitions of "event" and "occurrence" and applying them to the usage of those terms in the text); *Cafferelli*, 2026 WL 2294589, at *7 (same); *but see Orgel*, 2026 WL 474869, at *7. For example, a sports event contract

as to "who will win" the Kentucky Derby turns on the "outcome" of an event, not whether the Kentucky Derby "will take place (occur, not occur, or extent of occurrence)." *Nadex*, 815 F. Supp. 3d at 1184; *see also Assad*, 2026 WL 2543846, at *9 ("[W]e do not refer to whether the Dodgers will win the World Series, or how many touchdowns Fernando Mendoza might throw in a game, or how many points BYU Football will win by as an 'event'").

**b. Context And Purpose**

The statutory context and purpose surrounding the definition of "swap" and the CEA as a whole confirm that Plaintiff's sports event contracts are not swaps.

First, as to context, when Congress refers to conduct commonly understood to be gambling, betting, or wagering, it speaks clearly and explicitly. *See Assad*, 2026 WL 2543846, at *9 ("Congress has spoken on gambling repeatedly, deliberately, and specifically."). Such laws also manifest "a coherent federal policy: They respect the policy choices of the people of each State on the controversial issue of gambling." *Murphy*, 584 U.S. at 484; *see also Greater New Orleans Broad. Ass'n v. United States,* 527 U.S. 173, 187 (1999); 15 U.S.C. §3001(a)(1) ("[T]he States should have the primary responsibility for determining what forms of gambling may legally take place within their borders."). For example, 18 U.S.C. §1084 "outlaws the interstate transmission of information that assists in the placing of a bet on a sporting event…if the underlying gambling is illegal under state law." *Murphy*, 584 U.S. at 484. Similarly, under 18 U.S.C. §1955, "operating a gambling business violates federal law only if that conduct is illegal under state or local law." *Id*. Numerous other federal laws reflect this deference to states concerning gambling. *See* 15 U.S.C. §§3001(a)(1), 1178; 18 U.S.C. §§1952–1953; 31 U.S.C. §§5362–5363. Thus, federal law consistently evinces an intent to *support and assist* state police efforts, not *eviscerate* them. *See Martin*, 793 F. Supp. 3d at 679–84.

A more limited reading is also supported by the "background principle" that when a federal

statute touches on "areas of traditional state responsibility," courts must look for a clear statement from Congress that it intended to "effect a significant change in the sensitive relation between" the federal and state governments. *Bond v. U.S.*, 572 U.S. 844, 858–59 (2014). Congress did not intend to legalize and centralize sports betting under the CEA, severely undermining additional federal statutes, and preempting the states from regulating gambling, so long as DCMs self-certify their bets as "event contracts." *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes."); *Epic Sys.*, 584 U.S at 510 (presumption against implied repeals); *Assad*, 2026 WL 2543846, at *9, *15; *Martin*, 793 F. Supp. 3d at 683; *Cafferelli*, 2026 WL2294589, at *9; *Nessel II*, 2026 WL 2295184, at *9. And, "*everyone*" "knows" that "sports event contracts are, in reality, sports bets." *Assad*, 2026 WL 2543846, at *10.

Interpreting swaps so broadly as to include Plaintiff's offerings is contrary to the principle of statutory construction that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *U.S. v. Miller*, 604 U.S. 518, 533 (2025); *see also Dubin v. U.S.*, 599 U.S. 110, 124–25 (2023) (applying *noscitur a sociis* canon concerning context of words). Here, the other definitions of "swap" found in §1a(47)(A)(i)-(vi) "refer almost exclusively to financial measures, indices, or instruments." *Hendrick*, 817 F. Supp. 3d at 1027; *see also Assad*, 2026 WL 2543846, at *12. Accordingly, a swap is best "understood as a transaction involving financial instruments and measures that traditionally and directly affect commodity prices. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not." *Schuler I*, 2026 WL 657004, at *6; *see also Cafferelli*, 2026 WL2294589, at *10; *Wisconsin*, 2026 WL 2474512, at *10; *Nessel II*, 2026 WL 2295184, at *9; *Bird*, 26-cv-00109, ECF 57 at 16; *Assad*, 2026 WL2543846, at *10. Moreover, unlike the enumerated swaps within §1a(47)(A)(i)-(vi), "sports events contracts do not help

institutions or investors against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Id*.

The ordinary meaning of "swap" would also "not have been understood by educated users of the language to include 'sporting event contracts' to the extent that that category could be separated from sports betting, and the CFTC did not use the term 'swap' that way before [or after] the passage of Dodd-Frank." *Nessel*, 2026 WL 1895958, at *4; *Hendrick*, 817 F. Supp. 3d at 1027 (definition of swap "does not include consumer transactions that have not historically been known to be swaps, such as sports wagers"). For example, §1a(47)(A)(ii) closely mirrors a proposed definition of "OTC derivative instrument" sent by the Securities Industry Association ("SIA") to the SEC in 1998. Ex. 1. In this context, SIA proposed this language to "encompass[] the broad range of instruments that comprise OTC derivatives" and "dealer's securities trading activities" (*id.*), none of which extended to sports wagering (which was effectively banned at the time). Thus, for Plaintiff "to deny that its sports event contracts are sports bets under a reasonable person's understanding is disingenuous." *Assad,* 2026 WL 2543846 at *10.

Plaintiff's interpretation also suffers from other overbreadth problems. It "lacks a limiting principle." *Assad*, 2026 WL 2543846, at *11. It would render the other definitions of swap superfluous (*see U.S. v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016) (applying canon against superfluity)), whereas Defendants' reading harmonizes §1(a)(47)(A) with the other sub-definitions. *Supra* 14-15. It is also so expansive that it would encompass all *licensed gaming*, as the CEA generally makes it *unlawful* for retail customers to enter into a "swap" outside of a DCM. *See Assad*, 2026 WL 2543846, at *11 (citing §2(e)).

Finally, Plaintiff's broad interpretation of Dodd-Frank's amendments to the CEA as having redefined sports gambling as a "swap" does not align with the purpose of Dodd-Frank, which was

subtitled, in part, "An Act to promote the financial stability of the United States by improving accountability and transparency in the financial system." Pub. L. No. 111–203, 124 Stat. 1376 (2010). By passing Dodd-Frank, "Congress was bringing risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector… not enabling nationwide gambling on CFTC-designated exchanges." *Hendrick*, 817 F. Supp. 3d at 1031; *see also Assad*, 2026 WL 2543846, at *10 ("difficult" to "conclude" that "Congress intended to upend its decades of careful regulation of gambling based on broad definitions of the words used in a Wall Street Reform Bill"); *Cafferelli*, 2026 WL2294589, at *9; *Bird*, 26-cv-00109, ECF 57 at 12.

**c. Major Questions Doctrine**

Plaintiff's position that Congress purportedly bestowed national gambling regulatory authority on the CFTC should be rejected for the additional reason that it "would create a major-questions problem." *See Assad*, 2026 WL 2543846, at *14; *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (employing major-questions and federalism canon). "[C]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022); *Ala.*, 594 U.S. at 764. Gambling is unquestionably an area of vast economic and political significance, particularly given the speed and volume of cash exchanged, state taxation, job creation, and government regulation. "[I]t is implausible that Congress intended to allow the CFTC to engage in the national regulation of gambling based on expansive definitions of the words 'event' and 'associated with' in a Wall Street reform bill." *Assad*, 2026 WL 2543846, at *15.

**d. Legislative History**

The legislative history also shows that, in passing Dodd-Frank, Congress sought to remedy regulatory failures following the 2008 financial crisis. Indeed, "Congress had nothing like Plaintiff's products in mind when it defined 'swap.'…The markets with which Congress was

concerned were dominated by large financial institutions and did not involve individuals staking relatively small amounts of money on the outcome of a football game." *Nessel I*, 2026 WL 1895958, at *4. The legislative debate even stated that "swaps" do not reach sports betting because these "types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." 56 Cong. Rec. S5902-01, 2010 WL 2788026, at S5906–07; *see also Williams*, 2026 WL 2017466, at *9.

**ii. Plaintiff's Arguments That Its Sports Offerings Are "Swaps" Are Meritless**

Plaintiff's arguments that its sports event contracts are "swaps" are unavailing. First, Plaintiff argues that Defendants have improperly created a sports-only carve-out from the definition of swap. Mem. 15-16. That is incorrect. Defendants' interpretation explains why gambling on sports through "event contracts" contravenes the plain meaning, purpose, context, structure, and history of the CEA. *Supra* 11-17. Demonstrating that sports event contracts are *not* swaps does not preclude a finding that events contracts as to other topics (*e.g.*, culture and elections) are *also* not swaps. Indeed, Plaintiff's affirmative case relies on the AG's enforcement regarding "event contracts" as to culture and elections. Compl. ¶ 8.

Second, Plaintiff argues sports event contracts are "swaps" because they are "fundamentally distinct from sportsbooks." Mem. 16 (citing *id.* 8-9). But its distinctions are irrelevant and lack "any connection" to the CEA's definition of "swap" and likewise fail to account for other statutory language. *Assad*, 2026 WL 2543846, at *11.

Third, Plaintiff notes, without further analysis, that several courts have found that sports event contracts are swaps. Mem. 17 (citing to *Flaherty*, *Johnson* (no longer good law after *Assad*), *Orgel*, and *Minnesota*). However, these opinions are unpersuasive. They apply unduly broad interpretations of the CEA that fail to appropriately consider the statute as a whole, canons of construction, historical context, and pre-Dodd-Frank legislative history**.** For example, *Flaherty*

failed to grapple with the fact that its interpretation of "swap" would yield absurd results like "bingo games to ping[-]pong matches" falling under the CEA, claiming it to be unnecessary because the CFTC itself has the authority to promulgate rules with a narrower construction. *Flaherty*, 172 F.4th at 228. But *Flaherty*'s answers do not confront the fact that Plaintiff's interpretation of "swap," on its face, *does* allow anyone to avoid state regulation of, for example, ping-pong matches, simply by registering as a DCM and self-certifying offerings, a result that is patently contrary to the structure of the CEA, the intent of Congress, numerous canons of statutory constructions noted above, and the legislative history. Moreover, *Flaherty*'s suggestion that Congress placed the entirety of gambling into the ambit of the CEA and delegated to the CFTC the power to fix the resulting problems this would create, makes little sense on its face, and creates an even bigger major-questions doctrine problem. Unsurprisingly, most subsequent decisions have rejected the *Flaherty* view. *See Assad*, 2026 WL 2543846, at *11; *Cafferelli*, 2026 WL 2294589, at *10; *Wisconsin*, 2026 WL 247512, at *11; *Nessel II*, 2026 WL 2295184, at *9–10; *Bird*, 26-cv-00109, ECF 57 at 12–17.

Fourth, Plaintiff obliquely suggests the Special Rule reflects that sports event contracts are swaps because it purportedly "presupposes" that "gaming-related event contracts are within the CFTC's jurisdiction." Mem. 6. This is not accurate. The Special Rule provides that the CFTC may prohibit the listing of any "agreements, contracts, transactions, *or* swaps in excluded commodities" that "are contrary to the public interest," such as those involving "activity that is unlawful under any Federal or state law"; "terrorism"; "assassination"; "war"; and "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii) (emphasis added). This language does not in any way address what may be included in the definition of "swap," let alone "presuppose" that sports event contracts qualify. Moreover, although the Special Rule gave the concurring judge in *Assad* "pause" because the judge

interpreted the provision as "appear[ing] to give the CFTC *discretion* whether to ban altogether gaming contracts" (*Assad*, 2026 WL 2543846, at *19) (emphasis added), no such concern is warranted. As the *Assad* majority explained, the text of the Special Rule together with the CFTC's own regulation make clear that the listing of gaming contracts is prohibited and provide the CFTC with a mechanism for taking action on a contract that a DCM has improperly self-certified. *See id.* at *13 (citing 17 C.F.R. § 40.11(a), (c)).

Finally, Plaintiff hypothesizes contrived, made-for-litigation scenarios where a sports events contract might be used to mitigate risk. Mem. 8-9, 17. These hypotheticals are unpersuasive, as they reflect precisely the type of downstream financial consequences that fall outside the definition of swap and provide no limiting principle. *Supra* 11-12; *see also Cafferelli*, 2026 WL 2294589, at *8 (rejecting Kalshi's argument about "potential consequence[s] for stakeholders" as a poor interpretation of the text with "no limiting principle"); *Wisconsin*, 2026 WL 2474512, at *9 (if a financial consequence were to include impact on "vendors, lodging business, and food and beverage services," it would be "difficult to imagine" what "this definition would not cover").

Moreover, Plaintiff offers no evidence that its users are "regional sponsors," "hotels," "broadcasters" or "sportsbooks" looking to "mitigate risk" by betting on whether a game that conceivably might affect its bottom-line takes place. Mem. 8. Rather, Plaintiff "has a gambling problem" (*Assad*, 2026 WL 2543846, at *10), in that its own words and operating history make clear that it is, and always has been, a platform for retail sports bettors to "trade" against their "peers" for entertainment purposes. *Supra* 7-9; *see also Hendrick*, 817 F. Supp. 3d at 1029. Likewise, Plaintiff's coy observation that one can conceptualize a limited situation where a wager on whether a team will win an elimination game in a playoff series is similar to a wager on whether the next game will take place is unavailing. Plaintiff's actual offerings are wagers on outcomes

(winners, spreads, and statistics) and parlays of those wagers. *Supra* 9-10. Plaintiff's "sports event contracts do not help institutions or investors hedge against risk; they *create* risk, largely for ordinary consumers, where none previously existed." *Assad*, 2026 WL 2543846, at *10. Plaintiff's failure to demonstrate that its actual offerings satisfy its (incorrect) definition is an evidentiary failing that refutes any "clear or substantial" likelihood of success on the merits.

### B. Even If The Event Contracts Are "Swaps," Plaintiff Is Unlikely To Succeed On Its Claim Because The CEA Does Not Preempt The At-Issue New York Laws

There are three types of federal preemption: "express," "field" and "conflict." *N.Y. SMSA v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). Plaintiff bears a "considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). Plaintiff's claim fails under all three theories

#### i. No Express Preemption

Express preemption occurs when a federal statute "expressly directs that state law be ousted." *Ass'n of Int'l Auto. Mfrs. v. Abrams*, 84 F.3d 602, 607 (2d Cir. 1996). Even if a statute contains an express preemption clause, "it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp. v. Good*, 555 U.S. 70, 76 (2008). "The purpose of Congress is the ultimate touchstone in every pre-emption case," discerned in part from the "structure and purpose of the statute as a whole," and the court's "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic v. Lohr*, 518 U.S. 470, 485–86 (1996). If "preemptive force of the text is ambiguous," the court "resolve[s] that ambiguity against preemption." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025).

Plaintiff argues that the CEA expressly preempts state gaming laws because it states the CFTC has "exclusive jurisdiction" over "transactions involving swaps" "executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). However, a holistic reading of the CEA, particularly in light of its purpose and the context in which Dodd-Frank amended it, refutes this.

By its plain terms, §2(a)(1)(A) addresses "jurisdiction," "which would represent an unusual express-preemption provision" (as opposed to saying "preempt" or "supersede"). *Schuler II*, 2026 WL 1295806, at *4. The scope and effect of the "exclusive jurisdiction" provision is further diluted by its two savings clauses, as well as language in §13a-2(1) giving state regulators the jurisdiction to sue for violations of the CEA. *Id.* By contrast, the CEA elsewhere contains two unmistakable express preemption provisions relating to swaps. *See* 7 U.S.C. § 16(e)(2) ("This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" for certain limited kinds of swaps not at issue here); 7 U.S.C. §16(h)(2) ("A swap…may not be regulated as an insurance contract under the law of any State."). Congress' choice to "expressly preempt only certain categories of state laws shows that it did not mean to 'withdraw' the States' power to enact all such laws in other circumstances." *Schuler II*, 2026 WL 1295806, at *4; *see also Wisconsin*, 2026 WL 2474512, at *11 (same); *Nessel II*, 2026 WL 2295184, at *11 (same).

Plaintiff cites cases for the proposition that courts have found express preemption by use of "phrases like 'exclusive jurisdiction.'" Mem. 13-14. However, the CEA's ambiguous-at-best usage of "exclusive jurisdiction" must be read in context with its use of more traditional preemption language elsewhere. *Supra* 21. Moreover, the Supreme Court cases cited by Plaintiff involve situations not present here. *See Mississippi v. Louisiana*, 506 U.S. 73 (1992) (jurisdiction of court); *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) (as noted in *Nessel I*, 2026 WL 1895958, at *9, "the Court emphasized the unique legislative history of the statute in question");

*Monsanto Co. v. Durnell*, 146 S. Ct. 2001, 2008 (2026) (provision said "State[s] shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.").

In addition, Plaintiff's cases specific to §2(a)(1)(A) (Mem. 14) are unpersuasive, as they all significantly pre-date Dodd-Frank's 2010 passage, and none address the interplay of CFTC jurisdiction and state law in an area historically reserved to the states' police powers where the CEA preserves state law and Congress manifested no preemptive intent. *See also Martin*, 793 F. Supp. 3d at 682.

Plaintiff also argues that the language "except as hereinabove provided" in §2(a)(1)(A)'s savings clauses demonstrates that regulation of Plaintiff's sports event contracts is expressly preempted. Mem. 19. Not so. Although §2(a)(1)(A) has *some* preemptive effect, its preemptive scope nevertheless "leave[s] room for states to regulate certain activities that may have otherwise been covered by the CEA." *Williams*, 2026 WL 2017466, at *7; *Nessel I*, 2026 WL 1895958, at *10 ("The '[e]xcept as hereinabove provided' language" implies that "the 'exclusive jurisdiction' clause limits the jurisdiction of state regulatory authorities to some degree but does not suggest that it completely removed their ability to enforce state law."); *Cox*, 2026 WL 2241564, at *7 (agreeing that interpreting §2(a)(1)(A) as expressly preempting state gaming laws "is inconsistent with other CEA provisions and leads to absurd results").

Plaintiff also cites CEA legislative history and associated case law. Mem. 14-15. But these predate Dodd-Frank and the Special Rule. Importantly, "the limited legislative history that exists from 2010 that bears on the scope of Congress's preemptive intent cuts against preemption." *Martin*, 793 F. Supp. 3d at 683; *see also Schuler I*, 2026 WL 657004, at *8.

Finally, none of the analysis underlying the Ninth Circuit's decision in *Assad* is

inconsistent with Defendants' position on the scope of Congressional intent. Although the Ninth Circuit interpreted §2(a)(1)(A)'s "exclusive jurisdiction" language as preemptive but found that sports event contracts are not swaps, the Court emphatically refuted that Congress preempted (field or conflict) the application of state gaming laws to sports gambling disguised as events contracts. *Assad*, 2026 WL 2543846, at *7, *9-17; *cf. Williams*, 2026 WL 2017466, at *6; *Cafferelli*, 2026 WL 2294589, at *11-13. Moreover, *Assad*'s decision declined to apply any presumption against preemption in its express preemption analysis because the court concluded that the "plain wording" of the express preemption provision was supposedly clear. *Id.* at *7. But, as explained (*supra* 15-17), it is far from clear here that the "*substance and scope* of Congress's displacement of state law," *Yousefzadeh v. Johnson & Johnson Consumer Inc.*, _ F.4th _, 2026 WL 2192415, at *7-8 (2d Cir. 2026), reaches the application of state gaming laws to sports bets, just because they are traded on a DCM. Where, as here an express preemption clause is "ambiguous or open to more than one plausible reading, courts have a duty to accept the reading that disfavors pre-emption." *James*, 159 F.4th at 171 & n.8; *see Yousefzadeh*, 2026 WL 2192415, at *7 (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). There is thus no basis to read the "exclusive jurisdiction" language as expressly preempting the application of state gaming law here.

**ii. No Field Preemption**

Field preemption exists where "Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law." *N.Y. SMSA*, 612 F.3d at 104. It is "rare" and "occurs when Congress manifests an intent to occupy an entire regulatory field to the exclusion of the states." *N.Y. State Telecomms. Ass'n. v. James*, 101 F.4th 135, 147 (2d Cir. 2024). "In all pre-emption cases," courts presume Congress did not preempt state law, "particularly" in "a field which the States have traditionally occupied." *Medtronic*, 518 U.S. at 485. "[B]ecause the States are independent sovereigns in our federal system," courts "start with

the assumption that the historic police powers of the States were not meant to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id*.

Here, "the presumption against preemption applies[.]" *Martin*, 793 F. Supp. 3d at 677; *see also Schuler II*, 2026 WL 1295806, at *5; *Williams*, 2026 WL 2017466, at *5–6. States' authority to regulate gambling conducted within their borders is long established. *See, e.g., Murphy*, 584 U.S. at 458–59; *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). New York law regulating and policing gambling spans 250 years. *See supra* 4. As such, numerous courts have correctly found that the CEA does not field-preempt state gaming laws. *Williams*, 2026 WL 2017466, at *6–7; *Assad*, 2026 WL 2543846, at *17; *Schuler II*, 2026 WL 1295806, at *5; *Martin*, 793 F. Supp. 3d at 684; *Nessel I*, 2026 WL 1895958, at *11; *Cafferelli*, 2026 WL 2294589, at *11-13; *Cox*, 2026 WL 2241564, at *9-11; *see also Flaherty*, 172 F.4th at 236–38 (Roth, J., dissenting).

First, the savings clauses in §2(a)(1)(A) and the express preemption provisions in §16 both rebut any field preemption. "The presence of a savings clause usually signals that Congress does not mean to preempt the field," and Section 2(a)(1)(A) indicates that "Congress did not intend to preempt the field of futures trading." *Schuler II*, 2026 WL 1295806, at *5. "This provision evinces Congress' intent to leave room for states to regulate certain activities that may have otherwise been covered by CEA." *Williams*, 2026 WL 2017466, at *7; *see also Nessel I*, 2026 WL 1895958, at *10 (The "'[e]xcept as hereinabove provided' language [in the jurisdictional savings clause]…does not suggest that it completely removed [state regulators'] ability to enforce state law."). Similarly, reading the §2(a)(1)'s "exclusive jurisdiction" provision to field preempt *all* state gaming law would render the express preemption clauses in Section 16(e)(2) and (h)(2) meaningless. *See Schuler II*, 2026 WL 1295806, at *4; *Martin*, 793 F. Supp. 3d at 680–81; *Williams*, 2026 WL 2017466, at *7; *Cafferelli*, 2026 WL 2294589, at *12; *Wisconsin*, 2026 WL 2474512, at *11;

*Nessel II*, 2026 WL 2295184, at *11-14; *Cox*, 2026 WL 2241564, at *10, n.119. Plaintiff's attempt to treat the savings clauses and express preemption provisions as supporting a finding of field preemption (Mem. 20) flips the analysis on its head, as numerous courts have found.

Second, there is no comprehensive statutory scheme through which Congress intended to occupy the field as Plaintiff claims. To name but one flaw in Plaintiff's claim, that §13a-2(1) authorizes state officials to sue over violations of the CEA or CFTC "shows" state officials "have a role to play." *Schuler II*, 2026 WL 1295806, at *5. Moreover, contrary to Plaintiff's cursory suggestion that the Special Rule reflects field preemption (Mem. 21), the Special Rule's allowance for exclusions based on state law confirms that Congress intended for some state laws to operate alongside the CEA. *Williams*, 2026 WL 2017466, at *7; *Cafferelli*, 2026 WL 2294589, at *12; *Nessel II*, 2026 WL 2295184, at *13; *see also Schuler II*, 2026 WL 1295806, at *6. "[W]here 'coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.'" *Coal. for Competitive Elec. v. Zibelman*, 272 F. Supp. 3d 554, 567 (S.D.N.Y. 2017) (quoting *Hughes v. Talen Energy Mktg.,* 578 U.S. 150, 167 (2016) (Sotomayor, J., concurring)). There is nothing preemptive about the Special Rule: it does not make any illegal conduct legal or otherwise limit what a state may do in any way; it simply provides the CFTC with the ability to act. *See Williams*, 2026 WL 2017466, at *7, 9 (noting CFTC's "decision not to exercise its authority under the Special Rule" as to Kalshi's sports event contracts); *Assad*, 2026 WL 2543846 at *13 (noting same, and also concluding the "Special Rule did not give the CFTC any more preemptive authority over gaming than it gave the CFTC authority over terrorism or assassination and the other underlying 'excluded commodities.'"). Thus, there is no field preemption here because the CEA "often permits state regulation." *Schuler II*, 2026 WL 1295806, at *5.

Even if the Court credited Plaintiff's argument that its cited provisions of the CEA reflect a "comprehensive scheme for regulation" (Mem. 20-21), Plaintiff's argument still fails because it contravenes the Supreme Court's instruction that "[w]hen conducting the field preemption analysis," a court must "consider the *target* at which the state law *aims* in determining whether that law is pre-empted." *Assad*, 2026 WL 2543846, at *17 (quoting *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015)). Here, the at-issue New York laws regulate gaming, gambling, wagering and similar activity (*supra* 4), and "Congress has explicitly not occupied the field of gambling, declaring that 'the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders.'" *Assad*, 2026 WL 2543846, at *17 (quoting 15 U.S.C. §3001(a)(1)); *see also Nessel II*, 2026 WL 2295184, at *13.

Finally, "[i]t is highly unlikely that Congress would have overridden state gambling laws without at least some indication in the text and legislative history that it intended to do so." *Martin*, 793 F. Supp. 3d at 682; *Schuler I*, 2026 WL 657004, at *8 ("History reveals no evidence that Congress intended to preempt state sports gambling laws."). Rather, "given that the power to regulate gambling is a traditional police power exercised by New York," the Court should "decline[] to interpret the CEA's grant of exclusive jurisdiction as leaving 'no room for supplementary state legislation.'" *Williams*, 2026 WL 2017466, at *7 (quoting *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)). The best Plaintiff can muster is pointing out that Senator Lincoln cautioned that event contracts around sporting events would be used for gambling for the overbroad claim that "Congress thus directly considered sports." Mem. 21. However, "isolated statements by particular legislators have limited evidentiary value when it comes to the meaning of a statute," *Martin*, 793 F. Supp. 3d at 684 (citing *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012)). And the "concern about 'gambling' occurring on DCMs" raised by Senator Lincoln

(and similarly by Senator Feinstein) "makes it even less likely that Congress intended for Dodd-Frank to render obsolete state laws limiting or regulating gambling for transactions that Congress brought within the purview of the CEA pursuant to Dodd-Frank." *Martin*, 793 F. Supp. 3d at 684; *see also Williams*, 2026 WL 2017466, at *9 (finding that Senator Lincoln's statements undermine any suggestion that Dodd-Frank field preempted sports gambling); *Cafferelli*, 2026 WL 2294589, at *13; *Nessel II*, 2026 WL 2295184, at *13; *Cox*, 2026 WL 2241564, at *10.

In sum, neither the structure, context, nor legislative history of the CEA support or "establish that Congress clearly and manifestly intended to preempt state sports-betting laws." *Martin*, 793 F. Supp. 3d at 679; *Williams*, 2026 WL 2017466, at *7. There is no field preemption.

**iii. No Conflict Preemption**

Conflict preemption exists where state law conflicts with federal law such that it is either "impossible for a party to comply with both" or the state law "is an obstacle to the achievement of federal objectives." *Figueroa v. Foster*, 864 F.3d 222, 228 (2d Cir. 2017). Burdens under each branch are "heavy" and "sharp." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 725 F.3d 65, 101 (2d Cir. 2013) ("*MTBE*").

Impossibility preemption "occurs when state law penalizes what federal law requires, or when state law claims directly conflict with federal law." *Figueroa,* 864 F.3d at 234. It is a "demanding defense, and [the Second Circuit] will not easily find a conflict that overcomes the presumption against preemption." *MTBE*, 725 F.3d at 97. "If there was *any* available alternative for complying with both federal and state law—even if that alternative was not the most practical and cost-effective—there is no impossibility preemption." *Id.* at 99.

Obstacle preemption "precludes state law that poses an actual conflict with the overriding federal purpose and objective." *Id*. at 101. "What constitutes a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose

and intended effects." *Id*. The "mere fact of tension" is not sufficient for preemption; the conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id*. at 101–02. Significantly, conflict preemption does not lie even where "it is possible, even likely, that a [state] restriction…could make it much less profitable" to operate in New York. *Art and Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024).

Here, although neither Plaintiff's Motion nor its subsequent reliance on the CFTC's purported "emergency order" in its notice of supplemental authority is clear on which form of conflict preemption Plaintiff relies, neither form is applicable here.

**a. The Motion Failed To Establish Conflict Preemption**

Because New York has historic police powers over gaming, the court considers whether Congress manifested its intent to preempt through the scope, structure, and purpose of the CEA. *Figueroa*, 86 F.3d at 232. As set forth *supra* 11-19, Congress did not. Plaintiff has therefore failed to demonstrate how any New York law conflicts with or stands as an obstacle to achieving the CEA's purposes. Mem. 22-23. Numerous courts have declined to find conflict preemption and are persuasive on this point. *Williams*, 2026 WL 2017466, at *8–9 ("Although complying with New York gambling laws imposes an additional regulatory requirement on Kalshi, that requirement is not squarely contrary to federal law."); *Martin*, 793 F. Supp. 3d at 684–86, *Nessel I*, 2026 WL 1895958, at *11-13, *Schuler I*, 2026 WL 657004, at *9 ("Kalshi offers nothing but its own ipse dixit that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial.'"); *Assad*, 2026 WL 2543846, at *16; *Cafferelli*, 2026 WL 2294589, at *13-14; *Wisconsin*, 2026 WL 2474512, at *13; *Nessel II*, 2026 WL 2295184, at *14-15 ("Coinbase's averments are, in a word, applesauce."); *Cox*, 2026 WL 2241564, at *11-14.

Plaintiff primarily argues that conflict preemption applies because the application of New York gaming laws to Plaintiff's sports event contracts would allegedly "frustrate" Congress'

purported effort to create a "uniform" regulatory scheme for DCMs. Mem. 22-23. While this is largely a rehash of Plaintiff's other preemption arguments, it is belied by the fact that DCMs are subject to state law in other areas. *Schuler II*, 2026 WL 1295806, at *5–6 (noting the CEA "often permits state regulation," including but not limited to the savings clauses, state enforcement of a "general civil or criminal antifraud statute" in state court, state contract law "overlay[ing]" the CEA, and "allow[ing] state officials to enforce" the CEA). Moreover, the "CEA leaves room for states to regulate tangential issues that may arise from trading swaps and other financial products on DCMs….New York's gambling laws, which seek to regulate gaming in the state, complement rather than conflict with federal law." *Williams*, 2026 WL 2017466, at *9.

Similarly, Plaintiff argues that application of New York law would frustrate Congress' purported intent for a "national exchange" to operate under a single federal enforcement framework. Mem. 22-23. This is not true. *E.g.*, *Supra* 27-29. For example, Plaintiff cites no requirement that every event contract be offered nationwide. Indeed, Plaintiff admits it does not offer its contracts in Arizona, Michigan, and Nevada. Ex. 36. Rather, the situation is, at most, one where the federal government might view state enforcement action as upsetting its current enforcement priorities. But that is not enough to support preemption. *See Kansas*, 589 U.S. at 212 ("[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers. Art. VI, cl. 2."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, 959 F.3d 1201, 1224 (9th Cir. 2020) ("The potential for overlapping state and federal penalties has never, without more, raised the inference that Congress intended to preempt state law.").

In addition, Plaintiff argues that if it were required to obtain a gambling license in each

state in which it wishes to operate, this would be both costly and would allegedly result in reduced "liquidity" in each state as compared to a national exchange. Mem. 23. These allegations are vague, speculative, and unsupported by concrete financial or trading metrics. They are also meritless. Even where it is "likely" that state restrictions "could make it much less profitable" to operate, that is insufficient for conflict preemption. *Seggos*, 121 F.4th at 436. Plaintiff's claims are also undermined by the fact that it previously operated a "peer-to-peer" sports betting exchange solely in Colorado. *Supra* 7-8. Moreover, numerous courts have rejected prediction markets' arguments that operating state-by-state through appropriate licensing gives rise to conflict preemption. *See, e.g.*, *Williams*, 2026 WL 2017466, at *8; *Cafferelli*, 2026 WL 2294589, at *14; *Martin*, 793 F. Supp. 3d at 686; *Schuler I*, 2026 WL 657004, at *9; *Cox*, 2026 WL 2241564, at *12.

**b. Plaintiff's Notice of Supplemental Authority Is Irrelevant**

In its notice of supplemental authority, Plaintiff argues that the CFTC's August 11, 2026 "emergency order" ("Order") purporting to direct Kalshi "to continue to operate in accordance with its normal practices" even if the AG obtains a TRO against it "reveals" that Plaintiff "face[s] an irreconcilable conflict between federal law and state law." ECF 41 at 1-2. Although Plaintiff does not elaborate on the precise nature of the "conflict" (and the "Order" is directed to a non-party in the event of a future court order), Defendants note that the "Order" does not contain any consequences for non-compliance. *KalshiEX LLC v. Cafferelli*, 2026 WL 2368931, at *2 (D. Conn. Aug. 15, 2026) ("*Cafferelli II*") (denying injunction pending appeal, and rejecting the "Order" as post-decision evidence of a conflict). Moreover, Plaintiff cites no law standing for the proposition that a federal regulator can generate conflict preemption by ordering its regulated entities not to comply with a court order. In any event, as set forth below, the "Order" is irrelevant to the Motion.

In addition, the "Order" is dependent on the erroneous legal conclusion that New York state law is preempted as-applied to Kalshi, the agency's own interpretation of the CEA that is

entitled to no deference under *Loper Bright* and is disputed in this and other lawsuits. Like Plaintiff's, the CFTC's views have also been rejected by the majority of federal courts to address these issues. That the "Order" merely contravenes—and flat out ignores—these and other persuasive rulings that pre-date it, is not evidence of a purported conflict between federal and state law. *See Cafferelli II*, 2026 WL 2368931 at *2 ("Order" is not evidence of conflict preemption and "ignores" holdings of *Williams* and *Cafferelli*). (And, even if, *arguendo*, a DCM is directed to function "in accordance with the CEA's Core Principles" (ECF 41 at 13), this would necessarily require it to refrain from listing sports offerings. 7 U.S.C. §7(d)(1)(A)(ii); *Assad*, 2026 WL 2543846, at *12 ("Kalshi's self-certification and listing of these contracts is unlawful under this Special Rule, and its associated regulation, 17 C.F.R. § 40.11.").)

Nor is the "Order" based on the CFTC's expert and impartial judgment. *See* H.R. Rep. No. 93-1383, at *5900 (1974) (Conf. Rep.) ("effective use" of its emergency powers requires CFTC's "careful exercise of expert and impartial judgment"). Rather, it was issued to advance the federal government's litigation position in its own preemption lawsuits. And, unlike prior invocations of such emergency powers (Ex. 2), it does not claim to be based the CFTC's expert judgment.

## II. PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

"To establish irreparable harm, the moving party must show an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025). Plaintiff's claimed harms are speculative, unsupported, and self-inflicted—not irreparable. *First*, Plaintiff's argument that it faces irreparable harm from enforcement of preempted laws (Mem. 23-24) fails because Plaintiff is unlikely to succeed on its claim. *Patriots*, 17 F.4th at 294; *Williams*, 2026 WL 2017466, at *10.

*Second*, Plaintiff fails to establish that future civil enforcement by Defendants would cause

irreparable harm. Mem. 23-24. Gaming Commission civil penalties "follow[] a hearing or opportunity to be heard," Racing Law §116, and may be challenged in court. *Williams*, 2026 WL 2017466, at *10 ("[A]ny civil fines that may be levied against Kalshi can be challenged and vacated if Kalshi ultimately prevails[.]"). The civil state enforcement proceedings brought by the AG on which Plaintiff relies also involve an opportunity to be heard in court. As for threat of imminent criminal enforcement by the AG, Plaintiff's allegations are speculative.[6]

*Third*, despite contradictory allegations as to whether it is offering sports event contracts in New York or "refrain[ing]" from doing so, Plaintiff makes various claims of alleged financial harm if it cannot operate in New York. Mem. 24-25. None has merit. Plaintiff's alleged harm to its "reputation and goodwill among New York consumers" (*id.* 24) is vague and speculative. *See also Williams*, 2026 WL 2017466, at *10 (rejecting Kalshi's allegation of "harm to its reputation" as insufficient). Indeed, any "goodwill" Plaintiff might lose if subject to enforcement stems from its profit-driven business decision to offer sports event contracts in New York *just weeks* after a court in this District found (consistent with the view of a majority of courts) that New York laws are likely *not* preempted. *Id.* at *4–9. Such self-inflicted harm is not irreparable. *See Assad*, 2026 WL 2543846, at *17 (affirming district court conclusion that Kalshi's expansion of its offerings "despite knowing its sports contracts implicated state law" was "self-inflicted" harm); *Convergen Energy WI v. L'Anse Warden Electric*, 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (plaintiffs cannot "manufacture" "exigency" for irreparable harm). Plaintiff's claim that the lack of an injunction would be a "death knell" lacks sufficient evidence to establish that the "very viability of [its] business" is threatened. *See Tom Doherty Assocs. v. Saban Ent.*, 60 F.3d 27, 38 (2d Cir. 1995). Further, Plaintiff's claim regarding lost "revenue" is unsupported, and seemingly contrary

[6] Whether, and to what extent, Plaintiff is civilly and/or criminally liable is not at issue here.

to its position that "monetization" of its exchange "won't be a top priority" upon launch. Ex. 17 at 1. Plaintiff's brief also recites a laundry list of claimed harms (*e.g.*, alleged concerns about "liquidity" without New York "trades") that are lawyer *ipse dixit* unsupported by any evidence, and otherwise undermined by Plaintiff's prior operation of "peer-to-peer" betting operations in a single state (Colorado) and as a "sweepstakes" casino in fewer than 50 states. *Supra* 7-8.

Finally, Plaintiff's argument that its alleged monetary harm is irreparable because of sovereign immunity is misplaced. Mem. 24. Plaintiff alleges hypothetical future monetary harms that, as demonstrated above, fail to establish irreparable harm. An insufficient showing as to irreparable monetary harm is not transformed into an adequate showing when asserted against state defendants. *See James*, 159 F.4th at 171–72 (no irreparable harm on claims against state defendants where alleged monetary losses were "ordinary compliance costs" or "conclusory and speculative predictions"); *Freedom Holdings v. Spitzer*, 408 F.3d 112, 114–15 (2d Cir. 2005) (similar).

## III. THE EQUITIES AND PUBLIC INTEREST DO NOT FAVOR A PRELIMINARY INJUNCTION

"In balancing the equities, we first acknowledge the harm the government Defendants would suffer if enjoined from effectuating statutes enacted by representatives of its people." *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 249 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (June 30, 2026). The inability to enforce its own laws "clearly inflicts irreparable harm on the State," *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018), "particularly where there would be an ongoing and concrete harm to public safety interests." *Our Wicked Lady v. Cuomo*, 2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021). Here, the minimal equitable interests cited by Plaintiff (a well-funded corporation attempting to shield itself from longstanding state regulation) are plainly outweighed by New York's interest in protecting the public's welfare through enforcement of state gaming laws.

These laws contain numerous consumer protections, including on matters such as responsible gaming, problem gambling prevention, and age verification. For example, gaming licensees must maintain a page on their websites dedicated to responsible play with clear information about the risks of gaming. 9 NYCRR §5330.34 (responsible gaming). Gambling on New York-based college sports teams is prohibited. Racing Law §§1367(1)(s), 1367-a(4)(a)(xi); *see also* 9 NYCRR §5330.13. Sports wagering is prohibited for individuals under 21 (Racing Law §§1367(2)(d), 1367-a(4)(a)(iii); 9 NYCRR §§5330.8(c)(4), 5330.10(d)(5), & 5330.19), as is advertising, marketing, and promoting mobile sports wagering to underage persons (Racing Law §1367-a(4)(e); 9 NYCRR §5330.45). Notably, Plaintiff does not cite a single existing CFTC regulation that contains any gambling regulation equivalent to New York's safeguards.

These and other regulatory mechanisms exist for vital reasons. As of 2022, mobile sports betting surpassed casino gambling as the primary reason for gambling-related helpline calls made by New Yorkers. Ex. 9. Evidence suggests those with gambling addictions suffer relapses from exposure to prediction markets. Ex. 20. Moreover, Plaintiff offers "sports event contracts" regarding the points scored in college football games (*supra* 9-10), which implicates sports integrity issues like point shaving (Ex. 26). While Plaintiff does not presently allow users under 21, its marketing targets young people (particularly young men). Ex. 39. And with Plaintiff's partnership with the Mets, children will see Novig "integrated across the Mets ecosystem," including "prominent Citi Field signage, branded in-game moments, broadcast-visible branding and original digital content that introduce a new generation of sports fans" to Novig. Ex. 22. And if Plaintiff changes its mind, no CFTC regulation stops it from offering "contracts" to people under 21.

By contrast, Plaintiff identifies minimal equitable interests. It principally argues the

equities favor an injunction because New York's laws are allegedly preempted. Mem. 25. Because Plaintiff is wrong as to preemption (*supra* 10-31), this argument fails. Plaintiff's vague, unquantified claim that it spent money to "comply" with federal regulations for becoming a DCM (*id.*) carries little weight, as Plaintiff applied for DCM status even though governing regulations unambiguously prohibit sports event contracts (*supra* 5-6) and after three district courts (*Martin*, *Nadex*, and *Hendrick*) rejected prediction markets' preemption arguments. Plaintiff's argument that the "public" has an interest in "accessing" its sports event contracts (*id*. 26) is unavailing given that New Yorkers can obtain the same services (online sports betting) through licensed organizations and receive all the benefits of heightened consumer protections in the bargain.

In sum, New York's strong interests in preventing unlicensed betting activities from proliferating outweighs Plaintiff's claimed equitable interests, particularly given that Plaintiff is unlikely to succeed on the merits. *Williams*, 2026 WL 2017466, at *10.[7]

## IV. THE COURT SHOULD IMPOSE A BOND

If the Court grants an injunction (it should not), it should impose a bond on Plaintiff in an amount to be determined upon supplemental briefing. Fed. R. Civ. P. 65(c); *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *8 (D.N.J. Apr. 28, 2025) (setting bond).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court deny the Motion.

[7] *See also Assad*, 2026 WL 2543846, at *18; *Hendrick*, 817 F. Supp. 3d at 1035–36; *Schuler I*, 2026 WL 657004, at *10, *aff'd* 2026 WL 1295806, at *7; *Nessel I*, 2026 WL 1895958, at *13; *Nessel II*, 2026 WL 2295184, at *15; *Cafferelli*, 2026 WL 2294589, at *16-17.

Dated: New York, New York
September 10, 2026

Respectfully submitted,

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*

By: */s/ Robert Arnay*
KATHERINE RHODES JANOFSKY
ROBERT ARNAY
ZACHARY MANLEY
Assistant Attorneys General
28 Liberty Street, New York, NY 10005
(212) 416-8538
Robert.Arnay@ag.ny.gov

**WORD COUNT CERTIFICATION**

In accordance with Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York and the Court's Individual Practices and the Court's Order (ECF 48), I hereby certify that the MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION contains 35 pages and fewer than 12,250 words (including footnotes), exclusive of cover page, tables of contents and authorities, and signature block, as established using the word count function of Microsoft Word.

By: /s/ *Robert Arnay*

ROBERT ARNAY
Assistant Attorney General