**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

LUDLOW EXCHANGE, LLC, d/b/a NOVIG,

*Plaintiff*,

v.

LETITIA JAMES, in her official capacity as Attorney General of the State of New York; ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; and PETER J. MOSCHETTI, JR., JOHN A. CROTTY, SYLVIA B. HAMER, MARTIN J. MACK, MARISSA SHORENSTEIN, and JERRY SKURNIK, in their official capacities as Commissioners of the New York State Gaming Commission,

*Defendants*.

Case No. 26-cv-06676

**ELECTRONICALLY FILED**

**REPLY BRIEF IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1
ARGUMENT ..... 2
I. THE CEA PREEMPTS STATE REGULATION OF DCM-TRADED SWAPS ..... 2
II. SWAPS INCLUDE NOVIG'S EVENT CONTRACTS ..... 5
A. New York Has No Response To The Special Rule ..... 6
B. Defendants' Attempts To Narrow The CEA's Definition Of Swap Fail ..... 8
III. NOVIG WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF ..... 14
IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF ..... 15
CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Agric. Movement* v. *Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) .......... 5

*Bostock* v. *Clayton Cnty.*,
590 U.S. 644 (2020) .......... 11

*Commonwealth of Puerto Rico* v. *Franklin Cal. Tax Free Tr.*,
579 U.S. 115 (2016) .......... 4

*Graham Cnty. Soil & Water Conservation Dist.* v. *U.S. ex rel. Wilson*,
559 U.S. 280 (2010) .......... 12

*INS* v. *Nat'l Ctr. for Immigrants' Rts., Inc.*,
502 U.S. 183 (1991) .......... 7

*Jennings* v. *Rodriguez*,
583 U.S. 281 (2018) .......... 5

*KalshiEX LLC* v. *Johnson*,
832 F. Supp. 3d 954 (D. Ariz. 2026) .......... 3

*KalshiEX, LLC* v. *Assad*,
2026 WL 2543846 (9th Cir. 2026) .......... *passim*

*KalshiEX, LLC* v. *Flaherty*,
172 F.4th 220 (3d Cir. 2026) .......... *passim*

*KalshiEX LLC* v. *Williams*,
2026 WL 2017466 (S.D.N.Y. July 13, 2026) .......... 3

*Leist* v. *Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 1, 2

*Murphy* v. *NCAA*,
584 U.S. 453 (2018) .......... 12

*Oncale* v. *Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) .......... 13

*Opati* v. *Republic of Sudan*,
590 U.S. 418 (2020) .......... 6

*Reiter* v. *Sonotone Corp.*,
442 U.S. 330 (1979) .......... 12

*Susan B. Anthony List* v. *Driehaus*,
573 U.S. 149 (2014) .......... 14

*Tablie* v. *Gonzales*,
471 F.3d 60 (2d Cir. 2006) .......... 4

*Tom Doherty Assocs., Inc.* v. *Saban Entertainment, Inc.*,
60 F.3d 27 (2d Cir. 1995) .......... 14

*Util. Air Regul. Grp.* v. *EPA*,
573 U.S. 302 (2014) .......... 7

*Wachovia Bank, N.A.* v. *Burke*,
414 F.3d 305 (2d Cir. 2005) .......... 4

*West Virginia* v. *EPA*,
597 U.S. 697 (2022) .......... 14

**Statutes**

7 U.S.C. § 1a .......... *passim*

7 U.S.C. § 5 .......... 12

7 U.S.C. § 7 .......... 13

7 U.S.C. § 7a-2 .......... *passim*

7 U.S.C. § 13a-2 .......... 5

7 U.S.C. § 16 .......... 4, 5

15 U.S.C. § 78c .......... 9

15 U.S.C. § 8302 .......... 13, 14

N.Y. Penal Law § 225.20 .......... 5

**Other Authorities**

17 C.F.R. § 38.151(b) .......... 11

17 C.F.R. § 38.251(a) .......... 13

17 C.F.R. § 38.251(b) .......... 11

17 C.F.R. § 38.950 .......... 5

17 C.F.R. § 40.11 ........ 7

76 Fed. Reg. 44,776 (July 27, 2011) ........ 7

77 Fed. Reg. 48,208 (Aug. 13, 2012) ........ 13

91 Fed. Reg. 35,806 (June 12, 2026) ........ 7, 8, 15

## PRELIMINARY STATEMENT

Defendants contend that a preliminary injunction is not warranted because Novig, under its view, cannot establish irreparable harm. That was wrong the day Defendants filed their opposition, but it is especially wrong now. Earlier today, Defendants brought a lawsuit seeking tens of billions of dollars in penalties from another similarly situated prediction-market company. That is dispositive evidence that Novig faces the imminent harm of an unlawful and costly enforcement action. And the impropriety of Defendants' lawsuit flows from the plain language of the CEA[1], which gives the CFTC "exclusive jurisdiction" to regulate swaps that are traded on federally regulated exchanges such as Novig's. That should end the analysis. But Defendants seek to avoid the plain language of the statute in two ways. Both lack merit.

*First*, Defendants insist that the CEA's "exclusive jurisdiction" provision does not preempt state law. But Defendants' argument is contrary to long-standing Second Circuit precedent, *see Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), and was recently rejected by both the Ninth Circuit and the Third Circuit in the specific context of DCM-traded event contracts, *see KalshiEX, LLC* v. *Assad*, 2026 WL 2543846, at *7 (9th Cir. 2026) (Congress expressly preempted state law by vesting the CFTC with "exclusive jurisdiction" over the derivatives markets); *KalshiEX, LLC* v. *Flaherty*, 172 F.4th 220, 229–30 (3d Cir. 2026).

*Second*, Defendants wrongly argue that even if the CEA is preemptive, it does not preempt New York's regulation of Novig's event contracts because those contracts are not "swaps" within the meaning of the CEA. But "sports-event contracts fit comfortably within the statutory definition" of a swap. *Flaherty*, 172 F.4th at 227. To argue to the contrary, Defendants must both ignore key statutory text that Congress enacted and read in additional text that Congress did not.

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in Novig's opening brief.

The Court should not accept that invitation to err.

Most glaringly, Defendants fail to reckon with the CEA's Special Rule, which gives the CFTC the discretion to determine that an event contract is "contrary to the public interest" and therefore ineligible for listing on a DCM if it involves one of six categories, including "gaming" and "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C). The only logical upshot of the Special Rule is that "gaming" event contracts such as sports-based event contracts must be swaps that fall within the CFTC's exclusive jurisdiction. Otherwise, the Special Rule would have no purpose.

In addition to glossing over the Special Rule, Defendants commit the cardinal sin of reading language into the statute that Congress deliberately chose not to include. Nothing in the statute requires that a sporting event possess "inherent" economic value (though it often does) just as nothing in the statute requires that a weather event or drought conditions—two frequent subjects of other concededly lawful event contracts—possess inherent economic value. Defendants also read into the text additional requirements to try to carve out Novig's sports-related event contracts from the definition of "swap." But sports events do trigger economic, financial, and commercial consequences. Sports is a significant economic industry estimated to be worth over $1 *trillion*.[2]

Novig's motion should be granted.

## ARGUMENT

### I. THE CEA PREEMPTS STATE REGULATION OF DCM-TRADED SWAPS.

Despite Defendants' attempts to introduce ambiguity where none exists, the federal courts of appeals agree that the CEA preempts state law regulating swaps that are traded on a DCM. *See Assad*, 2026 WL 2543846, at *7 (§ 2(a)(1)(A) of the CEA "expressly preempts state law regulating

[2] Zakaria Anani, *The Size of US Sport: A $1+ Trillion Industry*, GLOBAL INST. SPORT (Oct. 21, 2025), https://gis.sport/news/the-size-of-us-sport-a-1-trillion-industry/.

swaps 'traded or executed on' a DCM" (quoting 7 U.S.C. § 2(a)(1)(A))); *Flaherty*, 172 F.4th at 229–30 (field preemption and conflict preemption each prohibit New Jersey from "regulating sports-related event contracts on CFTC-licensed DCMs"); *see also Leist*, 638 F.2d at 322 (§ 2(a)(1) of the CEA "preempts the application of state law"). Although a court in this district decided otherwise, *see KalshiEX LLC* v. *Williams*, 2026 WL 2017466, at *6–9 (S.D.N.Y. July 13, 2026), not even the Ninth Circuit, which ultimately ruled for the Nevada defendants, agreed with *Williams* on that point, *see Assad*, 2026 WL 2543846, at *7. Defendants' arguments thus fly in the face of the statutory text, authoritative case law, and legislative history.

a. As the Ninth Circuit recognized, the plain language of CEA § 2 expressly "preempts state regulation of swaps that are 'traded or executed' on a DCM" by giving the CFTC "exclusive jurisdiction" over such transactions. *Assad*, 2026 WL 2543846, at *7. Defendants disagree because they view a reservation of "exclusive jurisdiction" to a federal agency as an "unusual" way of preempting state law (at 21), but Defendants' view of the "usual" does not control. "[T]here are no magic words that a statute must employ to preempt state law"; "Congress need only express through the plain text that a statute preempts state law, rather than use specific language." *Assad*, 2026 WL 2543846, at *7 (citation omitted). Congress granting the CFTC "exclusive jurisdiction" plainly expresses an intent to preempt state law. And the CEA's defined scope of DCM-based swap trading eliminates concern of improper impact on the Indian Gaming Regulatory Act or implication of the private nondelegation doctrine. *See* Amicus Br. at 12–23, 29–31.

Defendants also cannot brush off settled precedent and robust legislative history showing Congress's intent to vest the CFTC with exclusive jurisdiction over federal derivatives simply by pointing out that some authorities predate the 2010 enactment of the Dodd-Frank Act and the Special Rule. Opp. at 22. These authorities remain relevant because they confirm the exclusive jurisdiction provision's preemptive effect and illustrate that the arc of the CEA's evolution has bent

towards increasing exclusive federal control over the derivatives markets. *See* Op. Br. at 4–7; *see KalshiEX LLC* v. *Johnson*, 832 F. Supp. 3d 954, 963–64 (D. Ariz. 2026) (collecting legislative history on the exclusive jurisdiction provision's adoption in 1974 and later Dodd-Frank Act amendment adding "swaps" under that jurisdiction).

b. Defendants' arguments that New York law is neither conflict preempted nor field preempted echo their arguments against express preemption, and they fail for similar reasons.

*First*, Defendants' insistence (at 24) that the presumption against preemption applies here is misplaced and contrary to the decisions of both the Third and Ninth Circuits. *See Flaherty*, 172 F.4th at 230; *Assad*, 2026 WL 2543846, at *7. Where, as here, a statute "contains an express pre-emption clause," courts "do not invoke any presumption against pre-emption." *Commonwealth of Puerto Rico* v. *Franklin Cal. Tax Free Tr.*, 579 U.S. 115, 125 (2016). The presumption would also not apply for the separate reason that the regulation of event contracts as a subspecies of derivatives is not an "area[] of regulation" that was "traditionally allocated to states." *See Wachovia Bank, N.A.* v. *Burke*, 414 F.3d 305, 314 (2d Cir. 2005).

*Second*, Defendants wrongly contend that the savings clause in § 2(a)(1)(A) and the express preemption provisions in § 16 undermine a preemptive interpretation of the statute. *See* Opp. at 24–25. The savings clause states that, "*[e]xcept as hereinabove provided*, nothing contained in this section shall [] supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A) (emphasis added). As the Ninth Circuit ruled, "[i]f the exclusive jurisdiction provision was not intended to have preemptive effect, the '[e]xcept as hereinabove provided' clause would be superfluous." *Assad*, 2026 WL 2543846, at *7; *see Tablie* v. *Gonzales*, 471 F.3d 60, 64 (2d Cir. 2006) (courts are "obliged 'to give effect, if possible, to every clause and word of a statute,' and to render none superfluous"). Conversely, recognizing the preemptive force of the CEA as applied to swaps does not make the express preemption provisions

in § 16 redundant. *See* Opp. at 24–25. Section 16(e)(2) provides a necessary complement to § 2: while § 2 broadly preempts state law only as to swaps traded on a DCM, § 16(e)(2) makes clear that state law is also preempted as to certain types of trades that do not occur on DCMs. Similarly, § 16(h) merely clarifies that States cannot use insurance law as a vehicle to regulate swaps.

*Third*, state regulation of sports-related event contracts interferes with Congress's intent as expressed in the CEA, despite Defendants' insistence to the contrary (at 25, 28–29). Providing the CFTC with "exclusive" jurisdiction sufficiently manifests an intent to bring derivatives—including swaps—under a uniform statutory scheme regulated solely by the federal government. *See Am. Agric. Movement* v. *Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). Defendants can hardly claim that they seek to complement those uniform federal regulatory efforts when New York has sued DCMs that are operating under the CFTC's jurisdiction. *See* Petition, *People* v. *KalshiEX LLC*, Index No. 453272/2026 (N.Y. Sup. Ct. July 31, 2026), Dkt. No. 1. Moreover, the CEA's grant of permission to states to sue "any person (*other than* a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader)" for "any act or practice constituting a violation of any provision of [the CEA] or any [CFTC] rule" explicitly precludes states from suing DCMs like Novig. 7 U.S.C. § 13a-2(1) (emphasis added). The statute's carve-out of a specified area in which states may exercise enforcement implies a general prohibition on state enforcement. *See Jennings* v. *Rodriguez*, 583 U.S. 281, 300 (2018).

*Fourth*, though Defendants claim otherwise (at 28–30), it is, in fact, impossible for Novig to comply with both federal and state law. As just one example, requiring DCMs to comply with New York's Penal Law § 225.20, which prohibits the possession of gambling records, would violate CFTC Core Principle 18, which requires DCMs to "maintain records." 17 C.F.R. § 38.950.

## II. SWAPS INCLUDE NOVIG'S EVENT CONTRACTS.

Novig's event contracts fall comfortably within the definition of swap, and thus the CEA

preempts New York's regulation of the contracts. Defendants' contrary arguments fail to grapple with the import of the Special Rule and read self-serving atextual limitations into the CEA.

**A. New York Has No Response To The Special Rule.**

Defendants give the Special Rule short shrift, underselling its vital role in establishing federal preemption of state law regulating DCM-traded event contracts. Defendants cite to the Special Rule merely to argue that it does not address what may be included in a swap, *see infra* at 12, 14, and that it suggests Congress intended some state laws to operate alongside the CEA, Opp. at 18–19, 25. But Defendants' conclusory assertions disregard the Special Rule's actual language and structure. The Special Rule shows that Congress both contemplated sports event contracts and assigned them to the CFTC's exclusive jurisdiction.

a. The statutory scheme does not require a DCM to obtain pre-approval before listing a contract; instead, if the DCM self-certifies the contract, then the contract is "presumptively approved under federal law." *Flaherty*, 172 F.4th at 226–27; 7 U.S.C. § 7a-2(c)(1). The Special Rule displaces that default only if the CFTC determines that a contract is contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(ii). The relevant question therefore is not whether the CFTC has blessed Novig's contracts, but whether the CFTC has prohibited them. It has not. *See* CFTC Letter, No. 25-36, at 2 n.4 (Sep. 30, 2025). And as explained below, Rule 40.11 does not do so either.

Under the Special Rule, the CFTC "may determine" that an event contract is "contrary to the public interest" if it involves one of six categories, including "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). That language confers discretion. *See Opati* v. *Republic of Sudan*, 590 U.S. 418, 428 (2020) ("[T]he word 'may' clearly connotes discretion."). The Special Rule's language does not require the CFTC to determine that a contract contravenes the public interest merely because it involves gaming or activity prohibited by state or federal law. To the contrary, the Special Rule *presupposes* that "gaming" contracts are not

inherently contrary to the public interest and *may* be traded on a DCM, subject to the CFTC's ultimate discretion. Both the Ninth Circuit and Defendants have misunderstood that scheme.

The Ninth Circuit ruled that the regulation promulgated under the Special Rule, 17 C.F.R. § 40.11, imposed a categorical ban on all event contracts covered by the Special Rule, including all event contracts that involve gaming. *Assad*, 2026 WL 2543846, at *12–14. But this reading fails to account for the interplay between Rule 40.11 and the governing statute pursuant to which it was enacted, and it ignores the CFTC's actual practices in implementing the regulation. Viewing Rule 40.11 as an outright prohibition cannot be squared with the Special Rule's discretionary structure. *Util. Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

Read properly, Rule 40.11 does not preemptively forbid event contracts that involve an enumerated category. While the Ninth Circuit read subsection (a) of Rule 40.11 in a vacuum, subsection (c) clarifies that if an event contract involves a category listed in subsection (a), the CFTC "*may*" (1) determine that the contract "be subject to a 90-day review" and (2) issue an order "approving or disapproving" the contract depending on whether it is contrary to the public interest. 17 C.F.R. § 40.11(c) (emphasis added); *see* Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,786 (July 27, 2011).

Moreover, far from prohibiting sports event contracts pursuant to its Rule 40.11 authority, the CFTC withdrew guidance and a rule proposal earlier this year that could have discouraged DCMs from offering access to such contracts.[3] And the CFTC has "consistently applied [Rule] 40.11 to operate a discretionary review framework rather than a self-executing per se prohibition." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,815

---

[3] CFTC, *CFTC Withdraws Event Contracts Rule Proposal and Staff Sports Event Contracts Advisory* (Feb. 4, 2026), https://tinyurl.com/2s3as6js.

(June 12, 2026). If that were not enough, the Special Rule's title—which the court may rely upon to resolve any textual ambiguity, *INS* v. *Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991)—confirms that the CFTC may "review and *approv[e]*" the specified types of event contracts. 7 U.S.C. § 7a-2(c)(5)(C) (emphasis added). It follows, then, that event contracts involving a statutorily enumerated category may be listed and traded on DCMs *unless* the CFTC determines otherwise.

What's more, Rule 40.11—in its current form—is coming to its end. In June of this year, the CFTC announced in its Notice of Proposed Rulemaking that it would soon replace Rule 40.11 with a detailed framework for determining on a contract-by-contract basis what types of sports event contracts satisfy the public-interest test. 91 Fed. Reg. at 35,835–37. That revision will clear up the source of Judge Lee's confusion, *Assad*, 2026 WL 2543846, at *19, and upend the Ninth Circuit's decision. It is also further proof of why Novig's request for injunctive relief is appropriate while the broader litigation and the rulemaking process proceed on an ordinary schedule.

b. The Special Rule also affirmatively shows the CEA's preemptive effect. The Special Rule expressly considers "gaming" event contracts to be swaps subject to the CFTC's jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). That provision can only make sense if gaming event contracts (*i.e.*, sports event contracts) were already swaps within the CFTC's remit. Absent that premise, after all, the CFTC would lack any authority to review or prohibit such contracts. So if Novig's sports event contracts involve "gaming," and if gaming event contracts are swaps subject to the CFTC's jurisdiction to *prohibit*, then sports event contracts must fall within the CFTC's jurisdiction to *permit*. And as Congress made clear in the CEA, that jurisdiction is *exclusive*. The combination of these premises—each of them individually unassailable—confirms Novig will likely succeed on the merits.

**B. Defendants' Attempts To Narrow The CEA's Definition Of Swap Fail.**

The CEA's text is plain: Novig's sports event contracts provide for payments dependent on occurrences "associated with a potential financial, economic, or commercial consequence." 7 U.S.C.

§ 1a(47)(A)(ii). Thus, sports-based event contracts fall "comfortably within" the statute's plain definition of "swap." *See id.*; *Flaherty*, 172 F.4th at 227. Unable to overcome that text, Defendants throw interpretive spaghetti against the wall in an effort to narrow its scope. They cannot.

a. Defendants begin (at 11–13) by claiming that sports events are not associated with potential financial, economic, or commercial consequences, and the amici put forth the same argument, Amicus Br. at 19–21. This is plainly wrong. Defendants' own description of the markets at issue (albeit under the label "gambling") belies the error of their assertion: this is "unquestionably an area of vast economic and political significance, particularly given the speed and volume of cash exchanged, state taxation, job creation, and government regulation." Opp. at 16. This concession is unsurprising: sports have become a major industry, and their results have obvious economic consequences for sponsors, broadcasters, hotels, fans, merchandisers, and the teams themselves.

Defendants can look to their own backyard for a real-world example. The New York City Economic Development Corporation estimated that the Knicks' championship run this summer generated *$380 million* from home games alone.[4] That revenue flowed to nearby bars, broadcasters, sponsors, and countless other New York businesses. For them, hedging against an early playoff exit is not the "contrived, made-for-litigation scenario[]" Defendants suggest. *See* Opp. at 19.

Faced with this factual reality, Defendants ask the Court to impose a different, atextual test that requires any associated economic consequence to be "sufficiently material and direct" and "inherent or intrinsic" to the event. Opp. at 11. Those words appear nowhere in § 1a(47)(A)(ii). Congress chose instead to frame this clause expansively to include events "associated with" "potential" economic effects. And Congress knew how to require a tighter causal relationship when it wanted one. *E.g.*, 7 U.S.C. § 1a(42); 15 U.S.C. § 78c(a)(68) (defining "security-based swap[s]"

[4] NYCEDC Monthly, *Knicks Championship Run Drives Major Economic Impact* (June 2026), https://tinyurl.com/KnicksRevenue.

based on whether the underlying event "directly affects" the issuer's "financial condition").

*Second*, Defendants' artificial distinction between an event's occurrence and its outcome is illusory. A victory is itself the "occurrence" of an event: a contract asking whether the Rangers will win pays if the event "a Rangers victory" occurs and does not pay if that event does not occur. The same contract could be phrased as asking whether the NHL will add three points to the Rangers' season total upon a victory, which is indisputably an occurrence. Either way, the payment depends on the occurrence or the nonoccurrence of an event. Defendants cannot change that merely by relabeling that event an "outcome." Ordinary usage of the term "event" confirms the point. *Event*, Webster's II New College Dictionary (3d ed. 2005) ("[t]he actual outcome or final result"); *Event*, Webster's Encyclopedic Unabridged Dictionary of the English Language: Deluxe Edition (1st ed. 2001) ("the outcome, issue, or result of anything"); *Event*, Collins Dictionary (10th ed. 2009) ("the actual or final outcome"); *Event*, Student's Dictionary of American English (2008) ("result; outcome"). Under Defendants' view, the line between an "outcome" and an "occurrence" would invite gamesmanship and uncertainty—the precise outcome that Congress sought to avoid by providing a broad, expansive definition of what constitutes a swap and by ensuring that swaps were exclusively regulated by a single federal agency. Surely, Congress did not intend this question to hinge on a semantic distinction without practical effect found nowhere in the statute.

Defendants also overlook the statutory alternative "contingency." § 1a(47)(A)(ii). Each example they identify (at 13) depends on a future uncertainty: the *possibility* that the Dodgers win the World Series, Fernando Mendoza throws four touchdowns, or BYU Football wins by seven.

The Third and Ninth Circuit have split on the meaning of "swap." The Third Circuit followed the text and rightly concluded that "sports-event contracts fit comfortably within the statutory definition" of swap because "the outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence," *Flaherty*, 172 F.4th at 227–28.

In reaching the opposite conclusion, the Ninth Circuit made the same errors that Defendants invite this Court to make: reading extra language into the statutory text. Although § 1a(47)(A)(ii) requires only that an event or contingency be "associated with" a potential economic consequence, the Ninth Circuit endorsed the district court's conclusion that "'associated with' as used in § 1a(47)(A)(ii) means that the event or contingency must be *inherently* associated with." *Assad*, 2026 WL 2543846, at *12 (emphasis added). That added word did all the work. It also did not come from Congress and, in fact, conflicts with the broader statutory scheme. After all, some swaps turn on events such as whether California will experience a drought or who will win the German parliamentary elections. Those underlying events are not "inherently" associated with an economic outcome, yet no one doubts that those events have a predictable, proximate relationship to potential economic consequences such that they satisfy the swap definition.

The Ninth Circuit also erred in scoping "event." It acknowledged the "plain-language appeal" of the ordinary reading, but nevertheless concluded that "event" and "occurrence" should be treated as distinct based on the "relevant backdrop" of "legislation involving gambling." *Id.* at *9. That move cannot be squared with bedrock principles of statutory interpretation. Context, to be sure, can illuminate statutory language, but it cannot be used to rewrite statutory text or carve out a "tacit exception" to "a more general statutory rule." *Bostock* v. *Clayton Cnty.*, 590 U.S. 644, 669 (2020). Here, Congress did not intend for the CEA's reach to depend on how different contracts with identical economic implications are phrased.

b. Unable to prevail on the text, Defendants appeal (at 13–16) to their view of Congress's intent. But congressional intent also cuts in Novig's favor.

*First*, Defendants invoke the states' traditional authority over gambling and characterize Novig as merely a sportsbook by another name. Opp. at 13–14. This argument only begs the question. Novig is an exchange. It does not set odds or earn a house "vig." Korsunsky Decl.

¶¶ 14–15. Instead, a DCM matches market participants in tradeable contracts, must ensure market-determined pricing, and must provide impartial access. 7 U.S.C. §§ 1a(6), 1a(37), 1a(51)(A); 17 C.F.R. §§ 38.251(b), 38.151(b). Those features permit hedging by "managing and assuming price risks"—one of the public purposes Congress identified for derivatives markets. 7 U.S.C. § 5(a). The relevant regulatory history is therefore longstanding federal oversight of derivatives exchanges, not state oversight of casinos and sportsbooks. Moreover, there is hardly an unbroken history of state regulation even with respect to sportsbooks because the Federal Government had assumed that responsibility for most states, including New York, at the time of the CEA's latest amendments. *See Murphy* v. *NCAA*, 584 U.S. 453, 460 (2018).

*Second*, Defendants contend (at 14–17) that other disjunctive subparts of the "swap" definition show that Congress was concerned only with instruments tied to financial measures. This is wrong on principle. *Cf. Reiter* v. *Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings."). Regardless, Defendants cannot narrow § 1a(47)(A)(ii) by importing limitations from neighboring clauses that Congress chose not to incorporate. To the contrary, the surrounding clauses of the swap definition explicitly *include* "weather swap[s]," "metal swap[s]," and "agricultural swap[s]," even though those underlying subjects are not themselves financial measures. 7 U.S.C. § 1a(47)(A)(iii); *see Graham Cnty. Soil & Water Conservation Dist.* v. *U.S. ex rel. Wilson*, 559 U.S. 280, 288–90 (2010).

The Special Rule confirms the point. Congress expressly authorized the CFTC to review "swap[s]" involving "terrorism," "war," and "assassination." 7 U.S.C. § 7a-2(c)(5)(C)(i). None of those necessarily "involv[e] financial instruments and measures that traditionally and directly affect commodity prices" as Defendants insist that covered events must. Opp. at 14. Nor can Defendants overcome Congress's language by asserting that Congress was more "concerned … by large financial institutions" than "the outcome of a football game." Opp. at 16–17. Statutes often reach

applications beyond the initial problem that prompted Congress to act, and "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

*Third*, Defendants contend (at 15 and 17–18) that Novig's reading of "swap" has no limiting principle and would convert everything from ping-pong to handshake wagers into federally regulated swaps. Those hypotheticals ignore the limits already supplied by the statute and CFTC rules.

To begin with, the phrase "associated with" requires a real relationship; it does not sweep in consequences so attenuated or speculative that virtually any activity would qualify. A children's race to the corner or a game of mini-golf with friends does not become a swap merely because the winner might buy lunch. In addition, swaps are tradeable instruments. *See* 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012). Ordinary household agreements not traded on organized markets are excluded. A traditional sports wager is likewise ordinarily a nontransferable contract with a house, which is not an instrument traded among market participants on an exchange. Finally, a DCM may not list a contract readily susceptible to manipulation. 7 U.S.C. § 7(d)(3); 17 C.F.R. § 38.251(a). Those requirements distinguish Novig's contracts from the casual wagers Defendants invoke and provide statutory limiting principles. And to the extent there are line-drawing questions regarding the scope of what constitutes a swap, Congress already expressly provided that those questions would be answered by the CFTC. 15 U.S.C. § 8302(d)(1). Defendants, by contrast, offer no administrable limit of their own. Their manufactured "inherent or intrinsic" standard (at 11) cannot exclude sports event contracts while also including other garden-variety event contracts implicating other important events such as weather- or election-based contracts.

c. Defendants finally fall back to the major-questions doctrine (at 16), arguing that Congress would not have displaced state gambling regulation without speaking clearly. Amici echo this argument. *See* Amicus Br. at 24–29. But, here, even adopting the dubious premise that this

question satisfies each of that doctrine's threshold requirements, this canon of interpretation is nonetheless inapposite because Congress spoke clearly.

Congress adopted a deliberately broad definition of "swap" and then authorized the CFTC to refine it. 15 U.S.C. § 8302(d)(1). Indeed, Congress in 2010 enacted the Special Rule, conferring exclusive jurisdiction to the CFTC to regulate "swaps" and empowering the CFTC to "review" and either "approv[e]" or "prohibit[]" event contracts that involve "gaming," 7 U.S.C. § 7a-2(c)(5)(C), which is what Defendants claim (at 16) that Congress was silent on. That is hardly the "modest," "vague," "subtle," or "elliptical language" that triggers the major-questions doctrine. *West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022). To be clear, affirming the CFTC's exclusive authority over DCM-traded sports event contracts does not displace New York's role in regulating sportsbooks given the structural differences between them.

## III. NOVIG WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Defendants' two responses misunderstand Novig's present and imminent injuries.

*First*, Defendants argue (at 31–32) that Novig can simply defend itself in a future enforcement action. This misunderstands federal law. Novig need not invite an enforcement action and expose itself to potentially ruinous liability to obtain relief. *See Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014). Defendants have already enforced laws against Novig's peers. *See People* v. *Coinbase Fin. Mkts., Inc.*, Index No. 451604/2026 (N.Y. Sup. Ct. Apr. 21, 2026). They have also refused to disavow enforcement against Novig, even though violations carry significant penalties and potential criminal exposure. Defendants, then, offer only a Hobson's choice: Novig must either cease serving New York customers or continue operating under the specter of significant sanctions. *See Tom Doherty Assocs., Inc.* v. *Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995).

*Second*, Defendants argue (at 32–33) that Novig's injury would be either "speculative" or "self-inflicted." But Defendants' enforcement against comparable exchanges, coupled with their

refusal to disavow enforcement here, makes the threat concrete and imminent. And it is not self-inflicted because Novig is not required to surrender its federal rights—or abandon an important market—to avoid injury from Defendants' threatened enforcement. Op. Br. at 23–25.

## IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.

Defendants' sole equity argument (at 33–35) is that the State and the public have an interest in enforcing New York law even where federal law preempts that enforcement. This argument runs headlong into the federal Supremacy Clause. Once Novig establishes likely preemption, Defendants cannot place the benefits of the preempted enforcement on their side of the scale.

Defendants argue incorrectly (at 34) that an injunction would endanger New Yorkers. Federal law comprehensively regulates event contracts and DCMs like Novig. DCMs are subject to ongoing CFTC oversight, including audits and examinations, and to CFTC and DOJ enforcement in the event of a violation. The CEA also imposes consumer-protection, anti-manipulation, and insider-trading requirements designed specifically for transactions on derivative exchanges. And the CFTC is actively exercising that authority in this area, including through a rulemaking directed specifically to event contracts. *See* 91 Fed. Reg. 35,806. Consistent with that regime, Novig has established and submitted Responsible Trading Standards to the CFTC.[5] Congress intended the CFTC to govern these derivatives exclusively. An injunction would only prevent New York from second-guessing that decision and the CFTC's judgment, leaving it free to enforce its laws against the casinos, sportsbooks, and traditional wagers under its purview. This arrangement represents the dual sovereignty of our constitutional system.

---

[5] *See* Letter from Elie Mishory, Ludlow Exchange, LLC Chief Regulatory Officer to Secretary of the CFTC (Aug. 12, 2026), https://www.cftc.gov/filings/orgrules/rules08132616704.pdf.

## CONCLUSION

For the foregoing reasons, injunctive relief is warranted.

Dated: September 24, 2026
New York, New York

Respectfully submitted,

*/s/ Benjamin R. Walker*

Benjamin R. Walker (4447363)
Ann-Elizabeth Ostrager (4903233)
John J. Liolos (5331053)
Jason P. Barnes (5874662)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
walkerb@sullcrom.com
ostragerae@sullcrom.com
liolosj@sullcrom.com
barnesjas@sullcrom.com

Rishabh Bhandari (*pro hac vice forthcoming*)
1700 New York Avenue, N.W.
Washington, D.C., 20006
SULLIVAN & CROMWELL LLP
Tel: (202) 956-7500
Fax: (202) 293-6330
bhandarir@sullcrom.com

*Counsel for Plaintiff Ludlow Exchange, LLC d/b/a Novig*

**CERTIFICATION PURSUANT TO S.D.N.Y. LOCAL CIVIL RULE 7.1**

I, Benjamin R. Walker, hereby certify that this document was prepared on a computer using Microsoft Word, and the page count for this memorandum of law is fifteen pages, as permitted by court order. *See* ECF Nos. 58, 63.

Dated: September 24, 2026
New York, New York

*/s/ Benjamin R. Walker*
Benjamin R. Walker

*Counsel for Plaintiff Ludlow Exchange, LLC d/b/a Novig*