UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

x

LUDLOW EXCHANGE, LLC, d/b/a NOVIG,

Plaintiff,

-against-

LETITIA JAMES, in her official capacity as Attorney General of the State of New York; ROBERT WILLIAMS, in his official capacity as Executive Director of the New York State Gaming Commission; BRIAN O'DWYER, in his official capacity as Chair and Commissioner of the New York State Gaming Commission; and PETER J. MOSCHETTI, JR., JOHN A. CROTTY, SYLVIA B. HAMER, MARTIN J. MACK, MARISSA SHORENSTEIN, and JERRY SKURNIK, in their official capacities as Commissioners of the New York State Gaming Commission,

Defendants.

x

26-cv-6676 (CM)

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

McMahon, J.:

Plaintiff Ludlow Exchange, LLC, doing business as Novig ("Novig"), operates an online exchange for so-called "event contracts." The event contracts at issue concern sports. Participants take opposing positions on whether a specified sporting event will occur or resolve in a particular way, and a trade is executed when a buyer and seller meet at the same price. Unlike more traditional forms of wagering on sporting events, Novig does not take the opposite side of any

trade; it simply operates the market in which participants are matched and "trade with" (or, perhaps, bet against) each other.

The Commodity Futures Trading Commission ("CFTC") designated Novig as a federal contract market in June 2026, and Novig began offering sports-related event contracts to customers in New York in August 2026.

New York considers the activity in which Novig (along with others) is engaged to be sports wagering – an activity that has traditionally been regulated by the several states. State law generally prohibits an entity from making a mobile sports-wagering platform available to persons in New York without first procuring a state license. New York has recently invoked its gambling laws to try to shut down activity on other businesses offering so-called "event contracts" relating to sporting events. Novig commenced this action to prevent New York officials from doing the same to it.

Novig contends that federal law defines the division of regulatory authority between the federal government and the states in this area. The Commodity Exchange Act ("CEA") defines certain agreements whose payments depend on an "event or contingency associated with a potential financial, economic, or commercial consequence" as "swaps." 7 U.S.C. § 1a(47)(A)(ii). And Congress provided that the CFTC "shall have exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market. *Id.*, § 2(a)(1)(A).

The questions presented are whether Novig's sports-related contracts fall within that definition of a "swap" – and, if they do, whether New York can prohibit Novig from operating its business unless Novig obtains a state gambling license.

At this preliminary injunction stage, the Court concludes that Novig's contracts are not "swaps" within the meaning of the Commodities Exchange Act, so New York can apply its

gambling and sports-wagering laws to Novig's activity by requiring it either to obtain a state gambling license or to prohibit the listing and trading of those contracts on Novig's designated contract market.

Accordingly, Plaintiff's motion for a preliminary injunction is denied.

## I. BACKGROUND

### A. Derivatives and the Commodity Exchange Act

The Commodity Exchange Act ("CEA") governs a class of financial instruments known as derivatives. A derivative takes its value from something else – a commodity, price, rate, index, or other specified measure or event.

The earliest federally regulated derivatives were agricultural futures, which developed in response to a basic problem confronting farmers and processors. "When an entire crop was harvested and marketed within a short time-span, dramatic price fluctuations sometimes created severe hardship[.]" *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982). For example, a bumper crop could produce an oversupply in the market, with later selling farmers suffering from the lower prices caused by the abundance of supply. A farmer could manage the risk of a price collapse by agreeing in advance to sell his crop at a fixed price; someone willing to assume the opposite risk – that there would be an undersupply in the market – could take the other side. As futures markets developed, standardized contracts could themselves be bought and sold before the date fixed for delivery – hence the term "futures trading." *Id.* at 357–59.

The resemblance between speculation in futures and the placing of bets in connection with the activity commonly known as gambling is hardly a twenty-first-century development. States in the nineteenth and early twentieth centuries sometimes treated futures transactions as wagers. An Illinois court, for example, referred to speculation in grain futures as "gambling in grain," *Cothran*

*v. Ellis*, 16 N.E. 646, 647 (Ill. 1888), and state statutes sometimes declared contracts for the future purchase or sale of commodities to be "gambling contracts" and void. *Id.* at 648. Nevertheless, the Supreme Court recognized that organized futures trading in agricultural commodities could serve economic functions quite apart from recreational gambling. *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 247–50 (1905).

Congress first attempted to regulate futures exchanges nationally when it passed the Futures Trading Act of 1921. After the Supreme Court invalidated that statute, Congress enacted the Grain Futures Act of 1922, which required covered grain futures to be traded on federally designated "contract markets." *See Curran*, 456 U.S. at 360–62 & n.17. Congress extended federal regulation beyond grain in 1936 by enacting the Commodities Exchange Act to regulate futures contracts in all types of agricultural commodities (hence the word "commodities"). Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936). Such futures contracts allowed parties – typically farmers – to hedge against the risk that the market price for their crops would change prior to the time their crops were delivered. *See Curran*, 456 U.S. at 358.[1]

At the time of its enactment, the 1936 Act expressly preserved state authority over hedging transactions; it provided that nothing in the Act should "impair any State law applicable to any transaction" governed by the federal statute. Pub. L. No. 74-675, 49 Stat. 1494 (1936). By the 1970s, however, it had become clear that the patchwork of "Varied and often conflicting" state regulation "could become a burden on commerce." 119 Cong. Rec. 41333 (Dec. 13, 1973). Accordingly, in 1974, Congress created the Commodity Futures Trading Commission ("CFTC"), an independent federal agency, to oversee trading on federally designated contract markets and to

[1] The concept of futures trading in agricultural commodities was probably best explained to the general public in the very funny 1983 movie *Trading Places*, starring Eddie Murphy and Dan Aykroyd, which featured an attempt to corner the market in orange juice futures.

administer the Act's regulatory framework. *See* 7 U.S.C. § 2(a)(1)(A). Congress also expanded the Act's reach from agricultural products to all "goods and articles . . . and all services, rights, and interests . . . in which contracts for *future delivery* are presently or in the future dealt in." Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (1974) (emphasis added).

At the same time, Congress provided the CFTC with "exclusive jurisdiction" over transactions involving derivative instruments that were listed and traded on federally registered exchanges. *See* 7 U.S.C. § 2(a)(1)(A). An entity that lists contracts on a CFTC-designated exchange is a designated contract market ("DCM"). 7 U.S.C. § 7(a). Before a designated contract maker can list a contract on a CFTC exchange, it must either request and receive approval from the Commission, see 17 C.F.R. § 40.3, or self-certify that its contracts are lawful, see 17 C.F.R. § 40.2(a).

Since 1974, Congress has continued to widen the scope of federal authority, to the point that the Act has come to reach considerably beyond its original role in connection with the marketing of agricultural products.

First, in 2000, Congress broadened the definition of commodity, breaking it into three different classes – agricultural commodities, excluded commodities, and exempt commodities – each with a different level of regulation. The newly added category known as "excluded commodities" encompassed an "occurrence" or "contingency" that is "beyond the control of the parties to the . . . transaction; and associated with a financial, commercial, or economic consequence." Commodity Futures Modernization Act of 2000, 7 U.S.C. § 1a(19)(iv), (iv)(I)-(II), Pub. L. No. 106-554, app. E, 114 Stat. 2763A-365. This definition embraced a wide variety of transactions, including those based on traditional measures like exchange rates, as well as more uncommon transactions, such as those with payouts based on interests such as "regional insured

property losses, the count of bankruptcies, [and] temperature volatilities[.]" Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). However, as hinted by the "excluded" title, trading in such commodities was largely exempt from CFTC oversight – so even as the definition of the term commodity expanded, federal oversight did not immediately grow along with it. *See* 7 U.S.C. § 2(d)(1), (d)(2), Pub. L. No. 106-554, app. E, 114 Stat. 2763A-365.

Next, the financial crisis of 2008 prompted Congress to enact the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, which aimed to "promote the financial stability of the United States by improving accountability and transparency in the financial system." Pub. L. 111-203, 124 Stat. 1376 (2010). The Dodd-Frank Act expanded the CEA's reach by bringing a new class of futures known as "swaps" within the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A), Pub. L. No. 111-203, 124 Stat. 1376, 1672. "Swaps" were defined to encompass:

> any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A)(ii).

As the Second Circuit recently observed, the Dodd-Frank Act "brought much of the swaps market within the CFTC's purview for the first time." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). The definition of "swaps" was broad enough that it encompassed excluded commodities; consequently, the exemptions of the Commodity Futures Modernization Act of 2000 – which exempted most transactions involving excluded commodities from CEA regulation – were impliedly repealed by the Dodd-Frank Act. This expansion of the CEA responded to concerns that unregulated trading in swaps, particularly those related to the housing market, contributed to the 2008 financial crisis. *Id.*

Of particular significance for our case, the 2010 amendments also implemented a "Special Rule" for the review and approval of "event contracts and swaps contracts." 7 U.S.C. § 7a-2(c)(5)(C). The Rule provides that the CFTC "may" prohibit a designated contract market from listing covered contracts "that are based upon the occurrence, extent of an occurrence, or contingency" for exchange on the market if such contracts would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress identified six categories of contracts that were subject to the Special Rule; these included contracts relating to "terrorism," "assassination," and "war" – as well as, as most relevant here, "gaming," "activity that is unlawful under any Federal or State law," and "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* A contract that the CFTC determines to be contrary to the public interest "may not be listed or made available for clearing or trading on or through a registered entity." *Id.*, § 7a-2(c)(5)(C)(ii).

The CFTC has exercised the regulatory authority granted to it by the CEA, although not always in a consistent manner. In June 2024, the CFTC released a Notice of Proposed Rulemaking specifying the types of event contracts that it would deem contrary to the public interest and so not listable for trading. *See* Event Contracts, 89 Fed. Reg. 48,968 (proposed June 10, 2024) (to be codified at 17 C.F.R. pt. 40). That notice was clear that sports event contracts would be deemed "gaming" and could not be listed. *Id.* at 48974–75. The notice was withdrawn in February 2026. *See* Event Contracts; Withdrawal of Proposed Regulatory Action, 91 Fed. Reg. 5386 (February 6, 2026).

In June of this year, the CFTC issued a Notice of Proposed Rulemaking outlining a framework to evaluate whether an event contract involves terrorism, assassination, war, gaming, or conduct that was unlawful under federal or state law – and, if so, whether such a contract would

be contrary to the public interest. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40). The proposed rule asserted that sports event contracts qualified as "swaps" and so fell within the exclusive jurisdiction of the CFTC. *Id.* at 35807-08.

On October 19, 2026, while this lawsuit and other similar litigation was pending nationwide, the CFTC published two seemingly contradictory statements. The first was a Notice of Proposed Rulemaking; the proposed rule, which, consistent with the June 2026 Notice of Proposed Rulemaking and promulgated pursuant to the Commission's authority under 15 U.S.C. § 8302(d)(1), purported to clarify the definition of the term "swap" to include "sports-, politics-, cultural-, and weather-related" event contracts. Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66,027 (proposed October 19, 2026) (to be codified at 17 C.F.R. pt. 1). The second was the announcement of an Interim Final Rule, which codified the Commission's "longstanding position that casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction." *See* Further Definition of "Swap" To Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969 (October 19, 2026) (codified at 17 C.F.R. pt. 1). The CFTC did not identify any differences between sports-related event contracts and sports-wagering contracts, such that one would qualify as a "swap" while the other would not. The Interim Final Rule does, however, make it perfectly clear that the CFTC has historically taken a hands-off position with respect to contracts that involve wagering on the outcome, score or other details of sporting events.

**B. Novig Enters the Sports Wagering Market**

Plaintiff Ludlow Exchange, LLC does business as Novig. Its parent, Novig, Inc., was founded in 2021, and Ludlow was formed on October 14, 2025 for the purpose of operating a

federally designated contract market. Dkt. No. 3, Compl., ¶¶ 18, 63, 72. Novig is headquartered in New York. *Id.*, ¶ 18.

Novig did not begin by seeking federal designation as a designated contract market. Its parent corporation originally envisioned that Novig would be engaged in state-regulated sports-wagering, and the company pursued traditional forms of licensure, obtaining an Internet Sports Betting Operator license in Colorado in 2023. *Id.*, ¶¶ 66–71.

Novig subsequently returned that license to the State of Colorado. It announced that it would be operating an exchange model regulated under the CEA. *Id.*, ¶¶ 71–72. Following that business strategy, Novig applied to the CFTC for designation as a contract market under § 5(a) of the CEA. On June 16, 2026, the Commission granted the application. Dkt. No. 25-1, *In re Application of Ludlow Exchange, LLC for Designation as a Contract Market*, Order of Designation (CFTC June 16, 2026). The Order recites, among other things, that Novig would offer trading through "an anonymous electronic central limit order book;" would be responsible for regulatory reporting, recordkeeping, investigations, and disciplinary proceedings; would clear contracts "on a fully collateralized basis by a derivatives clearing organization;" and would operate on a non-intermediated basis. *Id.* at 1–2.

The Commission found that Novig had demonstrated its ability to satisfy the requirements applicable to DCMs, subject to certain conditions imposed in the designation order. *Id.* Novig accordingly is itself the federally designated exchange; it is not merely an intermediary that routes trades to some other exchange. The contracts at issue are "listed, traded, and settled" on Novig's DCM. Dkt. No. 3, Compl., ¶ 20.

On August 4, 2026, Novig announced that it would make sports-related event contracts available to customers in New York, Dkt. No. 26, Korsunsky Decl., ¶ 20, by listing them on its

exchange and allowing consumers to take positions on sports events. Novig permits only persons twenty-one or older to trade and allows participants to impose trading and deposit limits and to lock their accounts for specified periods. *Id.*, ¶ 19.

Novig lists event contracts for many different sports on its exchange, but the Court will use, as an example, Novig's offerings for football.[2] For the football game between the New York Giants and the Philadelphia Eagles, which was played on Sunday, November 8, Novig allowed consumers to take a position on who will win the game. It offered them the opportunity to purchase "contracts" (place bets) not just on the outcome of the game, but also on "Game Lines," "Featured Parlays" and "Player Props." "Game Lines" permit consumers to take a position on what the spread (margin of victory) will be (Giants by 7.5, for instance),[3] or whether the total combined score will be over or under a certain number. A parlay is a contract that pays out if several different events all occur; for instance, a "No One Saw This Coming" parlay featured last week would pay out if Cleveland Browns defeated the New Orleans Saints, the Miami Dolphins defeated the Detroit Lions, the New York Jets defeated the Kansas City Chiefs, and the Philadelphia Eagles defeated the New York Giants. The Browns, Dolphins, Jets, and Eagles were all underdogs in their matchups, so that parlay had a whopping 111.11x payout – meaning if a consumer bought that particular contract for $100, he would receive $11,111.11 in the highly unlikely event that all four of these teams won their games (they did not; in fact, they all lost). Finally, Player Props permit consumers to take out contracts on player-specific outcomes, like how many touchdown catches

---

[2] The following information is drawn directly from Novig's app as of November 5, 2026.

[3] Spreads are offered exclusively in half point increments, presumably to ensure that every wager ends in a clear win or loss.

Malik Nabers will make, how many passing yards J.J. McCarthy will have, or how many yards Cam Skattebo will gain on the ground.

The reader will be "shocked, shocked"[4] to learn that Novig's sports event contracts bear more than a passing resemblance to sports betting. Consumers can place identical wagers on all of these event outcomes on traditional sports betting apps like FanDuel and BetMGM. *See KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1113 (9th Cir. 2026) (describing how Kalshi's sports event contracts and Caesars Sportsbook bets allow consumers to place wagers on identical events, such as the spread for a particular game).

### C. New York Gambling and Sports-Wagering Law

New York has long regulated gambling. Its Constitution provides, subject to specified exceptions, that "no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling" shall be authorized or allowed within the State. N.Y. Const. art. I, § 9(1).

The Penal Law defines gambling to occur when a person "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2). New York criminalizes knowingly advancing or profiting from unlawful gambling, *id.*, § 225.05, and specified larger-scale gambling activity, *id.*, § 225.10.

New York separately regulates mobile sports wagering. No entity may "administer, manage, or otherwise make available a mobile sports wagering platform to persons located in New York state unless licensed with the commission pursuant to this section." N.Y. Racing, Pari-

---

[4] The reference is, of course, to the famous line delivered by Captain Reynaud (played by actor Claude Rains) to Rick Blaine (Humphrey Bogart) in the immortal film *Casablanca*: "I'm shocked, shocked to find that gambling is going on in here" – delivered as he scooped up his winnings.

Mutuel Wagering & Breeding Law § 1367-a(2)(a). The law likewise provides that, "No entity shall directly or indirectly operate an unlicensed sports wagering platform in the state of New York, or advertise or promote such unlicensed platform to persons located in the state of New York." *Id.*, § 1367-a(4)(b).

New York has applied those provisions to sports-related event contracts offered through federally regulated derivatives markets. In October 2025, the New York State Gaming Commission directed KalshiEX LLC, a DCM, to cease making what the Commission regarded as an unlicensed mobile sports-wagering platform available in New York. In April 2026, the Attorney General commenced proceedings against Coinbase Financial Markets, Inc. and Gemini Titan LLC concerning sports-related event contracts. And on July 31, 2026, the State commenced an enforcement proceeding against Kalshi. Novig filed this action against the Attorney General and Gaming Commission officials in anticipation that similar enforcement action would be taken against its own sports-related contracts. Dkt. No. 3, Compl., ¶¶ 77–87.

### D. Procedural History

Novig sued New York State seeking declaratory and injunctive relief on August 5, 2026. Dkt. No. 3. The following day, it moved for a preliminary injunction. Dkt. No. 23. Its motion is supported by a memorandum of law and declarations from Benjamin Walker and Torey Korsunsky. Dkt. Nos. 24–26.

On August 11, 2026, the Court denied Novig's request for a temporary restraining order. Dkt. No. 38.

On September 10, 2026, the State filed its opposition brief. Dkt. No. 52. On September 17, 2026, the Court accepted an amicus brief from a group of 24 individual federally recognized Indian tribes and tribal organizations writing in support of the State's opposition to the motion for a preliminary injunction. Dkt. No. 62.

On September 24, 2026, Novig filed its reply in support of its motion for a preliminary injunction. Dkt. No. 68. On October 12, 2026, Novig filed a notice of supplemental authority, notifying the Court that the CFTC had issued the Interim Final Rule and the Notice of Proposed Rulemaking on October 9, 2026,[5] which are described at page 8, supra. Dkt. No. 71.

On November 5, 2026, New York filed a notice of supplemental authority, alerting the Court that a Second Circuit motions panel had issued a non-precedential summary order denying an injunction pending appeal in three consolidated cases brought by plaintiffs Kalshi and Coinbase, which raise essentially the same issues as this case. Dkt. No. 72. The Second Circuit has indicated that a merits panel will take up the issue; no date has yet been set for oral argument.

## II. LEGAL STANDARD

### A. Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In this Circuit, a preliminary injunction will be granted if the moving party shows that (1) it will suffer irreparable harm absent preliminary relief; (2) it is likely to succeed on the merits of its claim; (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). All four prongs of the test must be met for preliminary injunctive relief to issue.

[5] Although initially released on October 9, 2026, both were later updated on October 19, 2026, and are cited accordingly.

Novig, therefore, must "establish a clear or substantial likelihood of success on the merits." *New York State Firearms Ass'n*, 157 F.4th 232, 242 (2d Cir. 2025) (citation omitted). The first question, then, is whether Novig has prevailed on its claim that federal law preempts New York's application of its gambling and sports-wagering laws to the contracts at issue. If it has, the Court will separately consider whether Novig has established the other equitable requirements for an injunction.

**B. Preemption**

The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

"When a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield." *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026) (quoting *Martin v. United States*, 605 U.S. 395, 409 (2025)). The preemption doctrine, derived from the Supremacy Clause, thus serves to "invalidate[] state laws that interfere with, or are contrary to, federal law." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 414–15 (2d Cir. 2002) (internal quotations omitted).

Preemption can be either express or implied. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Express preemption arises when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Implied preemption can take the form of either field preemption or conflict preemption. Field preemption occurs where the federal regulatory scheme "is so pervasive as to make reasonable the inference that Congress left no room for the States to

supplement it." *Gade*, 505 U.S. at 98 (citation omitted). Conflict preemption arises where "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted).

The preemption categories themselves "are not 'rigidly distinct.'" *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (quoting *English v. General Electric Co.*, 496 U.S. 72, 79 n.5 (1990)). Indeed, "field pre-emption may be understood as a species of conflict pre-emption." *Id.*

Regardless of which form preemption takes, the "ultimate touchstone" of any preemption analysis is congressional intent. *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). A court must begin its analysis "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009). "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (citation omitted).

Here, Novig invokes all three theories of preemption – express, field, and conflict – to argue that New York lacks authority to regulate the sports wagering "event contract" market.

## III. DISCUSSION

### 1. <u>EXPRESS PREEMPTION</u>

Novig argues that New York's laws, as applied to the event contracts offered by Novig, are expressly preempted by the plain text of Section 2 of the CEA, which grants the CFTC

"exclusive jurisdiction" to regulate "transactions involving swaps . . . traded or executed on a [federally designated] contract market." 7 U.S.C. § 2(a)(1)(A).

Express preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress need not, however, "employ a particular linguistic formulation when preempting state law." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (quoting *Coventry Health Care of Missouri, Inc. v. Nevils*, 581 U.S. 87, 99 (2017)). Thus, whether statutory language has express preemptive force turns on what the language Congress enacted does, rather than whether Congress explicitly used the word "preempt."

Consequently, if Novig's sports event contracts are swaps, they fall within the "exclusive jurisdiction" of the CFTC, as defined by CEA.

### A. Novig's Sports Event Contracts Are Not "Swaps" Under the CEA

The CFTC's designation of Novig as a designated contract market does not resolve whether the particular contracts before the Court are swaps. The Court must therefore decide whether the contracts at issue fall within the statutory definition prescribed by Congress.

Congress defined "swap" as:

> any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(a)(ii).

The analysis begins with the language Congress enacted. Courts must "attempt to give effect to the plain meaning of each word" in a statute. *Assocs. Against Outlier Fraud v. Huron*

*Consulting Corp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016). Two portions of § 1a(47)(A)(ii) are at issue here: (1) the requirement that a contract depend on the occurrence or nonoccurrence of an "event or contingency," and (2) the requirement that the event or contingency be "associated with a potential financial, economic, or commercial consequence."

1. Novig's Contracts Depend on the Occurrence of an "Event or Contingency"

Novig describes the contracts at issue as settling by reference to a "final score, [point] margin, win-loss result, tournament advancement, or statistical performance in a professional or collegiate sporting event." Dkt. No. 3, ¶ 96. Each contract therefore makes payment depend on an event, the result of which remains uncertain when the contract is entered into. That seemingly would bring Novig's contracts within the statutory definition.

New York disagrees, arguing that Novig's contracts turn on the *outcome* of an event, but not on the occurrence or nonoccurrence of that event. *See* Dkt. No. 53 at 12–13.[6] New York proffers the example of a Kentucky Derby sports event contract. What matters is who wins the race, not whether the derby itself took place. According to New York, this means that sports event contacts do not come within the "event or contingency" prong.

Courts considering the issue have split. The court in *KalshiEX LLC v. Cafferelli*, 2026 WL 2294589 (D. Conn. Aug. 10, 2026) reasoned that "the statutory phrase 'occurrence, nonoccurence, or the extent of the occurrence of an event' is concerned with whether an event takes place and to what extent it occurs, not various outcomes of or embedded within that event." *Id.* at *7. On that reading, the Kentucky Derby is the "event," and which horse wins is merely its outcome – not the "occurrence" of an event. *Id.*; *accord KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1026

[6] Unless otherwise noted, all citations are to the ECF page number, not the page number in the underlying document.

(D. Nev. 2025). The Third and Sixth Circuits reached the opposition conclusion. Charitably, in *KalshiEX LLC v. Schuler*, 2026 WL 2884087, at *9 (6th Cir. Sept. 25, 2026), the Sixth Circuit proposed the example of the New York Giants winning the Super Bowl. The court reasoned that the issue "turn[s] on how the event itself is defined" because if the event is defined as the Giants winning, then the event occurred, whereas if the event is defined as the Super Bowl itself, then the Giants' victory is an outcome. *Id.* The court observed that nothing in the statute indicates that event must be defined in a manner that excludes outcomes and accordingly found that sports event contracts satisfy this statutory prong. *Id.*; *accord KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026).

This Court reaches the same conclusion as the Third and Sixth Circuits. The statute does not say, "event, but not the outcome of an event," nor does it limit "contingency" to uncertainty about whether the underlying game will take place. Furthermore, Section 1a(47)(A)(ii)'s phrase "extent of an occurrence" likewise shows that Congress did not limit clause (ii) to binary questions about whether an event occurs at all. It expressly included the *extent* of an occurrence. This language is hard to reconcile with an interpretation under which the statute is concerned only with whether the sports game takes place. To put it more concretely, I offer a few examples from Novig's offerings for the upcoming football game between the New York Giants and the Washington Commanders on Thursday, November 12. Whether the Giants win the game by 2.5 points or more is an event that either occurs or does not occur. Whether Cam Skattebo scores 1 or more touchdowns is an event that either occurs or does not occur. Whether the Giants score 21.5 points or more is an event that either occurs or does not occur.

These are the sort of events that are the subject of traditional (and historically state regulated) sports betting. They are also clearly events or contingencies, based on the plain meaning

of those words. Accordingly, Novig's sports event contracts – just like every wagering contract – depend on the occurrence of an "event or contingency" within the meaning of 7 U.S.C. § 1a(47)(a)(ii).

2. <u>The Relevant Events Are Not "Associated With a Potential Financial, Economic, or Commercial Consequence"</u>

To constitute a "swap," Congress also requires that the event or contingency be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). This language limits the reach of the broad definition discussed above, and the Court must give it meaningful effect.

The CEA does not define "associated with" so I begin with the ordinary meaning of the term. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012). At first blush, the plain text seems to favor Novig. "Associated with" generally means that one thing is related or connected to another. *See, e.g.*, Associate, Merriam-Webster's Advanced Learner's English Dictionary (2008) (to "happen together or are related or connected in some way"). This relation or connection need not be direct, as the ordinary meaning of "relating to" is broad. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). In Novig's view, such a broad reading is appropriate. Under that expansive view, "sports-event contracts fit comfortably within the statutory definition," because the results of sporting events promise economic consequences for sponsors, advertisers, fans, and others – including, of course, bettors. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026).

But the analysis cannot end there, for three reasons.

First, a key principle of statutory interpretation is that "a word is known by the company it keeps." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). Considering statutory definitions in context helps to "avoid ascribing to one word a meaning so broad that it is inconsistent with its

accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Id.* (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). And here, the surrounding subparts in the statutory definition of swap refer to financial and economic interests and managing financial risk. Both subpart (i) and (iii) define swap with reference to "the value [of] . . . 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, with subpart (iii) additionally including ". . . and that transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any value or level . . ." 7 U.S.C. § 1a(47)(A)(i), (A)(iii). Those subparts are found immediately before and after subpart (ii), the subpart definition at issue here. The list used in both subparts (i) and (iii) – "interest or other rates, currencies, commodities, [and] securities" – provides context about the types of transactions that Congress intended to envelope within the reach of the CEA. This informs the proper reading of subpart (ii).

Overall, the surrounding context here instructs that "associated with" cannot be read so broadly and must instead be construed "to refer to events that are inherently associated with potential financial consequences." *KalshiEX LLC v. Schuler*, 2026 WL 2884087, at *12 (6th Cir. Sept. 25, 2026); *accord KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1116 (9th Cir. 2026). Without this contextual reading, the definition of swap would be so wide that it would lose all meaning, because virtually any transaction or event carries with it a potential for economic consequences.

Second, the purpose of the CEA harmonizes with the above interpretation, as it also counsels against a broad definition of swap that includes sports event contracts. The findings and purpose section of the CEA contextualizes that the statute's aim was to "provid[e] a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7

U.S.C. § 5(a). Consider this in relation to the CEA's origin of regulating commodities futures markets. A farmer can buy a contract in the corn futures market to hedge against the risk of a price decline. That way, if the corn market craters, the farmer is protected from financial ruin even though his corn crop is nearly worthless. Thus, futures markets benefit producers, and by extension, consumers of commodities. Markets also benefit investors, as they enjoy the potential for profit by assuming the market risk that the hedger seeks to avoid. The CEA sought to encourage the benefits of futures markets, while regulating against the hazards, like manipulation. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982).

But Novig's sports event contracts are not like the transactions in futures markets targeted by the CEA. Bettors are not hedging against the economic fallout from price fluctuations. In fact, instead of hedging against risk, sports event contracts "*create* risk, largely for ordinary consumers[.]" *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1114 (9th Cir. 2026).

Novig protests, proposing examples where sports event contracts could be used to offset risk, such as a hotel's hedging against their local team's early playoff exit. Dkt. No. 3, Compl., ¶ 38. These examples are unpersuasive. Notably, Novig offers only hypotheticals, not a single real-world example of a business' hedging by purchasing a sports event contract. That absence is not surprising, because Novig's target market is not businesspeople like Hilton Hotels, who want to hedge against risks to their businesses. Novig markets its product to ordinary people who want to bet on sports games for recreational purposes. *See* Dkt. No. 52-22 (press release announcing partnership between Novig and the New York Mets). Congress drafted the CEA to regulate financial activity, like hedging against corn futures, not consumers betting on Thursday Night Football. The CEA's text must be read accordingly.

Third, the consequences of Novig's interpretation would be so breathtakingly broad as to make it highly unlikely that Congress intended its words to be read so broadly. If sports event contracts are swaps, the consequences would be far-reaching.

First and perhaps foremost, treating sports event contracts as swaps would cause widespread criminal liability. The CEA commands that it "shall be unlawful for any person . . . to enter into a swap unless the swap is entered into on" a federal DCM. 7 U.S.C.A. § 2(e). If Novig is correct, then "all sorts of commonplace gambling activity that does not currently occur on federally regulated exchanges" becomes illegal under federal law, subjecting members of the betting public to federal criminal liability. *KalshiEX LLC v. Schuler*, 2026 WL 2884087, at *14 (6th Cir. Sept. 25, 2026). That would include traditional sports betting, where state-licensed sportsbooks and casinos set the odds and facilitate the bets. But it would also, by its plain text, "encompass virtually every kind of wager that could exist, including classic casino games and charity raffles." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233 (3d Cir. 2026) (Roth, J., dissenting). Even a few informal bets between friends on a "neighborhood ping pong match" would conceivably fall within the reach of the statute, because the winning bettor profits financially and the losing bettor suffers financially, based on the outcome of the event on which they placed their bet. *Id.*

Novig cites to the Interim Final Rule, codified by the CFTC after briefing in this case closed, which outlines its "longstanding position that casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction." Further Definition of "Swap" To Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969 (October 19, 2026) (codified at 17 C.F.R. pt. 1); *see* 17

C.F.R. § 1.3 (defining "swap").[7] But the events at issue in traditional sports wagering contracts – the ones placed at casinos and on betting apps like FanDuel and DraftKings – involve exactly the same sort of "financial, economic or commercial consequences" as do the events than anchor Novig's sports "event contracts." That is because traditional bets ARE "sports events contracts." From the perspective of the customer, there is no qualitative difference between Novig's product and FanDuel's traditional sports bet. The only difference is who is on the other side of the contract.[8] Where, as here, the definition of a "swap" hangs on whether the occurrence of an event has "potential financial, economic or commercial consequences," who is on the other side of the bet is simply not a difference that makes a difference. It is impossible to escape the conclusion that traditional casino-style betting transactions would be swaps if we were to accept Novig's preferred construction of the term – no matter that the Commission says not so. So, for that matter, are casual bets among friends on local ping pong matches; they too depend on the outcome of an event that has "potential financial, economic or commercial consequences" for winner and loser, because one makes money and one loses money.

Finally, but hardly without significance, the Court need not defer to the CFTC's preferred interpretation, see *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024). In this case it would be particularly inappropriate to give the CFTC's position that Novig's contracts are swaps, but traditional sports bets are not, deference. Both sports event contracts and sports wagers are outcome dependent and have financial consequences for the contracting parties. As a result, the

---

[7] There are several Notices of Proposed Rulemaking pending in which the CFTC opines about the swap definition, see supra at 6–7. Because it is an "established point of law that proposed regulations . . . have no legal effect[,]" *Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000), the Court addresses only the Interim Final Rule and not those proposals.

[8] Novig makes its money, not off the sucker who places a losing bet on a sports event, but by charging two suckers a fee for the privilege of betting against each other on its platform. Again, not a difference that makes a difference.

Interim Rule and the proposed rule, announced on the same day, are inherently contradictory and cannot be reconciled. Furthermore, the Commission's sudden change in its longstanding position that sports wagering activity is the province of states appears calculated to influence the outcome of the ongoing litigation on this very issue. Litigation positions are not entitled to any deference at all.

Amici make the same point, but in a different context – that of the Indian Gaming Regulatory Act (IGRA), and the balance between federal, state, and tribal regulation of gaming. *See* Dkt. No. 57-1, Amicus Brief at 9. If the CEA sweeps as widely as Novig claims, then "Congress must have intended to repeal key provisions of IGRA" that apportion regulatory authority between tribes, states, and federal agencies. *Id.* at 17. To give credence to Novig's interpretation would assume that Congress "hide[s] elephants in mouseholes" – something the Court declines to do here. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). The Ninth Circuit affirmed this logic in *Blue Lake Rancheria v. Kalshi, Inc.*, 2026 WL 2728466 (9th Cir. Sept. 16, 2026), where it held "it implausible that Congress took a wrecking ball" to decades of sports gambling regulations, and concluded that, by amending the CEA, Congress did not intend to displace other federal statutes, "much less IGRA's separate regulation of gambling on Indian lands[.]" *Id.* at 14 (cleaned up).[9]

For those reasons, Novig's argument that its "event contracts" are swaps, while effectively indistinguishable traditional sports bets are not, is simply untenable. It is preposterous to suggest that Congress intended to criminalize broad swaths of gambling and impliedly repeal the IGRA

[9] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations to improve readability, without changing the meaning.

with its 2010 amendments to the CEA. The phrase "associated with a potential financial, economic, or commercial consequence" must be read in the context of its enacting statute.

The Court concludes that Novig's contracts do not depend on events or contingencies that are "associated with a potential financial, economic, or commercial consequence" within the meaning of § 1a(47)(A)(ii). Accordingly, they are not "swaps" under the CEA.

3. Novig's Sports Event Contracts Thus Do Not Fall Within the Exclusive Jurisdiction of the CFTC

Because Novig's sports event contacts are not swaps, that ends the inquiry. They do not fall within the exclusive jurisdiction of the CFTC as provided in 7 U.S.C. § 2(a)(1)(A). Thus, the CEA does not expressly preempt state laws seeking to regulate them.

This conclusion also disposes of Novig's field and conflict preemption arguments. If the CEA does not apply to sports event contracts at all, then it obviously holds no preemptive force, whether express or implied.

However, in the event that a higher court disagrees with my assessment, I will assess the preemptive impact of the statute, assuming that Novig's event contracts are swaps under the CEA.

2. **SCOPE OF PREEMPTION**

The CEA provides that the CFTC "shall have exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market (DCM). 7 U.S.C. § 2(a)(1)(A). Immediately after that provision, in the very next sentence, the statute contains two savings clauses. The first is relevant here. It reads:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission *or other regulatory authorities under the laws* of the United States *or of any State*, or (II)

> restrict the Securities and Exchange Commission and *such other authorities* from carrying out their duties and responsibilities in accordance with such laws.

*Id.* (emphasis added).

Assuming, arguendo, that Novig's sports event contracts are swaps, and that consequently they fall within the "exclusive jurisdiction" of the CFTC, there is still a question about the preemptive force of that exclusive jurisdiction, given the existence of the savings clause.

Before addressing the scope of preemption, there is one preliminary issue. In general, courts apply "a presumption against preemption with respect to areas where states have historically exercised their police powers." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010). The regulation of gambling is one such area. Courts across the nation have historically recognized that "regulating gambling is at the core of" state police powers. *See, e.g.*, *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009). However, when Congress has enacted an express preemption provision, the Supreme Court does "not invoke any presumption against pre-emption" and instead "focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125 (2016) (cleaned up). The impact of *Puerto Rico* on the interpretation of express preemption clauses, in areas traditionally regulated by the states, is not completely settled. Because some courts apply the presumption in this context and others do not, compare *Kalshiex LLC v. Williams*, 2026 WL 2017466, at *6 (S.D.N.Y. July 13, 2026) with *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1110 (9th Cir. 2026), this Court will proceed by analyzing the text, without relying on the presumption.

### A. Even If Novig's Sports Event Contracts Are "Swaps" Under the CEA, the Exclusive Jurisdiction Provision Does Not Displace All State Regulation

"If a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law

still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Thus, the interplay between the "exclusive jurisdiction" provision and the savings clause is key. Novig propounds that "shall have exclusive jurisdiction" means that the CEA prohibits New York from applying its gambling laws to Novig's event contracts, full stop. *See* Dkt. No. 24 at 20. New York acknowledges that the statute, if interpreted as Novig wishes, "has *some* preemptive effect" but disagrees as to its scope, arguing that it does not prohibit the general application of state gaming law. Dkt. No. 53 at 32.

The meaning of "exclusive jurisdiction" in this context is not immediately apparent from its text. The phrase more commonly delineates the division of jurisdiction between federal and state courts. For instance, in *Transcon. Gas Pipe Line Co., LLC v. Penn. Env't Hearing Bd.*, 108 F.4th 144 (3d Cir.), amended on denial of reh'g, 110 F.4th 612 (3d Cir. 2024), the "conferral of exclusive jurisdiction to a federal court . . . is a form of express preemption because it withdraws any concurrent jurisdiction that state courts may have over that same subject matter." *Id.* at 151–52. In contrast, preemption provisions often use explicit words, like supersede, or directly spell out the prohibition on state lawmaking. For example, in the Employee Retirement Income Security Act: "the provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a). Or, in the Airline Deregulation Act: "a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier[.]" 49 U.S.C. § 41713(b)(1). The "exclusive jurisdiction" provision is thus unlike much other statutory language that expressly preempts state law.

It is also unlike other preemptive provisions within the CEA itself. *See, e.g.*, 7 U.S.C. § 16(e)(2) ("This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops[.]"). These differences militate

against a broad reading that the CEA displaces state power to make *any* laws that apply to event contracts.

Instead, a more natural interpretation is that the CEA proscribes state laws that impinge on the CFTC's authority to regulate the licensing and operation of DCMs, but that it does not displace "ancillary regulations that only incidentally burden DCMs[.]" *KalshiEX LLC v. Schuler*, 2026 WL 2884087, at *21 (6th Cir. Sept. 25, 2026). A close examination of the text confirms this.

The first part of the savings clause explicitly reserves the "jurisdiction" of the SEC and other regulatory authorities; the second part reserves the ability of the SEC and other authorities to "carry[] out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). The import of that two-part reservation is that "jurisdiction" thus cannot encompass every duty and responsibility of the SEC and state regulatory authorities. If it did, there would be no need for the second part – it would be redundant. In general, courts presume that "a given term is used to mean the same thing throughout a statute[,]" a presumption that is "at its most vigorous when a term is repeated within a given sentence[.]" *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Accordingly, if "jurisdiction" in the savings clause does not include all regulatory duties and responsibilities, then the grant of "exclusive jurisdiction" in the sentence prior cannot either. That means that the CEA's affirmative grant of "exclusive jurisdiction" to the CFTC does not disturb most state regulatory authority.

Novig hoists *Leist* v. *Simplot*, 638 F.2d 283 (2d Cir. 1980) as a shield, arguing that the Second Circuit long-ago held that "the CEA preempts the application of state law." *Id.* at 322. However, *Leist* did not grapple with the scope of preemption issue, and nothing this Court decides here is inconsistent with it. The *Leist* court's brief mention of preemption was situated within its application of a four-factor test to determine if a private cause of action existed under the CEA.

*Id.* at 303–22. Today, the Court merely decides that the CEA's displacement of state law is limited, not that it is nonexistent.

The gambling laws that New York seeks to enforce do not inherently implicate the licensing or operation of transactions on DCMs. New York does not purport to hold the power to prohibit any operation of a DCM within its borders. Instead, it aims only to regulate betting activity that is taking place on those DCMs. And despite Novig's cloaking its operations in the terminology of a "derivatives market," there is no real dispute that the product it offers consumers is the ability to bet on the outcome of a sporting event. Novig and its CEO have loudly and repeatedly proclaimed that: "Our north star is to be the largest sports betting platform in the world[,]" Dkt. No. 52-17 at 4; "The federal government legalized sports betting in all 50 states under a financial regulatory exchange framework[,]" Dkt. No. 52-18 at 4; and "Our mission is to democratize and financialize sports betting[.]" *Id.* at 5. The Court is not required to disregard common sense – Novig's sports event contracts *are* sports betting. *Cf. Garland v. Cargill*, 602 U.S. 406, 430 (2024) ("When I see a bird that walks like a duck, swims like a duck, and quacks like a duck, I call that bird a duck.") (Sotomayor, J., dissenting). New York has longstanding authority to regulate sports betting within its borders. The CFTC has disclaimed any intention to regulate traditional sports betting, in its Interim Final Rule; since there is no practical difference between Novig's events contracts and FanDuel's sports bet, the Commission must intend that New York can regulate the betting activity inherent in Novig's operation.

New York's regulation of sports betting on Novig's DCM is not included in the preemptive sweep of the CEA. An example from another state illustrates the line that the Court draws here. In May 2026, Minnesota lawmakers enacted a statute that criminalized the operation of prediction markets, a term which includes federal DCMs, within the state. *See* Minn. Stat. § 609.7615, subd.

2. There, the district court found the statute was likely "at least in part expressly preempted by 7 U.S.C. § 2(a)(1)(A)'s exclusive jurisdiction provision." *United States v. Minnesota*, 2026 WL 2150211, at *15 (D. Minn. July 27, 2026).[10] In doing so, the court observed that the case did "not concern any effort by Minnesota to apply its existing sports-betting laws to Kalshi or Polymarket[.]" *Id.* at *10 n.17. This demonstrates the limited breadth of the CEA's preemption. States may not directly regulate the operation or licensing of DCMs themselves – that is properly the jurisdiction of the CFTC – but the CEA does not prevent the incidental application of state gambling regulations.

**B. The Result Is the Same Under Both Field and Conflict Preemption**

The above analyzes the preemptive force of the "exclusive jurisdiction" provision in 7 U.S.C. § 2, assuming arguendo that Novig's sports event contracts are swaps and that thus the provision expressly preempts state law to some extent. Supreme Court precedent "supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995). As such, the Court will briefly address both field and conflict preemption, keeping in mind that the existence of an express preemption provision counsels against a finding of implied preemption. Additionally, because both types are forms of implied preemption, the command of *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115, 125 (2016) to disregard the presumption against preemption does not apply. For that reason, and because gambling is an area "where states have historically exercised their police powers[,]" *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104

[10] The Court offers *United States v. Minnesota* only as an example and expresses no opinion about the other reasoning or ultimate outcome in the case.

(2d Cir. 2010), the presumption applies and the Court relies on cases invoking the presumption against preemption below.

i. Field Preemption

Field preemption occurs where the federal regulatory scheme enacted by Congress evinces a "decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012). Accordingly, "in rare cases, the Court has found that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (cleaned up). Novig argues that field preemption applies because the text and structure of the CEA demonstrate Congress' intent to "to create a uniform, comprehensive set of federal rules to occupy the field with respect to derivatives, including event contracts, traded on DCMs." Dkt. No. 24 at 27. Novig further asserts that the Special Rule's grant of power to *prohibit* gaming event contracts means that the CFTC has exclusive jurisdiction to *permit* gaming event contracts. *See* Dkt. No. 68 at 13.

Novig's field preemption arguments fail, for several reasons.

To start, other provisions in the CEA demonstrate that Congress knew how to displace state regulation of gambling and chose not to do so with the exclusive jurisdiction provision. One such provision, § 16 of the CEA, provides that "This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops . . . in the case of" limited classes of swaps that are not at issue in this case. 7 U.S.C. § 16(e)(2). That Congress spelled out preemption of gambling in another provision undermines Novig's argument that § 2(a)(1)(a), the exclusive jurisdiction provision, impliedly occupies the field – if it did, there would be no need for § 16(e)(2).

Second, as stated above, the existence of an express preemption clause is not dispositive but suggests there is no implied preemption. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995).

Finally, the Special Rule's grant of authority to the CFTC in relation to certain categories does not mean it displaces all state regulation of those categories. In fact, the Special Rule expressly contemplated a role for state input in defining one of the categories as "activity that is unlawful under any Federal or State law[.]" 7 U.S.C. § 7a-2(c)(5)(C)(i). Furthermore, at the time Congress enacted the Special Rule in 2010, federal law largely prohibited sports gambling, see *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 458–461 (2018), which makes it "difficult to imagine that Congress intended the CFTC to exclusively regulate whether sports-event contracts could be on DCMs, when those contracts did not even exist at the time." *KalshiEX LLC v. Schuler*, 2026 WL 2884087, at *25 (6th Cir. Sept. 25, 2026). For those reasons, Novig fails to show a likelihood of success in arguing that the CEA field preempts New York's gambling laws as applied to sports event contracts.

ii. <u>Conflict Preemption</u>

Lastly, the Court considers conflict preemption. Novig argues that New York's gambling laws are an "untenable obstacle" to Congress' goals in enacting the CEA and that it cannot comply with both federal law and state gambling law. Dkt. No. 24 at 29–30. Novig cites an order issued by the CFTC on August 11, 2026, which directs Kalshi (another DCM that offers sports event contracts) to continue operating its exchange as normal ("Kalshi Order"), even as the New York Attorney General pursues a temporary restraining order that would prohibit the listing of sports event contracts. *See* Dkt. No. 41. Novig contends that the Kalshi Order underscores that it faces an irreconcilable conflict between state and federal law.

There are three problems with Novig's propositions.

First, while the current CFTC clearly believes that the CEA preempts any application of state gambling laws to sports event contracts, this Court owes no deference to that determination. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024). As discussed above, the text and context of the statute make clear that the CEA has limited preemptive effect, which means that state gambling regulations are not obstacles to the CEA's federal objective.

Second, the Kalshi Order smacks of a collusive effort between a regulator and regulatee to generate a claim for conflict preemption. The Court rejects that attempt and notes that the currently effective regulation, implemented pursuant to the Special Rule, prohibits the listing of event contracts that relate to gaming. *See* 17 C.F.R. § 40.11. As such, even if the Court were to defer to the CFTC, under the CFTC's own regulations, Novig's "listing of these [sports event] contracts is unlawful[.]" *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1116 (9th Cir. 2026).[11] This reality betrays that the proffered conflict between CFTC regulation and state laws is a mirage; in fact, they are complementary in that they both disapprove of unlicensed gambling via sports event contracts.

Third, Novig's situation does not meet the demanding standard for conflict preemption where "it is impossible for a private party to comply with both state and federal law[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). The standard is not met "If there was any available alternative for complying with both federal and state law—even if that alternative was not the most practical and cost-effective[.]" *In re Methyl Tertiary Butyl Ether (MTBE)*

[11] The Court is aware that the CFTC issued a Notice of Proposed Rulemaking that amends 17 C.F.R. § 40.11 and would likely permit the trading of sports event contracts as not contrary to the public interest. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,835 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40). However, it is an "established point of law that proposed regulations . . . have no legal effect[,]" *Sweet v. Sheahan*, 235 F.3d 80, 87 (2d Cir. 2000), so the Court gives no weight to the not yet codified amendment.

*Prods. Liab. Litig.*, 725 F.3d 65, 99 (2d Cir. 2013). Here, Novig complains that, to comply with New York laws, it would need to obtain a gambling license and restrict its services to people physically located in the state. Dkt. No. 24 at 30. Novig further claims that it cannot comply with New York's Penal Law § 225.20, which proscribes the possession of gambling records, and 17 C.F.R. § 38.950, which obligates DCMs to maintain records. Dkt. No. 68 at 10.

But Novig's argument is ridiculous. Although Novig does not want to obtain a license from New York State, it certainly could do so (as it did in Colorado, before it reversed course and decided to contend that it was not in the sports wagering business). And it could implement geofencing so that it serves only customers who are physically in New York. Pursuing those alternatives would permit Novig to continue operating its DCM. And Penal Law § 225.20 only sanctions the keeping of records in relation to gambling activity "not specifically authorized by law." N.Y. Penal Law § 225.00(12); *see* 225.00(9)–(10). If Novig successfully pursued licensing through New York regulators, its offerings, obviously, would be explicitly authorized by law. And if Novig desires to operate nationally, it can pursue an operating license in every state that permits sports betting. For instance, FanDuel's Sportsbook product is offered in 24 different states – there is no reason that Novig could not follow that same model.

Therefore, because Novig could comply with both state and federal law and because state gambling laws do not defeat the objective of Congress in enacting the CEA, Novig has failed to establish the existence of conflict preemption.

## IV. CONCLUSION

For the foregoing reasons, Novig has failed to establish a likelihood of success on the merits. Accordingly, the Court rejects its motion without reaching the other equitable requirements for a preliminary injunction.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. No. 23.

This constitutes the Opinion and Order of the Court. It is a written decision.

Dated: November 10, 2026
New York, New York

Colleen McMahon

U.S.D.J.